IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

|  |  |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF FLORIDA; KEN DETZNER,<br>Secretary of State, in his official capacity.<br><br>Defendants. | CIVIL ACTION NO.<br>4:12-CV-00285-RH-CAS |

## THE UNITED STATES' MOTION
## FOR A TEMPORARY RESTRAINING ORDER

## I.   INTRODUCTION

Plaintiff United States of America, pursuant to Rule 65(b) of the Federal Rules of Civil

Procedure, respectfully requests that this Court enter a temporary restraining order to compel the

State of Florida's compliance with Section 8 of the National Voter Registration Act of 1993

("NVRA"), 42 U.S.C. § 1973gg-6.  The State is conducting a program "the purpose of which is

to systematically remove the names of ineligible voters from the official lists of eligible voters,"

within 90 days of the August 14, 2012 primary election for Federal office.  42 U.S.C. § 1973gg-

6(c)(2)(A).  Section 8(c)(2)(A) of the NVRA expressly forbids such removal programs during

the 90-day period, with a few exceptions that do not apply here.  *See* 42 U.S.C. § 1973gg-

6(c)(2)(A).  On June 15, we notified the State of Florida of this motion for a temporary

restraining order and will serve the Defendants with copies of this memorandum and supporting

exhibits.[1]  To prevent irreparable injury to voters, the United States requests that this Court grant a temporary restraining order to preserve the status quo and may seek the opportunity to conduct limited discovery prior to any preliminary injunction hearing.

Defendant Secretary of State Detzner has recently undertaken verification procedures for the purpose of conducting systematic voter list maintenance, and that removal activity has continued within 90 days of a Federal election, in contravention of Section 8(c)(2)(A) of the NVRA, 42 U.S.C. § 1973gg-6(c)(2)(A).  The Florida Division of Elections worked with the Florida Department of Highway Safety and Motor Vehicles ("DHSMV") to identify registered voters who potentially lack citizenship, by matching database records of the Florida Department of State with those of DHSMV ("the database matching program").  The program, however, has captured hundreds of eligible citizen voters, and county Supervisors of Elections ("Supervisors") directed by Defendants to use this list have found it to be unreliable and prone to serious error.  *See* Exhibit 1, ¶¶ 11-12 (Declaration of Ion V. Sancho, Leon County Supervisor of Elections); Exhibit 2 (May 31, 2012 Letter Miami-Dade County to Department of State).

Despite warnings from the United States that the Defendants were violating Section 8 of the NVRA, Defendants have refused to alter their course and continue to direct counties to remove voters based on this flawed list, in violation of Section 8 of the NVRA.  *See* Exhibit 3 (Letter of May 31, 2012, from Department of Justice to Florida Secretary of State, at 2); Exhibit

---

[1] In addition, process was served on the same day that the Complaint was filed.  *See* Local Rule 7.1(B).

The United States is prepared to provide oral argument on its motion for a temporary restraining order, if the Court so requests.  *See* Local Rule 7.1(D).  If the Court sets a hearing date on the United States' motion, the United States notes that the District Court for the District of Columbia in *Florida v. United States*, 1:11-CV-1428 (D.D.C.) has set oral argument for June 21 in that judicial preclearance action under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, to which both the United States and the Florida Department of State are parties.

4 (Letter of June 6, 2012, from Florida Secretary of State to Department of Justice); Exhibit 5 (Letter of June 11, 2012, from Department of Justice to Florida Secretary of State).[2]

Accordingly, the United States asks this Court to enjoin Defendants from enforcing any program to systematically remove registered voters in violation of the NVRA within 90 days of both the August 14, 2012 Federal primary (as the 90-day period before the August 2012 primary began May 16, 2012) and the November 6, 2012 Federal general elections (as the 90-day period before the November 2012 election pre-dates the August 14th primary). The proposed temporary restraining order would further require Defendants to take all steps necessary to ensure that no registered voter identified through the database matching program was removed or will be removed from the rolls starting on May 16, 2012, absent application of one of the statutory exceptions in Sections 8(a)(3)(A) & (B) and 8(a)(4)(A) of the NVRA.

## II. FACTUAL AND LEGAL BACKGROUND

The NVRA, which governs only elections for Federal office, was adopted pursuant to Congress' Elections Clause authority. *See* 42 U.S.C. §§ 1973gg(b); 1973gg-2, 1973gg-6. The Elections Clause of the U.S. Constitution "gives a broad grant of power to Congress, allowing it to define the boundaries of state transgressions and to remedy any wrongdoing" in the context of elections for Federal office. *See Harkless v. Brunner*, 545 F.3d 445, 454 (6th Cir. 2008). This provision of the Constitution gives "Congress plenary authority over Federal elections but also explicitly ensured that all conflicts with similar state laws would be resolved wholly in favor of the national government." *Id.* at 454-55.

---

[2] This Court recently issued a preliminary injunction against the State of Florida for violating other provisions of the NVRA, finding that the State's "harsh and impractical" 2011 changes to its voter registration law at issue in that case served no legitimate purpose and would discourage voter registration drives. *See* Order, *League of Women Voters v. Browning,* 4:11-CV-628, at pp. 2 & 8 (2012 WL 1957793 at *1 & *4)(S.D. Fla. May 31, 2012) (granting preliminary injunction) (Exhibit 6). In this matter, the State of Florida is again engaging in practices that violate the protections Congress established in the NVRA.

