**Exhibit 8**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FLORIDA DEPARTMENT OF STATE,<br>500 S. Bronough Street<br>Tallahassee, FL  32399-0250,<br><br>                              Plaintiff,<br>v.<br><br>UNITED STATES DEPARTMENT OF<br>HOMELAND SECURITY, UNITED STATES<br>BUREAU OF CITIZENSHIP AND<br>IMMIGRATION SERVICES, JANET<br>NAPOLITANO, in her official capacity as<br>Secretary of the United States Department of<br>Homeland Security, and ALEJANDRO<br>MAYORKAS, in his official capacity as Director<br>of the United States Bureau of Citizenship and<br>Immigration Services,<br><br>                              Defendants. | Civil No. _____ |

### COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Federal law confers upon Plaintiff, the Florida Department of State ("FDOS"), a statutory right of access to the Systematic Alien Verification for Entitlements Program System of Records ("SAVE Program"). Despite FDOS's repeated requests to exercise this statutory right of access to the SAVE Program, Defendants Department of Homeland Security et al. have refused to provide FDOS with the access to which it is entitled.

Defendants' unwarranted delay and recalcitrance in fulfilling its statutory obligation to provide SAVE Program access has unjustifiably interfered with FDOS's ability to fulfill its own statutory obligation to protect the integrity of elections and maintain current and accurate voter registration rolls. Immediate access is, therefore, required to ensure that the SAVE Program operates as intended and "assists … state[s] … [in] confirm[ing] immigration status information,

1

to the extent that such disclosure is necessary to enable [them] to make decisions related to … any legal purpose, such as … voter registration." *Notice of Revision and Republication of Privacy Act System of Records*, 76 Fed. Reg. 58525, 58528 (Sept. 21, 2011). Accordingly, FDOS, by and through Secretary of State Ken Detzner, seeks a declaratory judgment that Defendants are required by federal law to grant FDOS access to the SAVE Program and injunctive relief compelling Defendants to give FDOS immediate access to the SAVE Program.

## I.
## PARTIES

1. FDOS is an agency of the State of Florida. FDOS is "suffering legal wrong because of agency action" and is "adversely affected or aggrieved by agency action within the meaning" of 8 U.S.C. § 1373(c), which provides that DHS "shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." FDOS is thus a proper plaintiff under the Administrative Procedure Act, 5 U.S.C. § 702.

2. Ken Detzner, in his official capacity as the Secretary of State of Florida, is Florida's Chief Elections Officer and the head of the Department of State. Fla. Stat. §§ 20.10(1), 97.012. In his capacity as Secretary of State and Chief Elections Officer, Secretary Detzner has a responsibility under both state and federal laws to ensure that Florida's voter registration rolls are current and accurate. *See* Fla. Stat. § 98.075 (providing that FDOS "shall protect the integrity of the electoral process by ensuring the maintenance of accurate and current voter registration records"); Fla. Stat. § 98.093 (requiring FDOS to access information from state and federal officials "[i]n order to identify ineligible registered voters and maintain accurate and current voter registration records in the statewide voter registration system"); 42 U.S.C. §

15483(a)(4) (requiring states to "ensure that voter registration records in the State are accurate" and make a "reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters"). Permitting ineligible, non-citizen voters to cast ballots undermines that mission and erodes the justified faith the electorate has in the fairness and reliability of the electoral process.

3. Defendants are the United States Department of Homeland Security, Janet Napolitano, in her official capacity as Secretary of the United States Department of Homeland Security, United States Citizenship and Immigration Services ("USCIS"), and Alejandro Mayorkas, in his official capacity as Director of USCIS, (collectively, "DHS"). Defendant United States Department of Homeland Security is a federal agency headquartered in Washington, D.C., which administers the SAVE Program through USCIS, a federal agency within the United States Department of Homeland Security that is also headquartered in Washington, D.C. Each Defendant is either an agency of the United States or an officer or employee of an agency of the United States and has acted or failed to act in an official capacity and under color of legal authority. 5 U.S.C. § 702. They are thus proper defendants under the Administrative Procedure Act.

