IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

_____
                                        )
THE UNITED STATES OF AMERICA            )
                                        )
      Plaintiff,                        )
                                        )
v.                                      )       Civil Case No. 4:12-CV-285-RH/CAS
                                        )
STATE OF FLORIDA; KEN DETZNER,          )
Secretary of State, in his official capacity. )
                                        )
      Defendants.                       )
_____)

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

      Defendants, the State of Florida and Secretary of State Kenneth W. Detzner, ("Secretary") hereby submit this opposition to the United States' Motion for Temporary Restraining Order.

## INTRODUCTION AND SUMMARY OF ARGUMENT

      State and federal law both impose a responsibility on the Secretary to safeguard the integrity of Florida elections by identifying improperly registered voters. Specifically, the Secretary is required to review records contained in the Florida Department of Highway Safety and Motor Vehicles (DHSMV) MAN Driver and Vehicle Express (MDAVE) database, and pass on to County Supervisors of Elections ("supervisors") information indicating that registered voters are in fact ineligible. In April of 2012, after a careful review of these records, the Florida Department of State ("FDOS") distributed a small sample, containing the names of 2,600 individuals who were identified as non-citizens in MDAVE to county supervisors, who were to provide these individuals with personal notice and an opportunity to respond. Over 100

individuals *conceded* their ineligibility to supervisors, over half of whom had in fact voted in prior elections.  The Secretary is not aware of, and the Department of Justice ("DOJ") has not identified, a single citizen who has been erroneously removed from the statewide voter registration system.

Nonetheless, in order to utilize the most reliable information possible, Florida has repeatedly requested  (and been wrongfully denied) access to the Department of Homeland Security's ("DHS") Security Systematic Alien Verification for Entitlements Database (SAVE).  Moreover, on April 30, 2012, the Secretary suspended his use of MDAVE data, pending a decision regarding access to SAVE.

On June 12, 2012, over a month *after* the Secretary stopped forwarding names identified in the MDAVE matching process to county supervisors, DOJ filed this suit challenging the practice.  Specifically, DOJ asserted that the Secretary's use of the small sample of MDAVE records violated the National Voter Registration Act of 1993 ("NVRA"), 42 U.S.C. § 1973gg-6, because it led to the elimination of ineligible voters from the voting rolls within 90 days of the August 14 primary election and was not "uniform and nondiscriminatory" as required by the NVRA.  DOJ did not initially seek any preliminary relief; however, on the evening of Friday, June 15, it moved for a temporary restraining order ("TRO").  Contrary to the requirements of Local Rule 7.1(B), DOJ did not consult with Defendants prior to filing this motion.

DOJ's newfound haste in seeking a TRO is completely unwarranted, as Defendants are not currently taking any action  that could cause *any* injury to voters, let alone *irreparable* injury.  At best, DOJ's request for a TRO appears to be based on a misunderstanding of the facts, which could have been avoided had it engaged in the required conferral with Defendants.

(a)  At the threshold, the federal government's motion is meritless because the Secretary

2

is not causing any injury *at all*.  DOJ seeks a TRO enjoining FDOS's use of MDAVE data; however, in large part because the federal government has refused to comply with its legal obligation to supply Florida with access to SAVE, FDOS stopped providing MDAVE data to supervisors on April 30, 2012.  Thus, under the status quo, the Secretary will not affect anyone's ability to vote *at all* pending adjudication of any preliminary injunction or other motion.

(b) Even if county supervisors were being given additional names to verify, the verification process would impose no irreparable injury.  DOJ baldly asserts that asking registered voters to verify their eligibility will intimidate eligible voters and deter them from voting.  This allegation, however, is unsubstantiated and conclusory.  There is nothing offensive or invidious about ensuring that only citizens vote, particularly because the NVRA itself specifically sanctions the practice of requesting voter verification.

(c) Moreover, even if an individual were stricken from the voter registry tomorrow, and even if the Court were to determine on a later motion that such a strike was improper, that injury would not be irreparable because the Court could easily order the restoration of the voter to the rolls prior to the next election.  Accordingly, although DOJ repeatedly invokes the truism that losing the right to *vote* is irreparable injury, that is beside the point because DOJ's requested "emergency relief" is unnecessary to preserve that right or to have any individual's citizenship status fairly determined.  Thus, *even if* the Secretary were continuing to send new names to supervisors, there would be no *irreparable* injury that would justify a TRO.

(d) Finally, to the extent DOJ is seeking affirmative, restorative relief from the Secretary, that request is improper, as a TRO may be used only to maintain the *status quo*.

DOJ has thus failed to identify any injury, let alone an irreparable injury, that would occur pending the adjudication of a motion for summary judgment, much less a motion for a

preliminary injunction.  Indeed, it is not even clear that the federal government has established the Article III standing necessary to bring this suit.  This failure alone precludes entry of a TRO.

In any event, DOJ's position fails on the merits as well.

(a) Although DOJ asserts that its interpretation of the NVRA precludes the removal of non-citizens from the voter rolls only during the 90 days prior to an election, its reading necessarily means that the NVRA bars the removal of non-citizens at *any* time.  As DOJ recognizes, the 90-day quiet period imposed by the Act does not foreclose removal within 90 days based on the grounds specified in subsections (a)(3) and (a)(4)(A).  U.S. Mem. 3.  It contends here that non-citizenship is not listed in subsections (a)(3) and (a)(4)(A), and therefore the exceptions to the 90-day period do not apply.  But the NVRA expressly states that the enumerated grounds contained in (a)(3) and (a)(4)(A), along with change in residence, are the *only* grounds on which a registrant may be stricken from the rolls at any time.  Thus, if non-citizenship is not one of the criteria listed in subsections (a)(3) or (a)(4)(A), such that it is exempt from the 90-day provision, the NVRA necessarily bans it as a ground of removal *at any time.*

