IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF FLORIDA; KEN DETZNER,<br>Secretary of State, in his official capacity,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)   CIVIL ACTION NO.<br>)   4:12-CV-00285-RH-CAS<br>)<br>)<br>)<br>)<br>) |

**UNITED STATES' MEMORANDUM IN OPPOSITION TO
LUIS I. GARCIA, DIANA K. WHITEHURST, HAL DAVID RUSH, and
BARBARA A. DEREUIL's MOTION FOR PERMISSIVE INTERVENTION**

Pursuant to the Court's June 21, 2012 Order (Docket No. 22), the United States files its

response to the First Motion for Intervention (Docket No. 18).  The United States opposes the

permissive intervention of Luis I. Garcia, Diana K. Whitehurst, Hal David Rush, and Barbara A.

Dereuil ("Proposed Intervenors") and respectfully requests an order denying the Proposed

Intervenors' motion to permissively intervene.  Proposed Intervenors have failed to establish

sufficient grounds for permissive intervention, as they present a generalized grievance and lack

sufficient standing under Article III of the U.S. Constitution.[1]  *See, e.g.*, *Lance v. Coffman*, 549

U.S. 437, 442 (2007) (finding lack of standing where party alleged "an undifferentiated,

generalized grievance about the conduct of government").  Permitting intervention could delay a

swift resolution of this case, which turns on the meaning of Section 8(c)(2)(A) of the National

---

[1]  The United States does not oppose permitting intervenors to file an *amicus* brief at the
appropriate time, provided that the filing does not delay the implementation of the requested
temporary restraining order to prevent further harm to eligible voters caused by the State's
actions.

Voter Registration Act ("NVRA") and whether the State is permitted to continue a systematic

removal program within 90 days of a Federal election. As outlined in the United States' motion

for a Temporary Restraining Order (Docket No. 7), eligible voters face irreparable harm from the

potential loss of their right to vote because of the State's actions, and the addition of parties with

a generalized grievance against the United States' enforcement action will likely delay the

United States' ability to obtain relief to enforce the protections for voters provided by the

NVRA.

## I.   FACTUAL BACKGROUND

The United States filed this action to enjoin Florida's systematic removal of registered

voters in violation of Section 8 of the National Voter Registration Act ("NVRA"). The United

States alleges that the voter verification program initiated by Florida, which compares

information in the Florida Department of Highway Safety and Motor Vehicles ("DHSMV")

database to the list of registered voters in the Florida Voter Registration System ("FVRS"),

violates Section 8(c)(2)(A) of the NVRA, *see* 42 U.S.C. § 1983gg-6(c)(2)(A), which requires

jurisdictions to complete systematic removal programs of ineligible voters within 90 days of a

federal election. The United States seeks a temporary restraining order and preliminary

injunction.

As noted in the Complaint and Motion for a Temporary Restraining Order, Defendants'

database matching procedures not only occur within the NVRA's 90-day quiet period but also

have caught hundreds of eligible citizen voters in its dragnet, calling into question their right to

vote and potentially depriving them of the right if they fail to respond within 30 days of a

mailing by the local county supervisors of elections. *See* Complaint, ¶¶ 19-20 (Docket No. 2);

Motion for Temporary Restraining Order, Exhibits 1 & 2 (Docket No. 7).

Indeed, within 90 days of a federal election, citizens (including native-born citizens) have received letters threatening their removal from the rolls unless they provide evidence of citizenship. *See* Exhibit 1 (Declaration of Eileen Selis). Eileen Selis, for example, received a letter from the Volusia County Supervisor of Elections as a result of her name appearing on the State's list of purported ineligible voters produced by the database matching program. Ms. Selis is a long-time resident and voter in Volusia County and has been a citizen her entire life, since she was born in Pennsylvania. *See* Fourteenth Amendment, Section 1 ("All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States. . . ."). The letter that Ms. Selis received questioning her citizenship is dated May 18, after the 90-day quiet period began on May 16 for the upcoming August 14, 2012 primary for Federal office. Although Ms. Selis provided evidence of her citizenship to the County, she said that the experience "shook me because I try to be a good citizen" and she was concerned that she might not be allowed to vote without providing additional evidence. Exhibit 1, ¶¶ 3-5. She questioned why she would receive such a letter. *See id.*¶ 6 ("I have voted for over 50 years. I have a driver's license, a voter registration card, and a passport. In addition, I pay my taxes, . . . and I have reported for jury duty each time my name was on the roster."). The 90-day quiet period enacted by Congress was designed to protect citizens such as Ms. Selis from being captured in careless voter removal dragnets such as the State of Florida's database matching program at issue here.