**A.    Congress Struck a Careful Balance in Section 8 of the NVRA When Creating the 90-Day Rule Against Systematic Purges Before Federal Elections.**

The NVRA reflects congressional findings that the right to vote is a fundamental right, the exercise of which Federal, state, and local governments have a duty to promote. *See* 42 U.S.C. § 1973gg(a).  Congress specifically found that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities." 42 U.S.C. § 1973gg(a)(3).

Congress enacted the NVRA to increase the number of eligible citizens who register to vote in Federal elections, to enhance the participation of eligible citizens in Federal elections, to protect the integrity of the electoral process, and to ensure that accurate and current voter registration rolls are maintained. *See* 42 U.S.C. § 1973gg(b).  Thus, one primary purpose of the NVRA is to make it possible for state and local governments to implement its provisions "in a manner that enhances the participation of eligible citizens as voters in elections for Federal office." 42 U.S.C. § 1973gg(b)(2); *see also ACORN v. Miller*, 129 F.3d 833, 835 (6th Cir. 1997) (holding that Congress passed the NVRA "[i]n an attempt to reinforce the right of qualified citizens to vote").  Under Section 8 of the NVRA, States are required to conduct general programs to ensure the maintenance of an accurate and current voter registration list.  42 U.S.C. § 1973gg-6(a)(4).  The NVRA mandates that such programs be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965." 42 U.S.C. 1973gg-6(b)(1).

Congress also mandated that systematic programs designed to remove the names of ineligible voters from the voter rolls must be completed 90 days before the date of a primary or general Federal election.  42 U.S.C. § 1973gg-6(c)(2)(A).  The statute includes limited exceptions to this 90-day quiet period, and authorizes systematic voter removal programs within

90 days of a Federal election *only* (1) at the request of the registrant; (2) if the registrant is disqualified under state law by reason of criminal conviction or mental incapacity; and (3) if the registrant has died. 42 U.S.C. § 1973gg-6(c)(2)(B); *see also id.* § 1973gg-6(a)(3)(A) & (B), (a)(4)(A). Absent an explicit exception identified in the statute, "[a] State *shall complete*, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." *See* 42 U.S.C. § 1973gg-6(c)(2)(A) (emphasis added).

**B.      Florida Is Conducting a Systematic Removal Program Based on an Unreliable Database Matching Program During the 90-day Quiet Period.**

The State of Florida has generated a list of potential non-eligible voters, by comparing records contained in the state voter registration database (the Florida Voting Registration System ("FVRS")) with data from the Florida DHSMV's Driver and Vehicle Express system ("DAVE"). The State did not notify the county Supervisors of this new program until April 2, 2012. *See* Exhibit 1, ¶ 6 (Sancho Decl.). According to news reports, the State was in possession of a list of 180,000 potentially ineligible non-citizen registered voters.[3] *Id.* ¶ 5. In early April, the State distributed a list of approximately 2,700 voters to counties across the state. *Id.* ¶¶ 5-6; *see also* Exhibit 7 (April 2, 2012 email). The number of potential non-citizens (2,700) identified by the State is small compared to the total number of voters registered in the State of Florida, and news reports and the experience of Miami-Dade County indicate that many of those 2,700 individuals are, in fact, citizens eligible to vote. Exhibit 1, ¶¶ 5, 6; *see also* Exhibit 2 (Miami-Dade letter); Exhibit 11 (Marc Caputo, *How Rick Scott's Noncitizen Voter Purge Started Small and Then Blew Up*, MIAMI HERALD at 3 (JUNE 12, 2012), available at

---

[3] To date, the Supervisors of Elections have not seen that purported list. *See* Exhibit 1, ¶ 5.

http://www.miamiherald.com/2012/06/12/v-print/2846319/how-rick-scotts-noncitizen-voter.html).

The State presented a training/webinar about the program on April 12, 2012 and sent the Supervisors a copy of this webinar, which included written instructions on implementing the program, on April 23, 2012. *See* Exhibit 1 ¶ 6, Ex. A1 (April 23, 2012, email to the Supervisors of Elections) and Ex. A2 (PowerPoint presentation on "Processing Ineligible Registered Voters-Non-Immigrants").

The April 23, 2012 email informed the Supervisors that "The SOE website has been updated with a revised PowerPoint presentation for List Maintenance of Potential Non-Citizen Matches. . . . Also, a sample word document and form is provided for your convenience." Exhibit 1, ¶ 6, & Ex. A1. The email included (1) a PowerPoint webinar presentation entitled "Processing Ineligible Registered Voters-Non-Immigrants"; (2) a sample letter to send to voters; and (3) a voter eligibility form. Exhibit 1, ¶ 8 & Exh. A2-A4.