## II.
## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction under 28 U.S.C. § 1331, because this action arises under the Constitution and laws of the United States. This Court has authority to order declaratory relief under 28 U.S.C. §§ 2201 and 2202 because there is a live controversy between Plaintiff and Defendants that includes a dispute over whether Defendants are statutorily obligated to provide FDOS with timely access to the SAVE Program. This Court has authority to issue a Writ of Mandamus under 28 U.S.C. § 1361 because Plaintiff seeks a Writ requiring

Defendants to comply with 8 U.S.C. § 1373(c) and the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) and 5 U.S.C. § 703.

### III.
### FACTS

**A.    Federal Law Requires DHS To Provide State And Local Governments Access To The SAVE Program To Determine Voters' Immigration Status.**

6. In 1986, Congress enacted the Immigration Reform and Control Act, Pub. L. 99-603, ("IRCA"), requiring the former Immigration and Naturalization Service ("INS"), now USCIS (a Bureau within the Department of Homeland Security), to establish a system that would allow for ready verification of the immigration status of non-citizen applicants for, and recipients of, certain types of federally-funded benefits, and to make the system available to federal, state, and local benefit-issuing agencies and institutions that administer such benefit programs. INS fulfilled its statutory obligation through the creation and administration of the SAVE Program, which is now operated by USCIS.[1]

7. In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. 104-208, ("IIRIRA"). Through IIRIRA, Congress mandated that INS, now USCIS, "shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." 8 U.S.C. § 1373(c). Notably, Section 1373(c) does not limit the number of inquiries that state agencies may make, limit the circumstances under which a state agency may inquire, nor allow DHS to limit their responses to the inquiring state agencies.

---

[1]    The Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002), created the Department of Homeland Security, abolished the INS, and transferred INS functions to the newly created Department. *See* 8 U.S.C. § 1551 note; 6 U.S.C. § 291; 6 U.S.C. § 542 note.

8.  As recently as 2011, DHS recognized that its SAVE Program "include[s] the implementation of Section 642(c) of IIRIRA, which obligates [DHS] to respond to inquiries 'by a federal, state, or local government agency seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law.'" 76 Fed. Reg. 58525, 58528 (Sept. 21, 2011) (quoting 8 U.S.C. § 1373(c)).

9.  DHS thus provided notice that, consistent with 8 U.S.C. § 1373(c), DHS would allow Federal, state, and local government agencies to, upon request, "use SAVE for any legal purpose, such as credentials, background investigations, and *voter registration*." 76 Fed. Reg. 58525, 58527 (Sept. 21, 2011) (emphasis added).

**B.  The SAVE Program Is Intended To Give State And Local Agencies Quick Access To Accurate Federal Information In Order To Determine An Individual's Immigration Status For Any Lawful Purpose, Including Voter Registration.**

10. The SAVE Program is a "fee-based intergovernmental initiative designed to help Federal, state, tribal, and local government agencies check immigration status when granting benefits, licenses, and other lawful purposes." 76 Fed. Reg. 58525, 58526 (Sept. 21, 2011).

11. The SAVE Program uses an online system that checks the immigration status of an individual against millions of DHS database records. The advantages of using the SAVE Program include, among others "verifying immigration status information quickly and efficiently via the online SAVE system [and] retrieving information from more than 100 million records including official immigration status data contained in Department of Homeland Security databases." Ex. A ("About the SAVE Program").

12. To verify a person's immigration status through the SAVE Program, a government agency will enter an individual's identifying information into the SAVE verification system. The SAVE Program will then check the information against DHS

databases. The SAVE Program can verify (1) nonimmigrant status; (2) immigrant status; (3) U.S. citizenship for naturalized citizens; and (4) U.S. citizenship for derived citizens.

13.     The SAVE Program provides state and local agencies with the most accurate and up-to-date information regarding immigration status because it queries data from multiple sources—including databases maintained by USCIS, the Bureau of Customs and Border Protection, and the Bureau of Immigration and Customs Enforcement—some of which "are updated in real-time and others that are updated in daily uploads." Ex. B ("Telecon Recap: Immigration Status Verification for Drivers' Licenses, Public Benefits, and Social Security Cards: A Conversation with USCIS").

14.     In more than 90% of cases, the SAVE Program will determine the immigration status of an individual within 3 to 5 seconds. Ex. C ("Information for Noncitizens Applying for a Public Benefit").