 The text of the NVRA does not justify the DOJ's extreme and illogical stance. Subsections (a)(3) and (a)(4) provide that a registrant may be removed: "at the request of the registrant," "as provided by state law," "by reason of criminal conviction," by reason of "mental incapacity," "by reason of  . . . the death of the resident," or "by reason of  . . .  a change in residence of the registrant."  Here, the voters sought to be removed are ineligible "as provided by state law," because Florida law provides that non-citizens shall be removed from the rolls. Consequently, removing non-citizens falls within one of the NVRA's specific, enumerated bases for justifying removal at any time.  DOJ, however, ignores the "as provided by state law" ground for removing ineligible voters and thus revises the NVRA to authorize removal only on the

remaining, narrow grounds listed in subsections (a)(3) and (a)(4).  Under DOJ's reading, then, no state could *ever* strike ineligible voters for any reason except a request, death, criminal conviction, adjudication of mental incapacity, or change of residence.  All states would therefore be banned from removing non-citizens, minors, out-of-state residents, or fictitious individuals *at any time*.  That result was obviously not intended by Congress, which expressly instructed that "[t]he [NVRA] should not be interpreted in any way to supplant th[e] authority" of election officials to "continue to make determinations as to applicant's eligibility, such as citizenship, as are made under current law and practice."  H.R. REP. NO. 103-9, at 112 (1993), 1993 U.S.C.C.A.N. 105, 112.

(b) Alternatively, if DOJ's position is accepted—*i.e.*, if "as provided by state law" is not a ground authorizing removal—then the NVRA's voter removal provision, as well as the quiet-period provision that modifies it, must be read to address only the removal of voters who were validly registered at one time.  The express authorization in subparagraphs (a)(3) and (a)(4) (and thus the exceptions to the quiet-period provision) all deal with removal of individuals who have *become* ineligible, *i.e.* by reason of a request, death, criminal conviction, adjudication of mental incompetence, or change of residence.  None of them involves situations in which the individual was never eligible to vote in the first place.  This shows that authorizations and restrictions on removal of once-eligible voters do not constrain the exclusion of never-eligible voters.  Rather, the process of excluding never-eligible voters is governed by a separate NVRA provision, 42 U.S.C. 1973gg-6(b), which authorizes and regulates state activities "to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll."

In short, on any reading of the NVRA, a state may either remove noncitizens from the rolls at any time, or not at all.  It is self-evident which of these results Congress intended.

Defendants are willing to provide expedited briefing in opposition to any forthcoming motion for preliminary injunction or summary judgment, which will allow this Court to assess DOJ's claims based on a more complete understanding of the facts and the law.  In the meantime, however, DOJ has not come close to identifying the sort of irreparable injury and likelihood of success on the merits necessary to justify the extraordinary remedy of a TRO.

## BACKGROUND

### A.  Registry Maintenance Obligations Under State And Federal Law.

The laws of Florida and the United States both require the Secretary and county supervisors to review Florida's voter registry and remove ineligible voter from the rolls.  These laws serve well-established and deeply compelling public interests: preventing ineligible voters from participating in elections avoids the dilution of citizens' fundamental right to vote and protects the legitimacy of the democratic process.  As DOJ recently emphasized before the Supreme Court, "the federal and state governments have a compelling interest in excluding foreign citizens" from the political process.  Motion of the United States to Dismiss or Affirm at 11, *Bluman v. FEC*, 132 S. Ct. 1087 (2012) (No. 11-275), 2011 WL 5548718.  Such exclusion is neither an "invidious attack" on these individuals nor "a deficiency in the democratic system"; rather, it is "a necessary consequence of the community's process of political self-definition."  *Id.* at 15 (quoting *Cabell v. Chavez-Salido*, 454 U.S. 432, 439 (1981)).

Specifically, Florida law requires that the Secretary and county supervisors "protect the integrity of the electoral process by ensuring the maintenance of accurate and current voter registration records."  Fla. Stat. § 98.075(1).  As part of this duty, the Secretary may access information from state and federal officials "[i]n order to identify ineligible registered voters and maintain accurate and current voter registration records in the statewide voter registration system."  Fla. Stat. § 98.093.  If the Secretary or supervisor receives information that a registered

6

voter is ineligible, the supervisor must observe the following procedure to determine if the

individual should be removed from the statewide voter rolls:

1. **Notice and an opportunity to respond**. The supervisor must provide notice to the registered voter by certified mail informing him or her of his or her potential ineligibility, disclosing that failure to respond within 30 days may result in removal from the rolls, and informing the recipient that he or she has a right to a hearing.  The notice must further include a return form that requires the voter to admit or deny the basis for ineligibility.[1]

2. **Allow voter 30 days to respond.**

3. **Provide a hearing** if requested by the voter.

4. **Determine eligibility** of the registered voter based on a preponderance of the evidence.

*See* Fla. Stat. § 98.075(7).

Federal law places a similar obligation on the Secretary.  The Help America Vote Act

("HAVA") requires the Secretary to "ensure that voter registration records in the State are

accurate and are updated regularly" in order to "remove registrants who are ineligible to vote."

42 U.S.C. § 15483(a).  Moreover, the Secretary is required to review data from "the database of

the motor vehicle authority" in order to verify the accuracy of voter registration information.  *Id.*

The NVRA imposes additional obligations and restrictions on states in the maintenance

of their voter registries.  Specifically, the NVRA (a) enumerates the substantive grounds

determining *who* may be removed from a registration list, and (b) imposes procedural restrictions

on *how* and *when* a state removes a voter for those enumerated grounds.

- Subsection (a)(3) provides an exclusive list of the bases on which a registrant can be removed from the voting rolls:  "[T]he name of a registrant may not be removed from the official list of eligible voters except—(A) at the request of the registrant; (B) as provided by State law, by reason of criminal conviction or mental incapacity; or (C) as provided under paragraph (4)."