On May 31, the United States sent a letter to the Florida Secretary of State to outline the requirements of federal law with regards to its voter removal program and to note that the State's program was occurring within 90 days of the State's August 14, 2012 Federal primary election. *See* Docket No. 7, Ex. 3. On June 6, 2012, the Florida Secretary of State responded that it would

proceed with its voter removal program and that it viewed the program as consistent with federal law. Docket No. 7, Ex. 4. On June 12, the United States brought this action to ensure compliance with the NVRA, and is currently seeking a temporary restraining order to protect the rights of eligible voters who are being removed or threatened with removal during the 90-day period. The State has continued to insist that its removal program complies with federal law.[2] *See, e.g.,* Docket No. 27 (State's opposition to the motion for a temporary restraining order).

On June 20, 2012, Proposed Intervenors filed the instant motion, arguing that they are "properly registered and duly qualified voters who intend to vote in the [g]eneral [e]lection" and "clearly have 'an interest that is relating to the action pending before the court.'" Motion for Permissive Intervention at p. 4 (Docket No. 18). Proposed Intervenors assert limited facts in their motion for permissive intervention: an NBC report concerning jury excusal forms, the State's efforts to compare its voter registration database to the SAVE database, the distribution of lists to Supervisors of Election by Defendants, and the instant action. In a separate Answer

---

[2]   As mentioned in the motion for a temporary restraining order, the outcome of Florida's separate lawsuit against the Department of Homeland Security ("DHS") for access to the Systematic Alien Verification for Entitlements Program System of Records (the "SAVE" Program) has no bearing on this case, as the State is not permitted to conduct a systematic voter removal program within 90 days of a Federal election, regardless of the source of its database-matching efforts. *See* 42 U.S.C. § 1973gg-6(c)(2)(A). Since the filing of the DHS lawsuit, the Department of Homeland Security sent a letter to the State stating that the U.S. Citizenship and Immigration Services ("USCIS") agency that administers the database "has continuously expressed its willingness to work with Florida regarding possible SAVE Program participation, provided Florida is able to do so consistent with the SAVE Program's mandates and the conditions USCIS has lawfully placed on all SAVE Program participants." *See* Exhibit 2 (June 12, 2012 letter). The State responded on June 19, 2012. *See* Exhibit 3. Although the State's letter suggests that it has obtained preclearance under Section 5 of the Voting Rights Act for its action, in truth, the State has not obtained preclearance for its new database matching program. *See* Docket No. 7, Ex. 3 & 5. That lack of preclearance is not at issue in this case.

and counterclaim, Proposed Intervenors state that they "support the State's efforts." *See* Answer and Counterclaim of Defendant-Intervenors at 8 (Docket No. 18-1).

The District Court has scheduled a hearing on the United States' motion for a temporary restraining order for June 27, 2012.

## II.    LEGAL STANDARDS

District courts have broad discretion to refuse permissive intervention. *See Worlds v. Department of Health & Rehabilitation Services, State of Florida*, 929 F.2d 591, 595 (11th Cir. 1991).  Under Federal Rule of Civil Procedure 24(b)(1), proposed intervenors must show (1) that their application to intervene is timely and (2) that they have a conditional right to intervene by a federal statute or a claim or defense that shares a common question of law or fact with the main action.  Fed. R. Civ. P. 24(b)(1).  The district court's discretion to grant permissive intervention must also be guided by considerations of undue delay or prejudice to the adjudication of the rights of the existing parties.  Fed. R. Civ. P. 24(b)(3); *Meek v. Metro. Dade County*, 985 F.2d 1471, 1477 (11th Cir. 1993) *abrogated on other grounds by Dillard v. Chilton County Comm'n*, 495 F.3d 1324, 1332-35 (11th Cir. 2007) (per curium).  To that end, Article III standing is relevant to determining an intervenor's interest.  *Johnson v. Mortham*, 915 F. Supp 1529, 1535 n.6, 1538 (11th Cir. 1996); *Clark v. Putnam County*, 168 F.3d 458, 463 (11th Cir. 1999)( "[A] lack of Article III standing could suggest that the NAACP also lacks the particularized interest that an intervener must have in litigation.").  A generalized grievance does not satisfy Article III's standing requirements.  *Dillard,* 495 F.3d at 1333.