The Secretary of State's April 2012 webinar instructed each Supervisor of Elections to take the following steps after receiving the State-generated list of potential non-citizens who are current registered voters:

> Follow steps in section 98.075(6) and (7), F.S., as you would for any other potentially ineligible voter: (1) **Review file** information . . . (2) **Conduct** any additional **research** [Refer to whatever other sources you have to confirm identity and potential change in legal status. You should all have access to DHSMV's DAVE. If you find information credible and reliable, proceed.] (3) **Initiate notice (within 7 days)**. . . . (4) **Allow voter 30 days to respond** (if you receive verification that mail delivered), (5) **Publish notice** only if notice undeliverable . . . (6) **Provide hearing** ONLY if person denies eligibility AND person requests hearing. . . (7) **Review** proof of U.S. Citizenship **if provided** . . . (8) Determine **eligibility** of person based on information you have . . . (9) **If ineligible, remove voter's name** from rolls.

Exhibit 1, ¶ 7 & Exh. A2 at 8-18 (emphasis in original).

As noted above, in addition to the webinar, the Secretary of State's April 23, 2012 email contained links to two sample documents. Exhibit 1, ¶ 8. The first document is a model letter for Supervisors to send to the voters identified on the State-generated list. The notice provides, in relevant part, that **"[i]f you fail to respond within thirty (30) days, we may determine that you are ineligible and remove your name from the voter registration rolls. You will then no longer be eligible to vote."** *Id.*, Exh. A3 at 1 (emphasis in original). The document places the burden on the voter to disprove their lack of eligibility.[4]

The second sample document attached in the April 23 email, entitled "Voter Eligibility Form," is the model form the State provided to Supervisors to send to those individuals identified as potential non-citizens for purposes of confirming their eligibility (*i.e.*, citizenship). The form states, "You have been identified as potentially ineligible to be registered to vote . . . If you do not respond with thirty (30) days after receiving this notice, the supervisor of elections may determine that you are ineligible to be registered to vote and remove your name from the voter registration system." *Id.*, Exh. A4. The form also instructs the registered voter to check one of several boxes offered; if a voter is eligible, the voter is instructed to check the box affirming, under penalty of perjury "that the information that I am ineligible is **inaccurate**" and that the voter is either requesting a hearing or is not requesting a hearing but is attaching certain documents. *Id.* (emphasis in original). Finally, the form states that "[i]t is a criminal offense to knowingly make a false statement in writing with the intent to mislead a public official in the performance of his or her official duty." *Id.*

---

[4] As one experienced Supervisor of Elections has observed, voters may not open their mail, may be away from the county during the 30 day period, or otherwise may not respond to the letter. Exhibit 1, ¶ 14. In addition, many citizens may be offended at having their citizenship questioned as a result of these procedures, or may even feel intimidated if they are a newly naturalized citizen who is being questioned about whether he or she can vote. *Id.*

During the week of May 13 to May 17, the FSASE held its 2012 summer conference in Tampa. Exhibit 1, ¶ 9 & Ex. A5. On May 16, 2012, (the third day of the conference) the State had a presentation on the voter purge procedures, which the Florida Division of Elections material refers to as the "Non US Citizen Project." *Id.*, A6 at slide 10. May 16 was also the 90th day before the August 14, 2012 Federal primary election in the State of Florida. *See* Complaint ¶ 9.

The meeting started late because the Supervisors of Elections were discussing their serious concerns about the State's proposal, which was the most contentious issue discussed at this conference. Exhibit 1, ¶ 10. The Director of the Division of Elections, Dr. Gisela Salas, and Maria Matthews, an attorney from the Department of State's Office of General Counsel, presented information about the FVRS data-matching program intended to remove purported ineligible non-citizens from the lists of registered voters. *Id.* The topic was controversial, and provoked a strong reaction among the Supervisors in attendance, who described citizens who were outraged that their citizenship had been questioned because they received a letter as a result of the State's program. *Id.*

During the May 16 presentation, the Supervisors confronted the speakers with many questions and objections. Exhibit 1, ¶ 10. Specifically, the Supervisors voiced serious concerns that the State-generated lists of alleged ineligible voters contained too many "false positives." *Id.* When asked how this problem would be corrected, Dr. Salas responded that the Supervisors would have the burden of verifying the accuracy of the information contained on the lists. *Id.* Dr. Salas and Ms. Matthews suggested that there may be other, more accurate methods of database matching voter records in FVRS for purposes of identifying possible non-citizens, including the use of a Federal database; they further suggested that the Supervisors should use

that Federal database to verify the eligibility of the voters in question. *Id.* The Supervisors spoke out against this proposal, however. *Id.* They questioned why the Division was tasking them with this additional burden, which included costs to access the database that were not budgeted for by the Supervisors. *Id.* Some Supervisors told the State officials that they could not achieve what the State was demanding. *Id.* As a result of this interaction, on Thursday, May 17, 2012, Dr. Salas announced that the State would bear the burden of conducting further verification regarding the accuracy of the information in the State-generated list. *Id.* Since the conference, the State has not addressed the Supervisors' concerns whether any database matching by the State (using a Federal database or otherwise) will produce a more accurate list. *Id.*