15.     The purpose of the SAVE Program is to "assist[] Federal, state, Tribal, or local government agencies, or contractors acting on the agency's behalf and licensing bureaus [in] confirm[ing] immigration status information, to the extent that such disclosure is necessary to enable these agencies to make decisions related to: (1) determining [the] eligibility for a Federal, state, or local public benefit; (2) issuing a license or grant; (3) issuing a government credential; (4) conducting a background investigation; or (5) any other lawful purpose." 76 Fed. Reg. 58525, 58528 (Sept. 21, 2011).

16.     In particular, the SAVE Program may be used "for any legal purpose, such as credentials, background investigations, and voter registration." 76 Fed. Reg. 58525, 58528 (Sept. 21, 2011).

17. An agency may participate in the SAVE Program if "(1) [t]he agency is a federal, state, or local government agency or licensing bureau and (2) the agency provides a public benefit, license, or is otherwise authorized by law to engage in an activity for which the verification of immigration status is appropriate." Ex. A.

18. As of January 2011, 715 federal, state, and local agencies participated in the SAVE Program, including 42 departments of motor vehicles, 30 federal agencies, 240 state agencies, and 403 local agencies. Ex. D ("USCIS: Executive Summary"). By the end of fiscal year 2011, more than 1,000 government agencies were participating in the SAVE Program, including the Social Security Administration, the U.S. Department of Housing and Urban Development, the Department of Education, health and human services agencies, and 47 Department of Motor Vehicle agencies (DMVs). Ex. E ("DHS' Progress in 2011: Identify Verification"). Multiple states have mandated the use of SAVE for all public benefit granting agencies in the State. Ex. B

C. **FDOS Sought Access To The SAVE Program To Fulfill Its Obligation To Protect The Integrity Of The Electoral Process.**

19. Both state and federal law vest FDOS with both the authority and the obligation to protect the integrity of elections by maintaining accurate and up-to-date voter registration rolls.

20. In particular, Section 98.075 of the Florida statutory code gives FDOS and Secretary Detzner the affirmative duty and responsibility to "protect the integrity of the electoral process by ensuring the maintenance of accurate and current voter registration records." Fla. Stat. § 98.075(1).

21. Similarly, 42 U.S.C. § 15483 requires FDOS "to ensure that voter registration records … are accurate and updated regularly." 42 U.S.C. § 15483(a)(4).

22. In mid-2011, the Florida Secretary of State's office received credible and reliable information from the Florida Department of Highway Safety and Motor Vehicles that non-citizens were registered to vote in Florida.

23. While processing this new information, it became clear that the FDOS, through the state resources available, had only a limited ability to validate a person's citizenship status.

24. FDOS thus determined that the best means of verifying the citizenship of most current and new voters, and thus to fulfill its statutory obligation to protect the integrity of the electoral process, would be to access the information contained in the SAVE Program.

**D.   DHS Has Refused To Provide FDOS Access To The SAVE Program.**

25. On August 1, 2011, FDOS held a telephone call with DHS to discuss access to the SAVE Program. FDOS explained that it sought access to the SAVE Program to determine the eligibility of voters to be registered. FDOS requested access to perform a one-time query of all registered voters, to be followed by daily cross-checks of newly-registered voters.

26. On September 1, 2011, FDOS contacted DHS by email to request access to the SAVE Program. In response to DHS's request, FDOS identified both the use it would make of the immigration-status information and the legal authority for FDOS's request for access to the SAVE Program. DHS told FDOS that it would engage its legal counsel to prepare a response to FDOS's request for access to the SAVE Program.

27. DHS's review of an agency's legal authority is a process that ordinarily should take no more than "several weeks depending on the type of agency and the complexity of the legal authorities provided." Ex. F at 9 ("E-Verify and SAVE Overview").

28. On September 7, 2011, DHS and FDOS agreed to have a teleconference between September 12 and 14, 2011, to discuss obtaining access to the SAVE Program. The teleconference, originally set for September 13, 2011, was rescheduled at the request of DHS to

September 15, and then again to September 21, 2011. *See* Ex. G (email correspondence between Maria Matthews, Assistant General Counsel to the Florida Department of State, and the Department of Homeland Security).