- Subsection (a)(4), in turn, requires that States conduct a voter removal program, *i.e.*, "a general program that makes a reasonable effort to remove the names of

---

[1]  If the mailed notice is returned as undeliverable, the supervisor must provide notice by publication.

ineligible voters from the official lists of eligible voters by reason of - (A) the death of the registrant; or (B) a change in the residence of the registrant in accordance with subsection (b), (c), and (d) of this section."

- Subsection (c)(2)(A) provides a restriction on the aforementioned "Voter removal programs": "A State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters."

- However, the 90-day bar does not apply to removal on any enumerated ground for removal except change of residence.  That is, subsection (c)(2)(A) "shall not be construed to preclude—(i) the removal of names from official lists of voters on a basis described in paragraph (3)(A) [by request] or (B) [as provided by State law, by reason of criminal conviction or mental incapacity]; or (4)(A) [death]."

42 U.S.C. § 1973gg-6.

Thus, as a substantive matter, the NVRA prohibits the removal of names from a voting registry except for the reasons listed in subsections (a)(3) and (a)(4).  Moreover, as a procedural matter, the NVRA requires that a state must conduct a voter removal program to remove voters who are deceased, or changed their residence, provided that such a program may not systematically remove those who have changed their residence within 90 days of an election.

**B.    The Secretary Obtains Screening Information From DHSMV.**

Pursuant to the foregoing obligations, FDOS and county supervisors regularly engage in efforts to identify ineligible voters on the State's voter registration rolls.  For example, FDOS receives monthly reports of: deceased adults from the Florida Department of Health; persons adjudicated mentally incompetent from each clerk of the circuit court; and persons who have become licensed to drive in other states from DHSMV.  FDOS also receives information from the United States Social Security Administration about registered voters who are deceased.  And the Florida Department of Law Enforcement identifies persons on the voter rolls who have been convicted of a felony.  *See generally* Fla. Stat. §§ 98.075, 98.093.

In 2011, as required by federal law, the Secretary worked with the DHSMV to locate records in MDAVE pertaining to individuals on the voting rolls. *See* Fla. Exhibit 1, Declaration of Gisela Salas ("Salas Decl.") ¶ 2. This matching process produced DHSMV records for 11 million registered voters. Among those 11 million records, approximately 180,000, or 1.6%, showed that registered voters provided DHSMV with identification, such as a foreign passport, green card, or U.S. visa, indicating that they were non-citizens. *Id.* Between April 4 and April 30, 2012, the Secretary, at the urging of several members of the Executive Board of the Florida State Association of Supervisors of Elections, forwarded a sample of roughly 2,600 records to county supervisors for their additional review. *Id.* ¶ 4.

In distributing the sample of MDAVE data, FDOS reminded supervisors:

> The list that you will be receiving represents only non-immigrants initially identified in DHSMV's DAVE . . . . Please remember that you are still responsible for contacting these individuals and going through the process of verifying citizenship status before making a determination of eligibility for voter registration. You must follow the same procedures, in law, that you have in the past whenever you receive information that a registered voter of yours is ineligible to be registered to vote.

Pls. Exhibit 7 at 2.

### C.   Individualized Review Demonstrates Substantial Voter Fraud.

In response to the Secretary's sample of 2,600 records, most county supervisors complied with their legal duty to "[n]otify the registered voter of his or her potential ineligibility by mail within 7 days," Fla. Stat. § 98.075(7). Salas Decl. ¶ 5. Roughly 400 registered voters confirmed their eligibility to vote. *Id.* ¶ 6 Since April 4, 2012, over 100 registered voters admitted that they were non-citizens and have been removed from the voter rolls. *Id.* Over half of these individuals voted in prior elections. *Id.* FDOS is not aware of any individual who was removed from the rolls without a supervisor determining that the preponderance of the evidence

demonstrated they were ineligible, and DOJ has not identified a single individual who was wrongfully removed.  *Id.* ¶ 7

These results indicate a disturbing level of voter fraud.  Over half of the more than 100 admitted non-citizens who have been removed from the voter registration system since April 4, 2012, voted in prior elections.  If the results of this small sample were extrapolated to the remainder of the matched MDAVE records, potentially thousands of voters would be identified as non-citizens who had committed voter fraud.  The numbers grow even more disturbing if one considers those who did not respond to a notice, as it is reasonable to assume that the percentage of ineligible individuals among those who did not respond will be even higher than among those who did respond.

Notably, to the extent DOJ claims that certain county supervisors have threatened to remove voters solely based on the failure to respond to a notice of potential ineligibility, U.S. Mem. 19-20, such actions are contrary to state law and contrary to the directions of the Secretary. Such allegations are therefore irrelevant to this case, as they provide no justification for relief against the Secretary and must be addressed in an action against the relevant supervisor.

**D.     Out of an Abundance of Caution, the Secretary Suspends Practice Pending More Current and Accurate Information on Citizenship Status.**

On August l, 2011, in an effort to obtain the most reliable information possible, FDOS contacted DHS and explained that it sought access to SAVE to determine the eligibility of voters to be registered.  Pls. Exhibit 4 at 1.  FDOS's regular inquiries about the status of its request generally went unanswered for nearly a year.  *Id.*  Although the initial results of the 2,600-person sample confirmed a substantial amount of voter fraud, they also demonstrated that a number of eligible voters who became naturalized citizens after submitting paperwork to DHSMV had received notices of potential ineligibility.  The Secretary accordingly determined

that FDOS should acquire access to the more recent citizenship information contained in SAVE before forwarding additional potential non-citizens to county supervisors.  As stated in the Secretary's June 6, 2012, correspondence to DOJ: "Because DHS has repeatedly blocked Florida's access, we have been unable to send additional information to supervisors of elections since April 30, 2012." *Id.*

After being repeatedly and illegally denied access to SAVE data, on June 11, 2012, FDOS filed a Complaint for Declaratory and Injunctive Relief against DHS in the District Court for the District of Columbia seeking immediate access to the SAVE Program. *See Florida Dept. of State v. United States Dept. of Homeland Security et al.*, Case No. 1:12-CV-00960 (D.D.C.).