Other factors are relevant to determining whether granting permissive intervention will cause undue delay or prejudice the adjudication of existing parties.  Fed. R. Civ. P. 24(b)(3).  A Court may deny intervention, for example, if a would-be intervener's objective duplicates the

objective of a party. *See Meek*, 985 F.2d at 1477 (noting that "[w]hen applicants for intervention seek to achieve the same objectives an existing party in the case, that party is presumed to represent the applicants' interests adequately."); *Athens Lumber Co. v. Fed. Election Comm'n*, 690 F.2d 1364, 1367 (11th Cir. 1982) (affirming district court's denial of intervention when an intervenor did not assert a particularized interest and had the same objective as parties). Courts may also deny permissive intervention if an intervenor asserts new claims that expand the scope of an action. *See Sellers v. United States*, 709 F.2d 1469, 1471 (11th Cir. 1983) (affirming a District Court's denial of a motion to intervene permissively and noting that the proposed permissive intervention would have expanded the litigation); *Mt. Hawley Ins. Co. v. Sandy Lake Properties*, 425 F.3d 1308 (11th Cir. 2005) (denying permissive intervention where "[t]he issue of insurance coverage is unrelated to the issue of fault in the wrongful death action"); *U.S. v. Lee County*, 2012 WL 1676748, at *3-4 (M.D. Fla.) (Magistrate Judge ruling denying permissive intervention when the underlying facts and law needed to establish intervenor's claims were different) (Exhibit 4). This is particularly true when a would-be intervenor's interests are properly brought in a separate action. *Worlds*, 929 F.2d at 595. Finally, courts may consider the interests of judicial economy in determining whether to grant permissive intervention. *Johnson v. Mortham*, 915 F. Supp at 1535. Even if a would-be intervenor meets the threshold requirements of timeliness and commonality of law and fact, therefore, the court has discretion to deny a permissive motion to intervene. *See id.*

## III.   ARGUMENT

The United States brought this action to remedy a violation of federal voting rights law: the NVRA's bar on the systematic removal of registered voters within 90 days of a federal election. Here, otherwise lawfully registered voters are uncertain of their registration status

because they have been identified as potentially ineligible and systematic removal procedures have been initiated within 90 days of a federal election.  Proposed Intervenors fail to allege a particularized injury and do not satisfy the standards for permissive intervention.

A.    **Proposed Intervenors Fail to Assert a Particularized Grievance**

The right to vote is a fundamental right—one that the Department seeks to protect here with its motion for a temporary restraining order.  The right of registered voters to intervene in litigation impacting the right to vote, however, is limited.  *See Dillard*, 495 F.3d at1332-33 (quoting *Lance v. Coffman*, 549 U.S. 437 (2007) (per curiam) (finding that the grievance alleged by citizen voters was "precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past")).  "Any party, whether original or intervening, that seeks relief from a federal court must have standing to pursue its claims."  *Dillard*, 495 F.3d at1330.  Article III standing is also relevant to determining the interests of Proposed Intervenors and whether allowing a party to intervene will delay the adjudication of the instant action.  *See* Fed. R. Civ. P. 24(b)(3); *Johnson*, 915 F. Supp at 1536-38 (denying intervention when intervenors only had a generalized interest).

Proposed Intervenors only interest in this action is that they are a "bipartisan group of properly registered and duly qualified voters who intend to vote in the General election."  *See* Motion to Intervene at 4 (Docket No. 18).  However, a would-be intervenor must assert the particularized interests that an intervenor must have in the litigation.  *See Athens Lumber Co*, 690 F.2d at 1366, 1368 (finding that a genuine concern was insufficient to assert an "interest" sufficient for intervention as of right; also rejecting permissive intervention as it would delay the proceedings and because of the general nature of the proposed intervenors' claims).  A

generalized interest as a registered voter is not sufficient to assert an interest in the instant action. *See, e.g., Dillard*, 495 F.3d at 1332-33.