As noted above, the State's database matching program that resulted in the list of about 2,700 alleged ineligible non-citizen voters relies on outdated and inaccurate data; consequently, the resulting list has erroneously identified numerous eligible citizen voters who are already registered to vote. *See, e.g.,* Exhibit 2 (Miami-Dade Letter); Exhibit 1, ¶¶ 11-13. Specifically, in the case of Miami-Dade County, for example, out of 1,637 voters identified as potential non-citizens, the County found errors with 65 records, including (1) duplicates, (2) individuals who were citizens identified by the Miami-Dade Supervisor of Elections through the DHSMV database, (3) deceased voters (whose names had previously been removed from the FVRS), and (4) registered voters from other Florida counties (whose names already appear in the FVRS). Exhibit 2, at 2. Of the remaining 1,570 voters, 446 provided proof of citizenship and 32 advised that they were citizens and would provide documentation, as of May 31, 2012. *Id.* The County had not heard from hundreds more who were on the list. *Id.*

On May 31, 2012, the United States notified Defendant Detzner that the State's database matching program "appears to be a program to systemically remove the names of potentially ineligible voters from the official list of eligible voters within the meaning of Section 8 of the NVRA, and does not appear to fall within any of the exceptions allowed within the 90 day period before a federal election." *See* Exhibit 3 at 2. The letter further advises that "[b]ecause Florida's primary election for federal office is August 14, 2012, that 90-day period began on May 16, 2012." *Id.*

On June 1, 2012, Ron Labasky, the attorney for the Florida State Association of Supervisors of Elections, sent a memo to Supervisors of Elections noting that the Department of State was inquiring about the status of the voter removal efforts based on the database matching program. Exhibit 1, Ex. A7. Mr. Labasky also referred to the Department of Justice's letter and offered his advice that "under these circumstances, and based upon the previous issues that have been presented concerning the list, as well as the fact that the Department [of State] has indicated its intent to take further actions to review its list to determine its validity, I recommend that Supervisors of Elections cease any further action until the issues . . . raised by the Department of Justice are resolved between the parties or by a Court." *Id.* at 2. News reports indicate conflicting accounts of the extent to which Supervisors of Elections have or have not ceased removing voters after the advice was issued.

In a letter dated June 6, 2012, Jr., Defendant Detzner responded that the Defendants intended to proceed with their database matching program. Exhibit 4. In addition, Defendant Secretary of State publicly stated that the database matching program is consistent with Federal law and that the State will continue to conduct this program. *Id.* On June 11, 2012, the United States informed the State that because Florida had indicated its unwillingness to comply with the

requirements of the NVRA, the Assistant Attorney General for the Civil Rights Division had

authorized an enforcement action against Florida.[5]  *See* Exhibit 5.

On the same day, June 11, the State of Florida filed a lawsuit in the U.S. District Court of

the District of Columbia against the U.S. Department of Homeland Security, demanding access

to the Systematic Alien Verification for Entitlements Program System of Records (the "SAVE"

Program). *See* Exhibit 8 (Complaint, 1:12-CV-960 (D.D.C. June 11, 2012)). The complaint

does not address any of the NVRA claims at issue in this case, but instead raises claims under the

Administrative Procedure Act and the Mandamus Act. *See id.* at 13-15.

As the Department outlined in its letter, the Department of Homeland Security explained

to the State of Florida as early as October 2011 that the SAVE Program contained limited

information on some categories of non-citizens and required "unique identifiers, such as alien

registration numbers or certificate numbers found on immigration-related documents" that the

Division of Elections said it did not collect. Exhibit 5, at 3. This information is confirmed by

the State's own emails, attached to its June 6, 2012 letter. *See* Exhibit 4 at p. 16 of the pdf (Oct.

24, 2011 email from Matthews to Roth) (admitting that the SAVE database does not include all

potential non-citizens, and that any programmatic match with SAVE requires additional

information which the Division of Elections does not collect). Regardless of whether access to

the SAVE database might provide a more accurate data-matching program than the one the State

---

[5]  In its letters, the United States also noted that the State had not obtained preclearance under
Section 5 of the Voting Rights Act as to its new database matching procedure. *See* Exhibits 3 &
5. The State may not implement this new procedure in the five counties in Florida that are
subject to Section 5 of the Voting Rights Act, absent judicial preclearance in the U.S. District
Court for the District of Columbia or administrative preclearance by the Attorney General. *See*
42 U.S.C. § 1973c. Private parties recently brought an enforcement action against the State in
the Middle District of Florida for its failure to obtain Section 5 preclearance before implementing
these changes in the covered counties. *See Mi Familia Vota Education Fund v. Detzner*, 8:12-
CV-1294 (M.D. Fla. June 8, 2012).

currently has, and assuming Florida takes the necessary steps for participation in the SAVE

program, Florida is not permitted to conduct "any program the purpose of which is to

systematically remove the names of ineligible voters" within 90 days of a Federal election. *See*

42 U.S.C. § 1973gg-6(c)(2)(A).

As outlined below, the United States is likely to succeed on the merits of its claim that the

Defendants' systematic efforts to investigate, verify, and potentially purge voters from the rolls

within 90 days of Florida's August 14, 2012 primary election violates Section 8 of the NVRA,

42 U.S.C. § 1973gg-6 (c)(2)(A). The State must comply with the NVRA's requirements

notwithstanding the outcome of the State's lawsuit to obtain information from the SAVE

database. Because the State continues to direct counties to remove voters based on its flawed

database matching program, we respectfully request the court grant the injunctive relief sought.