29. On the morning of September 21, 2011, DHS cancelled a teleconference with FDOS scheduled for that afternoon. DHS stated that it "need[ed] to more fully consider issues relating to voter registration before addressing" FDOS's request and that DHS would "let [FDOS] know when [it was] ready to reschedule a discussion." Ex. G.

30. On September 28, 2011, after a week with no response from DHS, FDOS contacted DHS to inquire about when DHS would be ready to discuss FDOS's request to access the SAVE Program. DHS told FDOS that the issue was under review and that DHS might be ready to discuss the request the following week but that it would contact FDOS when it was ready to discuss the request. Ex. G.

31. On October 14, 2011, after more than two weeks with no response from DHS, FDOS contacted DHS to obtain the status of its request to access the SAVE Program. DHS replied that the issue was still under review. Ex. G.

32. On October 24, 2011, after another ten days with no response from DHS, FDOS contacted DHS to inquire about the status of its request to access the SAVE Program. FDOS informed DHS that the Secretary of State was interested in the progress of FDOS's request. DHS called FDOS later that day and asked for the information Florida was seeking from the SAVE Program and the State's legal authority for seeking it. Later that same day, FDOS responded to DHS and explained that it was "interested in establishing a systematic/continual process by which the State of Florida can use the SAVE Program database and any other available federal databases to check the legal status of all currently registered voters on the rolls

and/or new applicants before they become registered." FDOS noted that both federal and state law required the State to conduct maintenance of its voter registration lists on a regular basis to determine if a registered voter remains eligible to be registered and to vote. FDOS also asked DHS a number of questions about the types of information it could receive from DHS. DHS has never provided answers to FDOS's questions. Later that day, DHS asked a follow-up question regarding the documentation required from individuals seeking to register to vote, which FDOS responded to on the same day. Ex. G.

33. On November 3, 2011, having had another week pass without a response from DHS, FDOS contacted DHS to inquire about the progress of the request to access the SAVE Program. DHS did not respond to FDOS's inquiry. Ex. G.

34. On December 8, 2011, after more than a month with no response from DHS, FDOS contacted DHS to inquire about the progress of the request to access the SAVE Program. DHS did not respond to FDOS's inquiry. Ex. G.

35. On January 11, 2012, after more than two months with no response from DHS, FDOS contacted DHS to inquire about the progress of the request to access the SAVE Program. FDOS noted that it had left voicemails with multiple individuals at DHS over a period of weeks but that DHS had not returned any of these calls. FDOS stated that if DHS "need[ed] more information or would like to discuss more, [FDOS] will be happy to do so." FDOS explained that it was "simply trying to fulfill [its] duties under federal and state law to ensure that the [voting] rolls only consist of eligible and qualified voters." Ex. G.

36. On or about February 21, 2012, after nearly four months with no meaningful response from DHS, DHS contacted FDOS to ask about what information the State collected on its voter registration forms. On February 21, 2012, FDOS provided DHS with this information

as well as a link to the Florida Secretary of State's website where this information was publicly available. FDOS then reiterated that it "firmly believe[d] based on the law cited previously that government agencies are entitled to get access to information such as legal status in order to comply with the law." FDOS explained that it needed access to the SAVE Program "to ensure[] that only U.S. citizens are registering and/or voting and that those who have already registered are U.S. citizens." Ex. G.

37. On February 28, 2012, after a week with no response from DHS, FDOS contacted DHS to inquire about its request to access the SAVE Program. FDOS noted a recent study that found that one out of eight voter registrations in the country is inaccurate and no longer valid, and that FDOS had a strong interest in ensuring the accuracy of its voter registration rolls. DHS did not respond to this inquiry. Ex. G.

38. On March 5, 2012, after almost two weeks with no response from DHS, FDOS contacted DHS to inquire about its request to access the SAVE Program. FDOS explained that its Secretary of State and several county Supervisors of Elections were requesting an update about the request. Ex. G.

39. On March 6, 2012, DHS told FDOS that it needed more information about the types of documentation the State would use to identify citizens. That same day, FDOS responded to the inquiry and addressed the issue. Ex. G.

40. On March 8, 2012, FDOS provided additional guidance to DHS about the types of information it could provide to access the SAVE Program. FDOS stated that it "hope[d] to hear very shortly some final decision soon as to what the [federal government] can provide." FDOS offered to "hold[] a teleconference including with [its] new secretary of state if [DHS]

11

want[ed] to flesh out the details or get a better understanding of what [Florida] want[ed] and/or what the [federal government's] position is." Ex. G.