## ARGUMENT

As described above, DOJ's request for the extraordinary remedy of a TRO is patently unjustified.  DOJ has not identified *any* injury that will occur absent a TRO in the next several weeks, let alone an *irreparable* injury, and is also unlikely to succeed on the merits.

### A.    A TRO Is An Extraordinary Remedy, Granted Only In Cases Of True Exigency.

A temporary restraining order or a preliminary injunction is "an extraordinary and drastic remedy not to be granted unless the movant clearly carries the burden of persuasion." *Zardui–Quintana v. Richard*, 768 F.2d 1213, 1216 (11th Cir. 1985) (internal quotation marks omitted). In particular, the party seeking a TRO must make a clear showing both (a) that it will suffer irreparable injury absent the injunction *and* (b) that it is likely to prevail on the merits.  *See Winter v. Natural Res. Def. Council, Inc.*, 129 S.Ct. 365, 375 (2008).  Although the foregoing standard is sometimes described as an equitable balancing, *e.g.*, U.S. Mem. 12, the Supreme Court has stressed that these are absolute requirements, both of which must be clearly established in order to obtain an injunction.  *See Winter*, 129 S.Ct. at 375 (rejecting cases holding that a party

11

demonstrating a likelihood of success on the merits need only make a lesser showing of irreparable injury and holding that, at a minimum, "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction").  A court may not issue a general injunction directing a party to "obey the law" or avoid some general course of conduct not tethered to a specific violation.  *Burton v. City of Belle Glade*, 178 F.3d 1175, 1200-01 (11th Cir. 1999).  Rather, if warranted, any injunction "must be tailored to fit the nature and extent of [an] established violation."  *Gibson v. Firestone*, 741 F.2d 1268, 1273 (11th Cir. 1984)

### B.  DOJ Has Not Identified Any Irreparable Injury.

This case has none of the features normally accompanying a meritorious request for a TRO.  No property is on the verge of being destroyed, no trade secret will be revealed, and no constitutional rights will be violated in the upcoming weeks.  Rather, DOJ's suit seeks to enforce statutory requirements that relate to elections scheduled for August 14, 2012, and November 6, 2012.  Defendants are more than willing to provide briefing on any future motion with ample time for this Court to issue a ruling before August 14, 2012.  And no events will occur in the interim that could not be remedied by a preliminary or permanent injunction.

Nor is this a case in which the plaintiff has rushed to court to seek a TRO as soon as it learned of an imminent threat.   DOJ here waited to file its complaint until ten months after FDOS first asked the Federal Government to provide access to SAVE for voter verification purposes and over two months after the commencement of the (well-publicized) distribution of the sample list to local supervisors.  After belatedly filing its complaint, DOJ then waited an additional week before seeking a TRO.  *Cf. Crawford & Co. Medical Ben. Trust v. Repp*, No. 11 Civ. 50155, 2011 WL 2531844, at *7 (N.D. Ill. June 24, 2011) ("[P]laintiff waited almost a month to notice up its Motion for Temporary Restraining Order, demonstrating that there is little urgency by plaintiff.");  *Share Corp. v. Momar Inc.*, No. 10 Civ. 109, 2010 WL 933897, at *6

(E.D. Wis. March 11, 2010)  (plaintiff's delay of three days between filing a complaint and seeking a TRO "'raises questions' regarding the plaintiff's claim that it will face irreparable harm") (quoting *Ty, Inc. v. Jones Group Inc.*, 237 F.3d 891, 903 (7th Cir. 2001)).

As evidenced by DOJ's leisurely pace, there is no risk of irreparable injury that could justify the entry of a TRO.  Specifically, DOJ erroneously suggests that the Secretary is engaging in action which could irreparably injure the right of citizens to vote.  U.S. Mem. 18-19.  As noted above, however, the Secretary, as of April 30th, suspended the transmittal of additional "potential ineligibility" records to county supervisors.  Moreover, even were the Secretary to send out additional information, county supervisors would simply request verification of citizenship—a routine measure that hardly constitutes irreparable injury.  Finally, even in the unlikely event that an eligible voter is erroneously removed from the rolls, there would be ample time to correct any injury in a focused proceeding.  The *possibility* of a wrongful exclusion of an eligible voter that might occur *if* the *status quo* were to change (*if* the Secretary reinitiates his transmittal of potential ineligibility data and *if* the county supervisors seek verification and *if* a voter is excluded based on erroneous citizenship data), cannot justify emergency relief prohibiting action which is not occurring.  In our system, legal questions are adjudicated only when an injury ripens to the point that it is susceptible to focused injunctive relief based on facts, rather than, as DOJ would have it, through entry of prophylactic and unnecessary relief based on media-driven speculation about events that may never occur.

### 1.     The Secretary Is Not Engaged In The Challenged Activity.

Most fundamentally, DOJ's assertions of irreparable injury are based on a simple factual error: the Secretary is not currently engaged in—and, under present circumstances, has no plans to engage in—the activities DOJ challenges.  As explained above, because the federal government has wrongfully refused to provide SAVE access, the Secretary has suspended the

transmission of additional records to county supervisors.  Salas Decl. ¶ 8.  Simply put, until access to the SAVE data is resolved, the Secretary has no plans to engage in the conduct alleged by DOJ.   There is therefore nothing to be restrained at this juncture.   To be sure, the Secretary may *internally* review data in the State's possession to analyze the extent of possible voter fraud.  However, despite DOJ's  insinuations to the contrary, U.S. Mem. 15, the mere internal review of pre-existing data cannot conceivably constitute irreparable injury under the NVRA.