Like the injury plaintiffs alleged in *Lance v. Coffman*, 549 U.S. 437 (2007), Proposed Intervenors allege "an undifferentiated, generalized grievance about the conduct of government." *Id.* at 442. In *Lance*, the Supreme Court reiterated the jurisprudence on standing by noting that "a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Id.* at 439 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573-74 (1992)). Here, the Proposed Intervenors identify themselves as a group of voters that plans to vote in the November 2012 election, Docket No. 18 at p. 4, and nothing in their papers indicate how their concerns about potentially ineligible voters casting ballots differentiates the proposed intervenors from "every citizen's interest in proper application of the Constitution and laws." *Lance*, 549 U.S. at 439. Their motion presents nothing more than an attempt to weave together public information to imply that they (may or could) suffer an injury to their right to vote if the State of Florida is stopped from violating the NVRA. *See* Docket No. 18 at pp. 2-4.

In essence, intervenors object to the Department of Justice's decision to bring an enforcement action against the State of Florida for failing to comply with federal law; they assert no purported harm specific to themselves that is not shared by every other voter in the state. Speculative assertions that allege generalized harms are insufficient to establish a particularized interest in this action. *See Johnson*, 915 F. Supp at 1538; *Dillard*, 495 F.3d at 1332-33. Proposed Intervenors have failed to demonstrate anything more than a generalized grievance

about the NVRA's 90 day quiet period.  They further offer to "assist the court in [properly] interpreting" federal law, Docket No. 18 at p. 5, but they fail to allege facts establishing that they have an "expertise" that would assist the court or promote judicial economy.  *See, e.g., Johnson*, 915 F. Supp at 1538-39 (allowing intervention of the NAACP because of its "unique perspective" and its past involvement in a related case where the special master was "substantially influenced" by a redistricting plan submitted by the NAACP).

Finally, judicial economy supports a denial of intervention: the issue in this case rests principally on the proper reading of the NVRA.  Introducing purported constitutional claims based on these voters' generalized grievances against the United States' decision to enforce the NVRA will simply prolong and complicate a straightforward case and will potentially delay relief for voters who are being irreparably harmed as a result of the State's voter removal program.  Proposed Intervenors' alleged interest as registered voters is common to all registered voters in Florida.  If every registered voter in the State of Florida were able to allege an interest in this litigation because they are registered and have a fundamental right to vote, this case would become unmanageable.

**B.   The State Will Adequately Represent the Interests of the Proposed Intervenors, as Both Seek the Same Goal: the Ability of the State to Continue Its Voter Removal Program Within 90 Days of a Federal Election**

As outlined above, the Proposed Intervenors lack standing because they allege a purported, generalized grievance no different from a grievance any voter might allege.[3]  The Proposed Intervenors only seek permissive intervention, *see* Docket No. 18 at p. 1, and not

---

[3]  The Proposed Intervenors, of course, fail to take into account that the position that they advocate (and the State advocates) will harm eligible citizen voters just like themselves, and that the errors committed by the State in its unreliable voter removal program could easily have affected the Proposed Intervenors' rights, as well.  *See* Exhibit 1 (declaration of Pennsylvania-born voter identified for potential removal by State's database matching program).

intervention as of right under Fed Rule Civ. P. 24(a). One element present when courts deny

intervention as of right is also present here: the State will adequately represent the interests of the

Proposed Intervenors, as they share the same goal: the ability of the State to continue its voter

removal program within 90 days of a Federal election. *See* Motion to Intervene at pp. 4-5

(Docket No. 18). Although an intervenor may support the interests of a party, there must be

some evidence that Defendant's representation may be inadequate. *See Clark*, 168 F.3d at 461.

Defendants are steadfast in their intention to systematically compare databases and

distribute the resulting lists to County Supervisors of Elections, within the 90-day quiet period

before the August 14, 2012 primary election for Federal office. *See* Docket No. 7, Ex. 4 & 7.

Based on the Defendants' June 6, 2012 reply to the Department of Justice (Docket No. 7, Ex. 4 at

p. 3), the State's continued statements that they plan to continue the program, and counsel's

representations during the June 18, 2012 scheduling conference, Defendants' position is

consistent and their objective clear: to use the results of the database matching program within

90 days of a federal election to remove voters' names from the rolls.