## III. ARGUMENT

### A. The United States Is Entitled to an Injunction to Prevent Defendants' Noncompliance with the NVRA

The standard for determining whether a temporary restraining order should be granted is

similar to the standard for a preliminary injunction. *United States v. Metropolitan Dade County,*

*Fla.*, 815 F. Supp. 1475, 1477 (S.D. Fla. 1993). The Eleventh Circuit generally weighs four

traditional equitable considerations in determining whether preliminary relief is appropriate.

These factors are (1) likelihood of success on the merits, (2) the irreparable injury to the movant,

(3) "the threatened injury to the movant outweighs whatever damage the proposed injunction

may cause to the moving party," and (4) "if issued, the injunction would not be adverse to the

public interest." *Charles H. Wesley Educ. Found. Inc., v. Cox*, 408 F.3d 1349, 1354 (11th Cir.

2005) (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)(en banc)); *see also* Order

*League of Women Voters of Florida v. Browning*, No. 4:11-CV-628, slip op. at p. 3 (N.D. Fla.

May 31, 2012) (2012 WL 1957793 at *1) (order granting preliminary injunction) (Exhibit 6). "The requirements for injunctive relief are met when the government establishes that defendants have violated the statute and there exists 'some cognizable danger of recurrent violation.'" *See United States v. Sene X Eleemosynary Corp.*, 479 F. Supp. 970, 981 (S.D. Fla. 1979) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)).

### B. Equitable Factors Strongly Favor Injunctive Relief in This Case.

#### 1. Likelihood of Success on the Merits.

The United States is likely to succeed on the merits of its claims because Florida's systematic purge program violates the NVRA's requirement to complete any such program before the 90th day preceding the state's primary election for Federal office, and because Florida's error-ridden and over-inclusive purge violates the NVRA's mandate that list maintenance programs be uniform and nondiscriminatory and comply with the Voting Rights Act.

First, there can be no dispute that Florida is conducting a systematic purge program within the proscribed 90-day period before its Federal primary election. The text of Section 8(c)(2)(A) of the NVRA is clear: "A State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official list of eligible voters." 42 U.S.C. § 1973gg-6(c)(2)(A). As described above, Florida's current purge effort— developed by comparing two statewide databases, and executed by issuing repeated directives to every county Supervisor of Elections in the state— is a "program the purpose of which is to systematically remove" individuals from the voter registration rolls. *See* Part II. B, *supra.* The 90th day before Florida's August 14, 2012 primary election for Federal office was May 16, 2012. As of May 16,

Florida had not only failed to "complete" this list maintenance program, but was still providing instructions to the Supervisors on the program during a state-wide conference of Supervisors of Elections that fell on the 90th day. *See* Exhibit 1, ¶ 9. Defendants' decision to continue—even after receipt of notice from the Department of Justice—their ongoing directive to Supervisors of Elections to systematically investigate, verify, and remove voters from the voter rolls within 90 days of Florida's August 14, 2012 primary election, violates the plain text of Section 8(c)(2)(A) of the NVRA.

The NVRA provides for limited and specific exceptions to the 90-day quiet period established by Section 8(c)(2)(A), but none of these exceptions applies here. Section 8(c)(2)(B) makes clear that the only exceptions to the 90-day period are (1) if the voter requests removal, (2) if the registrant is disqualified under state law for criminal conviction or mental incapacity, or (3) if the voter has died. *See* 42 U.S.C. §§ 1973gg-6(c)(2)(B); 1973gg-6(a)(3)(A) & (B), 1973gg-6(a)(4)(A). There is no exception in the statute for the State of Florida to remove, within the 90-day period, voters whom it claims are ineligible non-citizens based on a systematic identification and removal program. The time to conduct and complete non-excepted systematic removal programs is before the 90-day period. *Cf. ACORN v. Ridge*, No. Civ. A. 94-7671, 1995 WL 136913, at *9 (E.D. Pa. March 30, 1995) (finding that state law authorizing systematic removal of voters within the 90-day quiet period is pre-empted by the NVRA) (Exhibit 10).

The State's actions are in clear violation of the text of Section 8 of the NVRA. The statute's legislative history also conveys Congress' intent that Section 8 represents a careful balancing of the dual goals of enhanced voter participation and the maintenance of accurate and current voter registration lists. The Senate Report explains, "The Committee is mindful of the need to keep accurate and current voter rolls." However, the Committee expressed concern that

"[a]buses may be found in the design of a [voter removal] program as well as its implementation." S. Rep. No. 103-6, at *32. The Senate Committee made clear that the legislation seeks to prevent voter list maintenance programs that would result in the removal of eligible voters solely because of their "failure to respond to a mailing." *Id.*; *see also* H. Rep. No. 103-9, at *15 ("The Committee is concerned that such programs can be abused and may result in the elimination of names of voters from the rolls, solely due to their failure to respond to a mailing."). Regarding the 90-day period specifically, Congress explained that "[t]his requirement applies to the State outreach activity such as a mailing or a door to door canvas and requires that such activity be completed by the 90-day deadline." S. Rep. No. 103-6, at *32. "This section does not prohibit a State during that 90-day pre-election day period from removing names from the official list of eligible voters on the basis of the request of the registrant, as provided by State law for criminal conviction or mental incapacity, death, or any other correction of registration records pursuant to the Act." *Id.* By providing a quiet period during which states are prohibited, with limited exceptions, from conducting list maintenance programs within 90 days of an election for Federal office, the NVRA protects against legitimate voters being dropped from the rolls right before the election, and it ensures voters have adequate notice and a fair opportunity to respond to registration issues long before the election.