41. On March 14, 2012, after more than a week with no response from DHS, FDOS contacted DHS and stated that it "would like to set up a teleconference with legal, policy advisor, and tech staff for next week to discuss the status of [its] request." DHS stated that it would get back to FDOS with a date and time for the call. Ex. G.

42. On March 20, 2012, after almost a week with no response from DHS, FDOS contacted DHS to ask whether it had a date and time for the call. DHS did not respond to this inquiry. Ex. G.

43. On March 26, 2012, after almost two weeks with no response from DHS, FDOS contacted DHS to ask about the status of the request and whether DHS would agree to hold a teleconference to discuss the request. FDOS asked if there was anything else DHS needed from the State. Ex. G.

44. On March 26, 2012, DHS told FDOS that it "regret[ted] the slow progress of this matter," but that there were "many issues surrounding the use of SAVE in the voter registration forum." DHS then "assure[d] [Florida] that [DHS] will let [FDOS] know as soon as any substantive conclusions are reached, and we can move forward." Ex. G.

45. On May 31, 2012, Secretary Detzner sent a letter to Secretary Napolitano underscoring DHS's failure to provide FDOS with access to the SAVE Program despite FDOS's nine months of requests and DHS's statutory obligation to respond to those requests. Ex. H (letter from Ken Detzner, Florida Secretary of State, to Janet Napolitano, Secretary of DHS).

46.     As of June 11, 2012, DHS has failed to provide FDOS with access to the SAVE Program.

## IV.
## CAUSES OF ACTION

A.   **Count One: Declaratory Judgment**

47.     Paragraphs 1- 46 are incorporated by reference herein.

48.     Under the Declaratory Judgment Act, the court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

49.     Section 1373(c) of Title 8 of the U.S. Code states that Defendants "shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information."

50.     Defendants created the SAVE Program in order to fulfill its "obligat[ion] to respond to inquiries 'by a federal, state, or local government agency seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law.'"  76 Fed. Reg. 58525, 58528 (Sept. 21, 2011) (quoting 8 U.S.C. § 1373(c)).

51.     An inquiry from a state agency for access to the SAVE Program in order to verify or ascertain the citizenship or immigration status of individuals within its jurisdiction for "voter registration" purposes is an inquiry for a purpose authorized by law. 76 Fed. Reg. 58525, 58527 (Sept. 21, 2011).

52.     Because Defendants have received an inquiry from Plaintiff for access to the SAVE Program in order to verify or ascertain the citizenship or immigration status of

13

individuals within its jurisdiction for a purpose authorized by law, Plaintiffs are entitled to a declaration that Defendants must "respond" to the inquiry "by providing the requested verification or status information." 8 U.S.C. § 1373(c).

**B.     Count Two: Administrative Procedure Act**

53.    Paragraphs 1-46 are incorporated by reference herein.

54.    The Administrative Procedure Act ("APA") provides for judicial review of federal agency actions. 5 U.S.C. §§ 701-706. Under the APA, a court may hold unlawful and set aside federal agency action—including the "failure to act"—when it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" or is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 551(13), 701(b)(2), 706(2)(A), (C).

55.    Defendants' failure to provide access to the SAVE Program in response to Plaintiff's inquiry to verify or ascertain the citizenship or immigration status of individuals within its jurisdiction for a purpose authorized by law, 8 U.S.C. § 1373(c), exceeded Defendants' statutory authority, and was arbitrary, capricious, and otherwise contrary to law within the meaning of 5 U.S.C. § 706.

56.    Defendants' failure to provide access to the SAVE Program in accordance with its Notice of Revision and Republication of Privacy Act System of Records, 76 Fed. Reg. 58525 (Sept. 21, 2011), was arbitrary, capricious, and otherwise contrary to law within the meaning of 5 U.S.C. § 706.

**C.     Count Three: Administrative Procedure Act**

57.    Paragraphs 1-46 are incorporated by reference herein.

58.  Under the APA, a court may "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). The APA further requires that an agency "proceed to conclude a matter presented to it" within "a reasonable time." 5 U.S.C. § 555(b).