## 2.      Asking Registrants To Verify Their Eligibility Is Not Irreparable Injury.

Even if the Secretary were providing new names of potentially ineligible voters to county supervisors, there would still be no irreparable injury that would justify a TRO.  DOJ speculates that asking registered voters to respond to evidence of their potential ineligibility will "generate confusion among those voters" and could therefore "discourage and intimidate voters from voting."  U.S. Mem. 20.  This bald assertion, however, is not supported by any evidence, anecdote, or even common sense.  It strains credulity to suggest that any meaningful number of Florida residents are unsure of their citizenship status, or that any citizen, particularly a newly naturalized one, would be unsure whether citizens are allowed to vote.

Nor is there anything offensive or "invidious" about ensuring that only citizens vote, *see* Motion of United States *supra* at 15.  Indeed, it is *at least* as plausible to believe that naturalized citizens would be honored, not ashamed, to affirm that they are American citizens and are now eligible to participate in legitimate elections free of fraud.  Moreover, the NVRA itself *require*s, and Florida law accordingly provides, that *every* individual must swear an oath that they are a citizen as a condition of registering to vote.  42 USC § 1973gg–3; Fla. Stat. 97.051.  In fact, federal law places such an emphasis on avoiding non-citizen voting that improper voting by a non-citizen can violate as many as four separate federal criminal laws.  *See* Fla. Exhibit 2, DOJ, Federal Prosecution of Election Offenses at 67 (2007).   For this reason, it is implausible to

believe that anyone will be deterred from registering to vote out of fear that they will be asked to verify their citizenship; if a voter is unwilling to verify their citizenship, they will be incapable of completing the voter registration form in the first instance.  Thus, states can obviously ask about citizenship.  Nor can there be anything troublesome about the Secretary's *method* of confirming citizenship, since that very method—sending notices requesting a verification of eligibility—is expressly authorized by the NVRA and HAVA.  42 U.S.C. 1973gg-6(b)(2); *id* § 15483(a)(4).  Surely DOJ does not contend that these federal statutes impermissibly chill the right to vote.

As the Supreme Court has emphasized, a plaintiff seeking preliminary relief cannot meet its burden by asserting an injury that is merely a "possibility";  rather, the plaintiffs must make a "clear showing" that irreparable injury is "likely."  *Winter*, 129 S. Ct. at  376.  Here, DOJ's bald assertions do not even rise to a meaningful possibility, let alone the necessary "clear showing."

### 3.    No Citizen's Right To Vote Will Be Irreparably Harmed.

Finally, even if the Secretary were continuing to distribute new names to county supervisors, and even if validly registered voters were impermissibly removed as a result, DOJ *still* would not have identified any harm that is irreparable.  Although DOJ repeatedly notes the unassailable proposition that deprivation of the right to vote constitutes irreparable harm, U.S. Mem. 19, emergency relief is not necessary to protect any Floridian's right to vote.  Rather, even if an individual were stricken from the voter registry tomorrow, and even if the Court were to determine on a later motion that such a strike was improper, the Court could avoid any injury at that later stage by restoring that voter to the rolls before the August 14, 2012 primary.

This Court plainly has the authority to order the restoration of a voter to the rolls.  *E.g.*, *E.g.*, *U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 376 (6th Cir. 2008) (upholding injunction ordering the reinstatement of voters stricken from the rolls).  Indeed, DOJ itself recognizes this authority when it seeks the reinstatement of certain voters in its motion.  U.S. Mem. 23.

Moreover, Florida law explicitly provides that a county supervisor *must* restore the name of any voter as soon as it is determined that he or she "has been erroneously or illegally removed," "even though the registration period for that election is closed."  Fla Stat. § 98.081.  And, as a final failsafe, any voter "claiming to be properly registered in the state and eligible to vote" may vote a provisional ballot and demonstrate his eligibility after the election.  Fla. Stat. § 101.048(1).

This Court's recent preliminary injunction in *League of Women Voters v. Browning*, No. 11 Civ. 628, 2012 WL 1957793 (S.D. Fla. May 31, 2012), provides a telling contrast.  In that case, the Court made a preliminary determination that the plaintiffs—who had asserted their speech and association rights to help *register* voters—could be irrevocably injured "because when a plaintiff loses an opportunity to register a voter, the opportunity is gone forever."  *Id.* at *11.  Accordingly, there [was] no way to remedy the plaintiffs' continuing loss through relief granted later in th[e] litigation."  *Id.*  Here, if a voter is removed, his right to vote is not "gone forever"; rather, it can clearly be remedied by "relief granted later in this litigation."  *Id.*

**4.     DOJ's Requests For Affirmative Relief Are Outside The Scope Of A TRO.**

In addition to asking this Court to enter an entirely superfluous injunction to preserve the *status quo*,  DOJ's motion seeks various forms of affirmative injunctive relief such as requiring the Secretary to order independent county supervisors, all but one of whom are elected,  not to remove additional individuals from the rolls and restoring to the rolls voters who were identified by the database matching program.  U.S. Mem. 23.  Such requests are plainly outside the scope of a TRO.  A temporary *restraining* order may only preserve the status quo pending further litigation; it cannot grant affirmative relief to remedy past conduct.  *See Mitsubishi Intern. Corp. v. Cardinal Textile Sales, Inc.*, 14 F.3d 1507, 1515 (11th Cir. 1994) (holding that an order was not a proper TRO "because it did not merely preserve the status quo but instead granted affirmative relief").  A TRO is thus inappropriate where the "Plaintiff is not seeking to have the

16

status quo maintained but instead is asking the court to alter the status quo on an emergency basis." *Winward v. Hill*, No. 92 Civ. 1227, 1992 WL 184313, at \*1 (E.D. Pa. July 24, 1992).