Nonetheless, Proposed Intervenors rely on *Clark v. Putnam* to assert that they have a

separate interest as registered voters. Their reliance on *Clark* is misplaced. In *Clark*, four white

Putnam County, Georgia voters alleged that a court-ordered, single-member district plan that had

been drawn to remedy a finding that an at-large method of election violated the Voting Rights

Act constituted an unconstitutional racial gerrymander. *Clark*, 168 F.3d at 460. The NAACP

and would-be intervenors, African-American voters who were plaintiffs in the original successful

challenge to the at-large method of election, moved to intervene as of right to defend the

remedial plan. *Id*. The *Clark* court found that intervenors showed a sufficient divergence of

interests to rebut the presumption that the county commissioners adequately represented their

interests, and only allowed intervention because of those divergent interests. *Id.* at 461. Unlike the Plaintiffs in *Clark*, Proposed Intervenors fail to allege *any* facts that their interests diverge from Defendants and therefore that the State will not adequately represent them.

The Proposed Intervenors also rely on *Johnson v. Mortham* to allow for intervention, yet the case actually undermines their case for permissive intervention. *Johnson* was a redistricting challenge in which a variety of intervenors who lived within and outside of a newly created minority-majority district sought to intervene in a case challenging that district. *Johnson*, 915 F. Supp. at 1536-38. The *Johnson* court found that only some of the proposed intervenors had "a direct, substantial, and legally protectable interest in the litigation sufficient to entitle them to intervene as of right." *Id.* at 1536. Again, Proposed Intervenors here do not seek intervention as of right pursuant to Fed. R. Civ. P. 24(a), and they certainly have not shown a "direct, substantial, and legally protectable interest in the litigation," given the generalized nature of their grievances. In *Johnson*, the court denied intervention as to registered voters and members of Congress who lacked standing to bring suit. *Id.* ("The fact that voters from other congressional districts lack standing is relevant to whether they have sufficient protectable interests to intervene."); *see also id.* (citing *ManaSota-88, Inc. v. Tidwell*, 896 F.2d 1318, 1223 (11th Cir. 1990) for the proposition that "mere fact that a movant may be disadvantaged by [the] potential stare decisis effect of decision does not automatically warrant granting movant's application to intervene as of right").

### C. Proposed Intervenors' Attempt to Raise Additional Claims Not at Issue in this Case Should Be Denied

Although the Proposed Intervenors' claims also purportedly arise over the State of Florida's voter removal program, the adjudication of issues raised in the Proposed Intervenors' complaint will significantly expand the scope of this action and unduly delay the adjudication of

- 12 -

the United States' claims. *See Sellers*, 709 F.2d at 1471 (denying permissive intervention and

noting that permissive intervention would have expanded the litigation); *U.S. v. Lee County*,

2012 WL 1676748 at *3-4 (denying permissive intervention when the underlying facts and law

needed to establish intervenor's claims were different) (Exhibit 4); *EEOC v. Dimare Ruskin,

Inc.*, 2011 WL 5974682, at * 2-3 (M.D. Fla.) (denying permissive intervention where it would

cause undue delay or prejudice the adjudication of the EEOC's claims) (Exhibit 5). Proposed

Intervenors' counterclaims could be appropriately dealt with in a separate suit, assuming they

could prove jurisdictional requirements. *See Worlds*, 929 F. 2d at 594-95 (denying intervention

by right and permissive intervention when the intervenor's interests were sufficient to allow

intervention as of right but "would not be impaired by refusing intervention").

Proposed Intervenors raise an undifferentiated, generalized grievance about the conduct

of government (*i.e.*, the decision of the United States file a lawsuit enforcing the NVRA's 90-day

quiet period requirement). *See* discussion, *supra*. The intervenors wish to change a

straightforward case about the proper interpretation of a federal statute, for which this Court does

not require the intervenors' assistance, and to transform it to a novel claim challenging the

constitutionality of the NVRA based on questionable Article III standing.[4]

---

[4]   Under the cannons of statutory construction "federal courts should not construe a statute to
create a constitutional question unless there is a clear statement from Congress endorsing this
understanding." *Johnson v. Gov. of Florida*, 405 F.3d 1214, 1229 (11th Cir. 2005). Here,
Congress acted pursuant to the Elections Clause of the Constitution in enacting the NVRA, and
the Act's protections of eligible voters from being removed from the voter rolls through voter
removal programs within 90 days of a Federal election does not infringe on any rights of the
Proposed Intervenors. The constitutionality of the NVRA has been repeatedly upheld in
response to challenges by states. *See, e.g., Association of Community Organizations for Reform
Now v. Miller*, 129 F.3d 833 (6th Cir. 1997); *Voting Rights Coalition v. Wilson,*60 F.3d 1411 (9th
Cir. 1995), cert. denied, 516 U.S. 1093 (1996); *Association of Community Organizations for
Reform Now v. Edgar*, 56 F.3d 791 (7th Cir. 1995).  Courts have also dismissed several private
party challenges to the NVRA for lack of standing.  See, e.g., *Kalsson v. U.S. Federal Election*