In light of the above, Florida is violating the prohibition on *conducting*, within 90 days of its primary election for Federal office, a list maintenance program designed to systematically remove names of potentially ineligible voters from its voter registration rolls. 42 U.S.C. § 1973gg-6(c)(2)(A). The United States is therefore likely to succeed on the merits of its claims under Section 8(c)(2)(A) of the NVRA.

Second, the United States is likely to succeed on the merits of its claims because Florida's list maintenance program violates the NVRA's requirement that any such program "be uniform, nondiscriminatory, and in compliance with the Voting Rights Act." 42 U.S.C. § 1973gg-6(b)(1). The database matching procedures that form the basis of the State's voter verification program are inaccurate and unreliable and therefore cannot form the basis of a uniform, state-wide program. Exhibit 1, ¶ 11; Exhibit 2 (Miami-Dade letter). The State's largest county (Miami-Dade) found multiple errors on the list, including 446 voters who provided proof that they are, in fact, citizens eligible to vote, with another 32 voters who advised the county that they are citizens and would provide documentation. Exhibit 2 at 2. In addition, counties have taken different approaches to this program, with Collier County, for example, informing voters who received a letter because of database matching program that the voters' failure to respond "will result" in their removal from the rolls; other counties have taken different approaches. *See* Exhibit 9; *see also* Exhibit 2. Further, news reports indicate that the program may have a disproportionate impact on minority voters.[6] A list maintenance program that is this unreliable and error-prone violates the NVRA's requirement that such efforts be uniform and nondiscriminatory, and comply with the Voting Rights Act. *Cf. Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 707 (N.D. Ohio 2006) (invalidating under the NVRA an Ohio state law regulating third-party voter registration organizations on the ground that, in part, the state requirement was "neither uniform nor non-discriminatory, because it does not apply to everyone involved in the process").

---

[6] Although the United States anticipates that it may well engage in discovery on the potential discriminatory impact of this procedure, news accounts report that the State's database matching program disproportionately impacts Hispanics. *See, e.g.,* Exhibit 11 ("Indeed, about 87 percent of those on the 2,700-person list are minorities.").

Therefore, Florida's list-maintenance program—which threatens to remove more eligible voters than ineligible ones; which puts the burden on the registrant to provide an affirmative response or else be struck from the rolls; and which commands eligible voters to attest under threat of criminal sanction that they disagree with the State's information regarding their purported ineligibility—violates the mandate in Section 8(b)(1) of the NVRA that all list-maintenance procedures be "uniform" and "nondiscriminatory." 42 U.S.C. § 1973gg-6(b)(1).

The use of unreliable and inaccurate database matching procedures, within the 90-day quiet period before Federal elections, also runs contrary to a primary purpose of the NVRA, namely to "enhance the participation of eligible citizens as voters in elections for Federal office."[7] 42 U.S.C. §1973gg-6(b)(1).

That Florida is violating the NVRA in this instance of course does not mean that States are prohibited from creating uniform, non-discriminatory procedures to ensure that non-citizens do not register to vote and to remove individuals from the rolls who are ineligible to vote based on lack of citizenship—provided that such programs are timely under Section 8(c)(2)(A), and otherwise comply with the NVRA and the Voting Rights Act of 1965, as required by Section 8(b)(1). And States may also remove a registrant who requests removal without regard to the timing of the request.[8] 42 U.S.C. § 1973gg-6(a)(3)(A). However, to protect eligible voters from

---

[7] In its June 6, 2012, letter to the United States, Florida ignores the clear language of the NVRA regarding the 90-day quiet period and rejects the application of this rule to Florida's database matching program. Exhibit 4. The State assumes, without basis, that the vast majority of the voters identified by the data-matching program are, in fact, ineligible to vote.

[8] For instance, if there are individuals who have responded to a notice of potential ineligibility by attesting as to their ineligibility, it may well be appropriate, depending on the response, to treat those individuals as having requested removal from the registration rolls, pursuant to the exception in Section 8(a)(3)(A).

being caught in a systematic purge program with insufficient time to remedy any errors,

Congress prohibited these purges within 90 days of a Federal election.

In light of the foregoing, the State cannot ignore the requirements of the NVRA simply because it disagrees with the balance Congress struck between the need for accurate and current voter rolls and protections to prevent harms to voters caused by voter removal programs. *See* S. Rep. No. 103-6, at \*32. The United States is likely to succeed on the merits of its claims that Florida is violating Section 8 of the NVRA.