59.  Defendants' failure to timely provide access to the SAVE Program in response to Plaintiff's inquiry to verify or ascertain the citizenship or immigration status of individuals within its jurisdiction for a purpose authorized by law, 8 U.S.C. § 1373(c), amounted to agency action unlawfully withheld within the meaning of 5 U.S.C. § 706.

60.  Defendants' failure to timely provide access to the SAVE Program in response to Plaintiff's inquiry to verify or ascertain the citizenship or immigration status of individuals within its jurisdiction for a purpose authorized by law, 8 U.S.C. § 1373(c), amounted to agency action unreasonably delayed within the meaning of 5 U.S.C. § 706.

61.  Defendants' failure to timely provide access to the SAVE Program in response to Plaintiff's inquiry to verify or ascertain the citizenship or immigration status of individuals within its jurisdiction for a purpose authorized by law, 8 U.S.C. § 1373(c), amounted to a failure to conclude a matter within "a reasonable time" within the meaning of 5 U.S.C. § 555(b).

**D.  Count Four: Writ of Mandamus**

62.  Paragraphs 1-46 are incorporated by reference herein.

63.  Under the Mandamus Act, the court may "compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.

64.  Defendants owed Plaintiff a clear nondiscretionary duty to provide access to the SAVE Program in response to Plaintiff's inquiry to verify or ascertain the citizenship or immigration status of individuals within its jurisdiction for a purpose authorized by law. 8 U.S.C. § 1373(c). As a direct and proximate cause of Defendants' failure to provide the access,

Plaintiff has been irreparably harmed and continues to suffer ongoing irreparable harm. Because Plaintiff has "a clear right to the relief sought," Defendants have "a clear duty to do the particular act requested by the [Plaintiff]," and "no other adequate remedy is available," mandamus relief is warranted. *See In re First Federal Sav. and Loan Ass'n of Durham*, 860 F.2d 135, 138 (4th Cir. 1988) (finding writ of mandamus appropriate to order Secretary of Treasury to pay refund to taxpayer); *see also Heckler v. Ringer*, 466 U.S. 602, 616 (1984) (holding that "common-law writ of mandamus, as codified in 28 U.S.C. § 1361," is appropriate where plaintiff "has exhausted all other avenues of relief" and "the defendant owes him a clear nondiscretionary duty.").

65. A writ of mandamus should issue compelling Defendants to provide Plaintiffs access to the SAVE Program pursuant to 8 U.S.C. § 1373(c).

## V.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and against the Defendants and award Plaintiff the following relief:

a. A declaration, pursuant to 28 U.S.C. § 2201, that Plaintiff is entitled to immediate access to the SAVE Program pursuant to 8 U.S.C. § 1373(c);

b. An order, pursuant to 5 U.S.C. § 706, holding unlawful Defendants' failure to provide Plaintiff access to the SAVE Program in response to its inquiry to verify or ascertain the citizenship or immigration status of individuals within its jurisdiction for a purpose authorized by law, 8 U.S.C. § 1373(c), and compelling Defendants to provide Plaintiff immediate access to the SAVE Program;

c. Permanent injunctive relief pursuant to Fed. R. Civ. P. 65 ordering Defendants and their officers, employees and agents to immediately provide Plaintiff access to the SAVE

Program;

    d.    An award of Plaintiff's costs and reasonable attorneys' fees, as appropriate; and

    e.    An award of any further relief to Plaintiff that this Court deems just, proper, and equitable.

Respectfully submitted,

/s/ William S. Consovoy

| | |
|---|---|
| Daniel E. Nordby | William S. Consovoy* (D.C. Bar 493423) |
| Ashley E. Davis | Thomas R. McCarthy  (D.C. Bar 489651) |
| FLORIDA DEPARTMENT OF STATE | J. Michael Connolly (D.C. Bar 995815) |
| R.A. Gray Building | WILEY REIN LLP |
| 500 S. Bronough Street | 1776 K Street, NW |
| Tallahassee, FL  32399-0250 | Washington, DC  20006 |
| Tel: (850) 245-6536 | Tel.: (202) 719-7000 |
| Fax:  (850) 245-6127 | Fax: (202) 719-7049 |
| | |
| Dated: June 11, 2012 | *Counsel of Record |