Indeed, DOJ's requested relief would be improper even if sought as part of a preliminary injunction.  "Mandatory preliminary injunctive [that alters the status quo] in any circumstance is disfavored, and warranted only in the most extraordinary circumstances." *In re Microsoft Corp. Antitrust Litig.*, 33 F.3d 517, 525 (4th Cir. 2003).  *See also Harris v. Wilters*, 596 F.2d 678, 680 5th Cir. 1979) ("Only in rare instances is the issuance of a mandatory preliminary injunction proper.").  Here, however, the affirmative relief sought by DOJ is particularly improper, as it would direct the Secretary to purport to order the actions of independent, elected officials, over whom the Secretary has no direct supervisory authority, and who are not before the Court.

Finally, DOJ's vague request that the Secretary be ordered to "take further action" to ensure that county supervisors do not remove additional voters and "take all actions necessary" to stop implementation of the "matching purge program" are plainly inconsistent with the specificity requirement of Federal Rule of Civil Procedure 65(d).  *See Burton,* 187 F.3d at 1200.

### C .    The Activities Challenged By DOJ Were Lawful.

Because DOJ has not identified anything resembling an irreparable injury, this Court has no reason to engage in a rushed review of the merits.  Preliminary rulings on partial briefing are disfavored for good reason, and DOJ has offered no justification for what would effectively be an advisory opinion at this stage.[2]  In any event, DOJ's claims also fail on the merits.

As explained below, the plain text of the NVRA, while not artfully worded, cannot be read in a manner that prohibits removal of non-citizens from the rolls *within* a 90-day quiet period, but that permits non-citizens to be removed from the rolls *outside* of a 90-day quiet

---

[2] Indeed, it is far from clear that DOJ has identified any Article III injury sufficient to create standing.

period.  DOJ's focus on the 90-day quiet period is thus a red herring.  That is, either states may remove wrongfully-registered non-citizens from the rolls at any time, or not at all.  Multiple reasonable interpretations of the NVRA produce the first result, but there is no reasonable reading of the Act that produces the second.

> **1.** **The NVRA's "Quiet Period" Does Not Apply To Removals Based On Lack of Citizenship, Which Are "As Provided By State Law"**

As described above, the NVRA provides the exclusive grounds on which a state may remove voters from the rolls: "(A) at the request of the registrant; (B) as provided by State law, by reason of criminal conviction or mental incapacity; or (C) as provided under paragraph (4) [*i.e.*, because of death or change in residence]."  42 U.S.C. § 1973gg-6(a)(3).  These are the *only* grounds allowed by the NVRA for removing a registered voter *at any time*: outside of these grounds, "the name of a registrant may not be removed."  *Id.* § 1973gg-6(a)(3).  Each of these grounds, except for change in residence, is also explicitly exempt from the NVRA's prohibition on the "systematic[]" removal of registered voters within 90 days of a given election.  *Id.* § 1973gg-6(c)(2)(B).  In other words, the 90-day ban in fact applies to one, and only one, of the permissible grounds for removal: change in residence.

Thus, removal of non-citizens may be done within 90 days of an election if it falls within *any* authorized ground for removal, except for change in residence.  Here, the "as provided by state law" criterion authorizes non-citizen removal because Florida law provides that non-citizens shall be removed from the rolls, Fla. Stat. § 98.075(6).  And because the 90-day ban does not apply to removals "as provided by state law," such removal may be conducted at any time.

DOJ attempts to avoid this reading by assuming that the "as provided by state law" is limited by the clause "by reason of criminal conviction or mental incapacity."  U.S. Mem. 14.  To be sure, the NVRA is ambiguously worded:  On the one hand, Congress *could* have intended

the phrase "as provided by State law" to be modified by the clause that follows it—"by reason of criminal conviction or mental incapacity."  On the other hand, had Congress intended that meaning, it would have been far simpler to state that voters may be removed "by reason of criminal conviction or mental incapacity as provided by state law."  By placing the phrase "as provided by state law" first and separating it with a comma, Congress created an alternative inference that the two clauses were intended to operate independently.

Perhaps more important, the NVRA was obviously not intended to restrict or alter the bedrock grounds for disqualification of voters "provided by state law," such as the criteria disqualifying non-citizens and under-age youth.  The legislative history makes this truism explicit: "The [NVRA] should not be interpreted in any way to supplant th[e] authority" of election officials "to enroll eligible voters" and "continue to make determinations as to applicant's eligibility, such as citizenship, as are made under current law and practice." H.R. REP. NO. 103-9, at 112 (1993), 1993 U.S.C.C.A.N. 105, 112.  Indeed, the NVRA itself requires that every individual must swear an oath that they are a citizen as a condition of registering to vote. 42 USC § 1973gg–3.  That being so, the Act's drafters would obviously have wanted a provision endorsing exclusion under the normal "state law" requirements.

In any event, any ambiguity can only be resolved in one direction.  "[N]othing is better settled than that statutes should receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or absurd conclusion." *United States v. Ballinger*, 395 F.3d 1218, 1237 (11th Cir. 2005) (quoting *In re Chapman*, 166 U.S. 661, 667 (1897)).  Thus, courts routinely reject readings of ambiguous statutory language that would produce anomalous results.  *In re Graupner*, 537 F.3d 1295, 1302 (11th Cir. 2008).  Likewise, it has long been established that "every reasonable construction must be resorted to, in order to

save a statute from unconstitutionality." *Hooper v. California*, 155 U.S. 648, 657 (1895).