Proposed Intervenors counterclaims seek to inject new questions about the constitutionality of the NVRA's removal procedures into this action. Congress has already balanced this constitutional interest. In enacting the NVRA, Congress acted pursuant to the Elections Clause of the U.S. Constitution, which gives Congress "plenary authority over Federal elections but also explicitly ensure[s] that all conflicts with similar state laws would be resolved wholly in favor of the national government." *Harkless v. Brunner,* 545 F.3d 445, 454 (6th Cir. 2008). Congress passed the NVRA recognizing that the right of "citizens of the United States to vote is a fundamental right." Thus, "protect[ing] the integrity of the electoral process" and "ensur[ing] that accurate and current voter registration rolls are maintained" are among the identified purposes of the Act. *See* 42 U.S.C. §§ 1973gg(a)(1) & (b)(3) & (4). Proposed Intervenors ignore the plain language of the statute and assert constitutional claims that seek to supplant congressional judgment with their own. Specifically, Congress' judgment was that states must conduct list maintenance procedures, provided that they comply with the requirements of the NVRA, including that they be concluded within 90 days of a federal election, absent a specific exception, and that they be uniform, non-discriminatory, and consistent with the Voting Rights Act. *See* 42 U.S.C. §§ 1973gg-6(b)(1) & (c)(2)(A). To the extent that Proposed Intervenors raise an objection at all, it is that the NVRA prevents systematic voter removal programs within 90-days of a federal election. Their claim is analogous to the generalized grievances raised by would-be plaintiffs in *Lance v. Coffman* and rejected by the Supreme Court. *See* 549 U.S. at 442 (plaintiffs only injury was that "the law—specifically the Elections Clause—[was] not followed)." Under the plain language of the NVRA, Congress found that the right to vote was fundamental. Proposed Intervenors protest is simply that the

---

*Com'n,* 356 F.Supp.2d 371 (S.D.N.Y. 2005); *Amalfitano v. U.S.,* 2001 WL 103437 (S.D.N.Y., February 07, 2001), *aff'd,* 21 Fed.Appx. 67 (2nd Cir. 2001), cert. denied, 536 U.S. 939 (2002).

- 14 -

NVRA's 90-day requirement exists and that the United States has brought action to enforce it. Their effort to raise constitutional claims would unnecessarily expand the scope of this action and should therefore be denied. *Lee County*, 2012 WL 1676748, at *4.[5]

## IV.    CONCLUSION

For the foregoing reasons, the United States respectfully submits that the Court should deny Proposed Intervenors' Motion to Intervene.  The United States does not object to the Proposed Intervenors being permitted to participate as *amicus*, provided that such participation does not prevent the expeditious entry of relief in this case to protect the rights of voters caused by Florida's failure to comply with Section 8 of the NVRA.

Date:  June 26, 2012

PAMELA C. MARSH
United States Attorney

Respectfully submitted,

THOMAS E. PEREZ
Assistant Attorney General
Civil Rights Division

*/s/ Jenigh J. Garrett*

MICHAEL HARWIN
Georgia Bar Number 335605
Assistant United States Attorney
111 North Adams Street, 4th Floor
Tallahassee, Florida 32301
Tel:  (850)942-8483
Fax: (850) 942-8448

T. CHRISTIAN HERREN, JR
JOHN ALBERT RUSS IV
ELISE SANDRA SHORE
JENIGH J. GARRETT
Attorneys, Voting Section
Civil Rights Division
United States Department of Justice
950 Pennsylvania Ave. NW
Room NWB-7254
Tel:  (202) 305-
Fax: (202) 307-3961
United States Department of Justice

---

[5] If the Court grants the Proposed Intervenors' Motion to Intervene, the United States reserves its rights under the Federal Rules of Civil Procedure to respond to the proposed counterclaim within 60 days of the Court's permitting intervention. *See* Fed. R. Civ. P. 12(c) (providing United States and its agencies and officers 60 days to answer counterclaims or cross-claims).

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing will be sent electronically to the registered participants through EM/ECF system.


/s/ Jenigh J. Garrett

_____

JENIGH J. GARRETT