### 2. Irreparable Harm.

A showing of irreparable injury is "the sine qua non of injunctive relief." *Siegel v. LePore,* 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (citing *Northeastern Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)). The State's program, which will result in eligible voters being removed from the list for failing to respond to a mailing questioning their citizenship, will undoubtedly leave voters irreparably harmed. Congress found in enacting the NVRA that the right to vote is a fundamental right, 42 U.S.C. § 1973gg(a)(1), and the denial of the right to vote is "presumed by law" to be irreparable injury. *See Dillard v. Crenshaw County*, 640 F. Supp. 1347, 1363 (M.D. Ala. 1986). "Given the fundamental nature of the right to vote, monetary remedies would obviously be inadequate in this case; it is simply not possible to pay someone for having been denied a right of this importance." *Id.*; *see also Florida Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1082 (N.D. Fla. 2004) ("A person who is denied the right to vote suffers irreparable injury.").

This Court held just a few weeks ago that the potential denial of the opportunity to register to vote "almost always inflicts irreparable harm. . . ." *See* Order, *League of Women Voters of Florida*, No. 4:11-CV-628, at 24 (2012 WL 1957793 at \*11). The imminent and

overwhelming risk of removing eligible voters who are already registered to vote must therefore also inflict irreparable harm. *See id.* (noting that voting rights are of "special significance"; they are the rights most protective of all others, joined in this respect by the ability to vindicate one's rights in a Federal court); *see also Charles H. Wesley Educ. Foundation*, 408 F.3d at 1355.

Most imminently, the State's procedures cause irreparable harm because they are designed to remove individuals who fail to respond to a mailing, without any further evidence that the voter is ineligible beyond their presence on the list and their failure to respond. Supervisors of Elections have indicated that this will result in eligible voters being removed from the rolls. Exhibit 1, ¶ 14 (stating that because of this process, "eligible citizens who are registered to vote will find themselves unable to vote on Election Day, even though they were eligible to vote and should not have been removed from the list in the first place."); Exhibit 2, at 2 (rejecting taking further action on the list, by noting that "I cannot find by a preponderance of the evidence before me that the remaining voters who have not yet responded are ineligible, thereby potentially disenfranchising eligible voters based on an inaccurate list.").

Registered voters who are removed from the rolls because they failed to respond to a letter, *see, e.g.* Exhibits 1 ¶ 14, A3, & 9, predicated on a deeply flawed list that presumes ineligibility to vote based on purported lack of citizenship, will be irreparably harmed if they lose their right to vote in the upcoming election, or are forced to cast a provisional ballot and provide evidence of citizenship when their citizenship should not reasonably have been questioned in the first place.

Hundreds of eligible citizen voters received letters based on a State model that warn them that they may be removed from the voter rolls if they fail to respond within 30 days. *See* Exhibit 1, ¶ 14 & Ex. A3. At least one county has included even stronger language than the sample

provided by the State. The letter that Collier County sent warns the voter: "Failure to submit this form within thirty (30) days will result in the removal of your name from the voter registration rolls and you will no longer be eligible to vote." Exhibit 9. The letters also advise the recipient of criminal penalties for providing false information in response. Eligible citizen voters who fail to respond to letters generated because the State's unreliable database matching—whether because they do not open or read the notice, forget to reply, or do not understand the instructions—may find themselves unable to vote a regular ballot on Election Day. *See* Exhibit 1, ¶ 14.

Furthermore, the State's procedures will cause irreparable harm because they generate confusion among those voters who did not respond to the mailing and who do not know whether or not they have been kept on the rolls and whether they will be permitted to vote. They can also cause confusion to recently naturalized citizens who may not have received a letter but will question whether they will be caught in future dragnets cast by the State. Registered voters' negative experience of being erroneously identified as a potentially ineligible non-citizen voter will erode the voter's and the electorate's confidence in the electoral system and could discourage and intimidate voters from voting, thereby negating one of the primary purposes of Section 8 of the NVRA, 42 U.S.C. § 1973gg(b), namely, to enhance and encourage voter participation. For all of these reasons, the Court should grant the injunction based on the irreparable harm caused by the State's ongoing efforts to continue its database matching program.

### 3. Any Burden on Defendants Is Minimal and Is Outweighed by the Risk of Harm to Florida Voters.

The potential burden to the State in this matter is minimal, and is clearly outweighed by the substantial harms caused to eligible voters who may be denied the right to vote because they

failed to respond to an erroneous systematic purge procedure within 90 days of a Federal

election. As of May 31, Miami-Dade alone found at least 446 eligible citizen voters on the

State's list, *see* Exhibit 2 at 2, and the State can have no legitimate interest in striking eligible

voters from the rolls—or in burdening them with the obligation to produce affirmative proof of

their eligibility— in contravention of the NVRA.