Here, DOJ's reading would mean that no State could *ever* strike ineligible voters for any reason except a request, death, criminal conviction, adjudication of mental incapacity, or change of residence.  Thus, states would be banned from removing non-citizens, minors, out-of-state residents, or fictitious individuals *at any time*.  That result would be clearly absurd.  *See Bell v. Marinko*, 367 F.3d 588, 592 (6th Cir. 2004) ("Were we to find that the Board's removal of these voters [who were ineligible nonresidents] does violate the Act, we would effectively grant, and then protect, the franchise of persons not eligible to vote.").  Such a result would also likely be unconstitutional, as it would require the State to dilute the votes of eligible voters.

The foregoing absurdity, and specter of unconstitutionality, dictate that the Court resolve the ambiguity of the NVRA against DOJ's reading by holding that the phrase "as provided by State law," contained in paragraph (a)(3) is an  independent basis for removing a voter from the rolls.  That basis, in turn, is explicitly excepted from the NVRA's 90-day quiet period.  42 § 1973gg-6(c)(2)(B).  Stated another way, Congress either intended that states may remove non-citizens, minors, non-residents, and fictitious persons from the voting rolls at any time, or not all.  Where, as here, the statutory text is ambiguous, it would be absurd to conclude the latter.

### 2.    Alternatively, The NVRA Regulates Only the Removal of Properly Registered Voters.

The Secretary believes that the preceding analysis is the best approach to reconciling statutory ambiguity in light of obvious congressional intent.  However, if the DOJ's request to read away "as provided by state  law" is accepted, there is an alternative reading of the NVRA that is still far closer to congressional intent than to conclude that citizens may never be removed from voter rolls.  Specifically, if subsections (a)(3) and (a)(4) are read to contain no catchall phrase permitting the removal of voters improperly registered under state law, then these

provisions, and the 90-day rule that modifies them, must be read to address only the eligibility of people who were validly registered at one time.  That is, these provisions must regulate only when once-eligible voters may be deprived of that status because of a request, death, criminal conviction, adjudication of mental incapacity, or change of residence.  The 90-day ban then restricts only removal on *these* grounds, not removal based on foreign citizenship, age, or fraud.

This is because, on the federal government's reading, subsections (a)(3), (a)(4), as well as the 90-day provision, only deal with situations where formerly *bona fide* "registrants" are removed because they are no longer eligible to vote.  They do not govern the situation of belatedly excluding those who should never have been on the rolls because they were never *bona fide* registrants.  Rather, the process of belatedly excluding those who were never eligible is governed by a separate provision, 42 U.S.C. 1973gg-6(b), which authorizes state activities "to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll."   In short, Congress created two parallel sets of rules: one set of "removal" rules, contained in subsections (a)(3), (a)(4), and the 90-day provision, that regulates removal of bona fide "registrants," and a separate set of "maintenance" rules, contained in subsection (b), which regulate efforts to belatedly exclude voters who were never eligible.

This conclusion was adopted by multiple courts.  For example, in *Common Cause of Colorado v. Buescher*, 750 F. Supp. 2d 1259, 1274 (D. Colo. 2010), the court refused to hold that the NVRA barred Colorado from removing recently registered voters whose voter card was returned as undeliverable.  Although these voters "would technically have been on Colorado's 'official list of eligible voters,'" *id.* at 1265, the court reasoned that, when "place[d] in the overall context of the states' federally mandated [election] obligations," the NVRA was intended only to regulate how "*duly* registered voters are removed,"  not to restrict the removal of individuals who

were never properly eligible to begin with.  *Id.* at 1275.  Likewise, in *Bell*, 367 F.3d 588, the

court held that Ohio was not barred from removing improperly registered temporary residents

from the rolls because, "[i]n creating a list of justifications for removal, Congress did not intend

to bar the removal of names from the official list of persons who were ineligible and improperly

registered to vote in the first place." *Id.* at 591-92.

In short, while the NVRA is not free of ambiguity, the better view is that exclusion of

never-eligible voters is not subject to the NVRA's restrictions on removing once-eligible voters.

More important, the ambiguity must be resolved in favor of allowing the exclusion of non-

citizens, because Congress never would have intended the absurd and seemingly unconstitutional

result of permanently disabling states from preserving the integrity of their voter rolls.

DOJ cannot avoid the foregoing absurd result by arguing that citizenship is somehow a

forbidden basis for removal during a 90-day quiet period, but permitted outside it.  The sole basis

for its argument that citizenship removal is not excepted from the 90-day period is that

citizenship is not among the listed grounds of removal in (a)(3) and (a)(4).  U.S. Mem. 4-5.

Since non-citizenship is purportedly not among the listed authorizations in (a)(3) and (a)(4), then

individuals "may not be removed" on this basis at any time.  If citizenship is a listed ground

included in (a)(3) and (a)(4), then it is excepted from the 90 day provision.  If citizenship is not a

listed ground, then it is not excepted.  In other words, subsections (a)(3) and (a)(4) do two related

things.  First, they specify that the included grounds for removal are permissible, and second,

they also place these same grounds (except for change in residence) outside the scope of the 90-

day ban on removal.  DOJ cannot maintain, therefore, that citizenship is a permitted ground for

removal, but is not excepted from the 90-day provision.  Simply put, if citizenship is not a

criterion included in subsection (a)(3) or (a)(4) when those provisions identify the grounds for

permissible removal *outside* a quiet period, then citizenship be included in subsection (a)(3) or

(a)(4) when those provisions identify exceptions to the removal ban *within* the quiet period.

Since DOJ has not argued, and surely will not argue, that removal based on non-citizenship is

always banned, this conclusively shows that its 90-day argument must be wrong.

> ### 3. The Secretary's Past Actions Were Plainly "Uniform, Nondiscriminatory, And In Compliance With The Voting Rights Act."

Finally, DOJ asserts that Florida's use of MDAVE data is not (a) "uniform" and (b)

"nondiscriminatory," as required by the NVRA. This claim is equal parts non sequitur and

unsubstantiated accusation.