Although Florida has an interest in "ensur[ing] that accurate and current voter registration

rolls are maintained," 42 U.S.C. § 1973gg(b)(4), that interest cannot overcome the significant

burdens imposed on eligible voters in this case—especially where Congress already considered

this balance in the NVRA and drew the line on the side of restricting systematic purges this close

to a Federal election, in order to avoid errors and confusion and protect the fundamental rights of

eligible voters. As the Sixth Circuit recognized in denying a State's request to stay a preliminary

injunction, the "NVRA strikes a balance between removing fraudulent registrations while

ensuring that legitimate voters are able to vote, and [the State] cannot remove names from its

rolls in a manner that fails to respect this balance that Congress has drawn. . . . Because the risk

of actual voter fraud is miniscule when compared with the concrete risk that [the State's] policies

will disenfranchise eligible voters, we must conclude that the public interest weighs in favor of

denying the stay of the preliminary injunction." *United States Student Ass'n Foundation v.

Land*, 546 F.3d 373, 388 (6th Cir. 2008).

Nor is Florida without alternatives to pursue its stated interest. It could have undertaken

this database matching program well before the 90-day quiet period, if it chose. And the county

Supervisors can still, without time limitation, remove voters whose removals fall within the

statutory exceptions to the NVRA's 90-day quiet period. But where Florida has instead chosen

to pursue a seriously flawed systematic voter removal program within 90 days of a Federal

election, and that is capturing hundreds of eligible citizen voters in its dragnet, the balance of equities cannot be said to tip in its favor. The potential harm of removing eligible registered voters within the 90-day quiet period before a Federal election must outweigh the burden, if any, of complying with Federal law. *See BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs.,* LLC, 425 F.3d 964, 970 (11th Cir. 2005) (rejecting allegations of harm when the potential harm was caused by conduct contrary to a Federal regulatory order); *see also Dillard*, 640 F. Supp. at 1363 (denial of the right to vote is presumed irreparable harm).

### 4.    The Public Interest Favors Immediate Relief

Finally, the public interest is served by the grant of injunctive relief in this case. The NVRA reflects Congress's determination that the right to vote is a fundamental right; that Federal, state, and local governments have a duty to promote voting; and that unfair registration laws and procedures can "have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities." 42 U.S.C. § 1973gg(a)(1)-(3). By doing so, the NVRA affirms the fundamental nature of the right to vote. *See Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws. . . . Other rights, even the most basic, are illusory if the right to vote is undermined."). The State practice here implicates "the clear directives of . . . processes protected by the NVRA," and therefore should be enjoined. *Charles H. Wesley Educ. Foundation*, 408 F.3d 1349, 1355 (11th Cir. 2005); *see also League of Women Voters of Florida*, 4:11-CV-628, at p. 24 (2012 WL 1957793 at *11) ("[t]he . . . enforcement of a federal statute serves the public interest almost by definition.").

## IV.    RELIEF SOUGHT

The relief the United States seeks is appropriately tailored to remedy Defendants' violation of Federal law. *See* accompanying proposed order, Exhibit 12. The United States asks this Court to order Defendants to (1) enjoin the State and anyone acting in concert with the State from systematically removing registered voters within 90 days of the August 14, 2012 and November 6, 2012 elections for Federal office, based on the State's DHSMV database matching program, (2) to take further action to ensure that voters who did not respond to any notices sent to them pursuant to this program are not removed from the rolls, (3) to enjoin further demands that registered voters identified by the database matching program provide proof of their eligibility during the 90-day quiet period, and (4) to take all actions necessary to halt the implementation of the state's ongoing, systematic voter database matching purge program using DHSMV data during the 90-day quiet period leading up to the State's 2012 Federal elections. The order also seeks to restore to the rolls voters who were identified by the database matching program and removed from the rolls for failing to respond to a letter sent by Supervisors of Elections.

## V.    CONCLUSION

For the reasons set forth above, the United States requests that the Court enter its proposed temporary restraining order to ensure that Defendants comply with the requirements of Section 8 of the NVRA.

Date:  June 15, 2012

PAMELA C. MARSH
United States Attorney
Northern District of Florida


MICHAEL J. HARWIN
Georgia Bar No. 335605
Assistant United States Attorney
111 North Adams Street, Fourth Floor
Tallahassee, FL 32301
Tel:  (850) 942-8430
Fax:  (850) 942-8448

Respectfully submitted,

THOMAS E. PEREZ
Assistant Attorney General
Civil Rights Division


/s/ John Albert Russ IV
_____
T. CHRISTIAN HERREN JR
JOHN ALBERT RUSS, IV
California Bar No. 192471
ELISE SANDRA SHORE
Georgia Bar No. 557131
JENIGH J. GARRETT
New York Bar No. 4230124
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
Tel:  (202) 305-0070
Tel:  (202) 353-7738
Fax:  (202) 307-3961
john.russ@usdoj.gov
elise.shore@usdoj.gov
jenigh.garrett@usdoj.gov

**Certificate of Service**

I certify that a true and correct copy of the foregoing will be sent electronically to the

registered participants (filed through EM/ECF system) and an e-mail copy of the same will be

transmitted to the non-registered participants, on this the 15th day of June, 2012:

Daniel E. Nordby
Florida Department of State
R.A. Gray Building
500 S. Bronough Street
Tallahassee, FL 32399-0250
daniel.nordby@dos.myflorida.com

/s/ John Albert Russ IV

JOHN ALBERT RUSS IV
Special Litigation Counsel
Voting Section