(a) The Secretary's use of MDAVE data is not "uniform," DOJ claims, because "the

database matching procedures" used by the Secretary "are inaccurate and unreliable." U.S. Mem.

16. This complaint is ironic, given that the federal government has repeatedly and without

explanation ignored Florida's request for more accurate data from the SAVE database. But in

any event, "uniform" does not mean "accurate and reliable"; rather, it means "always the same,

unvarying." American Heritage Dictionary 1321 (2d ed. 1985). Specifically, as used in the

NVRA, "[t]he term 'uniform' is intended to mean that any purge program or activity must be

applied to an entire jurisdiction." H.R. REP. NO. 103-9, at 119 (1993), 1993 U.S.C.C.A.N. 105,

119. DOJ does not, and cannot, allege that the Secretary's use of the MDAVE data, or Florida

law regarding the obligations of county supervisors regarding that data, was not statewide.[3]

Moreover, even if one indulges DOJ's attempt to read an accuracy requirement into the

NVRA, DOJ has not identified anything inaccurate, in any relevant sense, about Florida's use of

---

[3] To the extent the United States argues that the use of the MDAVE data was not *implemented* in a uniform manner because some county supervisors refused to comply with their uniform obligation under state law to verify eligibility of those names, it is free to sue those supervisors to compel them to resume verification. It cannot be, however, that any variation by a single supervisor can void otherwise uniform efforts to verify voter eligibility.

MDAVE data.   DOJ has not identified a *single* voter who was improperly removed from the rolls. And it is frivolous to contend that a state may never use a broad, statewide database to *screen* for individuals who *may potentially* be ineligible and refer these names for further, individualized investigation.   That is, a state need not *know* that a voter is ineligible in order to *ask* if they are ineligible.   If that were the law, a state could *never* begin the process of narrowing down its list of registered voters from those who are potentially ineligible (on any ground) to those who are definitely ineligible because, on DOJ's view, the mere act of beginning with a general list renders the process inaccurate.   And, in any event, Federal law in fact *requires* Florida to undertake such efforts.   42 U.S.C. § 15483(a)(5)(B).

(b)   DOJ crosses even further into the realm of conclusory and unsubstantiated speculation by asserting that the Secretary's use of MDAVE data is "discriminatory."   DOJ cites a single source to support this claim: a news report "indicat[ing] that the program *may* have a disproportionate impact on minority voters" because "87 percent of those on the 2,600-person list are minorities."   U.S. Mem. 17 & n.6 (emphasis added).   As a threshold matter, a single media report speculating that the MDAVE data "may" have a disparate impact is obviously not competent evidence to support any judgment or relief.

More fundamentally, the fact that a program to remove non-citizen voters affects a large percentage of minorities is neither surprising, nor remotely indicative of impermissible discrimination.   *Any* program that removes non-citizens from the rolls in Florida, even if 100% accurate, will undoubtedly have this result.   But DOJ cannot and does not argue that the *accurate* removal of non-citizens has any impermissible disparate impact.   Any such argument, moreover, would be foreclosed by binding precedent.   In *Johnson v. Governor of State of Florida*, 405 F.3d 1214, 1228-29 (11th Cir. 2005), the Eleventh Circuit rejected the claim that an ex-felon

24

disenfranchisement statute created impermissible disparate impact because, although a disproportionate share of ex-felons were minorities, the Constitution and the Voting Rights Act presume felons may be denied the right to vote.  Here, the Constitution obviously presumes the absence of non-citizen voting even more strongly than that of ex-felon citizens, and construing the Voting Rights Act to require the dilution of citizens' votes by requiring non-citizen voting whenever there is a disparate impact raises even more "grave constitutional concerns" than an interpretation that reaches ex-felons.  *Id.* at 1232.  In short, accurately excluding non-citizens cannot violate the Voting Rights Act, notwithstanding its inevitable disparate impact, and DOJ does not allege that the "inaccuracies" in the MDAVE database cause or exacerbate a disparate impact *relative* to this unquestionably lawful practice.  Consequently, it has no claim that the challenged practice is "discriminatory" or violative of the Voting Rights Act.

In sum, DOJ's allegation of disparate impact makes no sense as a challenge to Florida's intended use of MDAVE data; at most it is an allegation that Florida's use of the data is unreliable.  As noted, such an allegation is not only ironic given the federal government's refusal to provide more accurate data, but also completely unsubstantiated.

## CONCLUSION

For the foregoing reasons, the federal government's motion for temporary restraining order should be denied.

Date: June 25, 2012

/s/ Michael A. Carvin

Daniel E. Nordby (Florida Bar No. 14588)
General Counsel

Michael A. Carvin (D.C. Bar No. 366784)
Gregory G. Katsas (D.C. Bar No. 448142)
Warren D. Postman (D.C. Bar No. 995083)

Ashley E. Davis (Florida Bar No. 48032)
Assistant General Counsel

JONES DAY
51 Louisiana Avenue N.W.
Washington, DC 20001
Telephone:  (202) 879-3939
Facsimile:   (202) 626-1700
macarvin@jonesday.com
ggkatsas@jonesday.com
wpostman@jonesday.com

Florida Department of State
R.A. Gray Building
500 South Bronough Street, Suite 100
Tallahassee, Florida 32399-0250
Telephone (850) 245-6536
Facsimile (850) 245-6127
Daniel.Nordby@DOS.MyFlorida.com
Ashley.Davis@DOS.MyFlorida.com

Counsel for Defendants

Counsel for Secretary of State Detzner

CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing will be sent electronically to the

registered participants (filed through CM/ECF system) on this the 25th day of June, 2012:


/s/ Michael A. Carvin

Michael A. Carvin
Counsel for Secretary of State Detzner