**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

|  |  |
|---|---|
| THE UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> STATE OF FLORIDA; KEN DETZNER, ) <br> Secretary of State, in his official capacity, ) <br> ) <br> Defendants. ) <br> ) | No. 4:12-cv-00285-RH-CAS |

**BRIEF OF *AMICI CURIAE* THE BRENNAN CENTER FOR JUSTICE
AT N.Y.U. SCHOOL OF LAW, THE LEAGUE OF WOMEN VOTERS OF FLORIDA,
AND THE LEAGUE OF WOMEN VOTERS OF THE UNITED STATES IN SUPPORT
OF THE UNITED STATES' MOTION FOR A TEMPORARY RESTRAINING ORDER**

## INTEREST OF AMICI

The Brennan Center for Justice at N.Y.U. School of Law ("Brennan Center") is a not-for-profit, nonpartisan public policy and law institute that focuses on issues of democracy and justice.[1] Through its Democracy Program and Voting Rights and Elections Project, the Brennan Center seeks to eliminate barriers to full and equal political participation. Of particular relevance here, the Brennan Center has extensively studied, litigated, and consulted on issues relating to election administration, voter list maintenance, and the National Voter Registration Act of 1993 ("NVRA"). The Brennan Center issued one of the first comprehensive reports on voter purges, examining data matching, notification, and other issues, and has served as counsel in NVRA litigation. The Brennan Center also regularly provides legal assistance to government officials and advocates seeking to ensure that voter purges are accurate, uniform, and non-discriminatory.

The League of Women Voters of the United States ("League") is a nonpartisan, community-based organization that encourages Americans to participate actively in government and the electoral process. Founded in 1920 as an outgrowth of the struggle to win voting rights for women, the League now has more than 150,000 members and supporters, and is organized in approximately 800 communities and in every State. For over 90 years, the League has led efforts to remove the unnecessary barriers that too many Americans face in registering to vote and casting a ballot. The League of Women Voters of Florida is the Florida affiliate of the national League, with over 13,000 members, supporters, and volunteers and 29 chapters across the State. Over the years it has reached out to increase political participation among women, youth, and traditionally underrepresented communities, including new citizens, the poor, and minorities.

---

[1] This brief does not purport to convey the position of N.Y.U. School of Law.

**INTRODUCTION**

On May 9, 2012, Defendants announced a special initiative to purge noncitizens from the Florida voter rolls. According to Defendants, in order to identify potential noncitizens who are registered to vote in Florida, they compared names in the Florida Voter Registration System with a State Department of Highway Safety and Motor Vehicles (DHSMV) database. Through this database match, the Department of State initially identified as many as 182,000 potential noncitizens on the voter rolls, and in April 2012 sent county election supervisors names of registered voters based on a list of approximately 2,700 potential noncitizens.

The information Defendants have disclosed about this purge shows several problems with its design and implementation. The DHSMV database employed in the data match, on which citizenship information was first collected in 2010, as required by the REAL ID Act of 2005, still contains—and is expected to contain for five more years—records not supported by documentation of citizenship status.[2] Under Florida's procedure, individuals may be identified as potential noncitizens based on no more than a match of first and last names and date of birth. Also targeted are registered voters who have not updated their drivers' licenses since becoming naturalized citizens.

Media accounts have consistently indicated that more than 500 registered voters—nearly 20 percent of the approximately 2,700 individuals on the purge list—have already been confirmed as citizens. The election supervisor for Miami-Dade County has advised the Department of State that the known error rate in that county is at least 30 percent. Also, the purge disproportionately targets Hispanic voters, with initial reports that approximately 60

---

[2] See Pub. L. No. 109-13, 119 Stat. 302. The REAL ID Act, among other things, imposes on the States specific federal standards for drivers' licenses.

percent of the listed registrants State-wide are Hispanic. Notwithstanding all of these issues and others, Defendants consistently refused to fully suspend the purge, and in some counties voters who have not responded to written notices of their suspected ineligibility have already been removed from the rolls. This action brought by the United States to enforce the NVRA followed.

For the reasons presented by the United States in its motion for a temporary restraining order, the NVRA plainly bars implementation shortly before a federal election of this State-wide program because it has the purpose of systematically removing registrants from the official lists of registered Florida voters.

Amici submit this brief in order to set out the concerns animating the NVRA provisions restricting systematic voter removal programs and to demonstrate why, given those concerns, Section 8(c)(2) of the NVRA, 42 U.S.C. § 1973gg-6(c)(2), forbids States from engaging in systematic voter removal programs during the NVRA's 90-day quiet period regardless of what the basis for putative ineligibility may be. Additionally, amici submit this brief to further inform the Court as to the types of problems resulting from systematic voter purges that the NVRA is designed to forestall.

## I. THE NVRA PROHIBITS *ANY SYSTEMATIC PROGRAM* TO REMOVE REGISTERED VOTERS WITHIN 90 DAYS OF A FEDERAL ELECTION

It is well-documented that large-scale State efforts to systematically remove names from official lists of voters, whether by mass mailings or by comparing names with lists of persons ineligible to vote—such as lists of persons residing out of State, deceased persons, or convicted felons—are inherently prone to error. Such purges have often resulted in large numbers of eligible, properly registered voters being removed from official voter lists. See generally Myrna Pérez, Brennan Center for Justice, Voter Purges (2008), available at http://www.brennancenter.org/content/resource/voter_purges [hereinafter Voter Purges]

3

(describing several instances of erroneous voter purges); Pew Center on the States, Upgrading Democracy: Improving America's Elections by Modernizing States' Voter Registration Systems (2010), available at http://www.pewstates.org/uploadedFiles/PCS_Assets/2010/ Upgrading_Democracy_report.pdf [hereinafter Upgrading Democracy] (describing the shortcomings of voter registration systems).  When an eligible voter is erroneously purged from the rolls shortly before an election, the risk is magnified that the error will not be identified in time to reinstate the voter, or that the very threat of disenfranchisement by the State in the weeks prior to an election will discourage a registered voter targeted in the purge from going to the polls.  Accordingly, Congress included in the NVRA a cut-off date by which a State's efforts to systematically purge voter rolls must be completed:

> A State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters.

42 U.S.C. § 1973gg-6(c)(2)(A) (emphases added).

State programs seeking to systematically purge registered voters are thus forbidden during the 90-day quiet period, irrespective of the particular category of ineligible voters that the State seeks to identify and remove.

While such discrete systematic purges are thus precluded, ineligible voters can nevertheless be removed during the 90-day period.  This is confirmed by the provisions of Section 8(c)(2)(B), which clarify that ongoing voter list maintenance is not prohibited by the 90-day moratorium on systematic purge programs.  The statute provides in Section 8(c)(2)(B) that Section 8(c)(2)(A) "shall not be construed" to require a State to suspend its regular maintenance

of registration records, such as the "correction" of records pursuant to the NVRA,[3] or the "removal of names" from the rolls on the "basis" of the occurrence of certain specified events: the State's receipt of a voter's request to be removed from the rolls, a voter's death, or a voter's criminal conviction or loss of mental capacity. 42 U.S.C. § 1973gg-6(c)(2)(B). Section 8(c)(2)(B) thus makes clear that when an eligible voter becomes ineligible during the quiet period, the State need not wait until after Election Day to remove that voter from the rolls—provided that the voter is identified for removal in the normal course of business, and not as part of "any program the purpose of which is to systematically remove the names of ineligible voters," 42 U.S.C. § 1973gg-6(c)(2)(A).[4]

Consistent with this, Section 8(c)(2)(A) directs that States "shall complete" any "systematic[]" program prior to the 90-day quiet period. Ongoing, day-to-day maintenance of voter rolls to reflect recent events that affect eligibility (for example, a registrant's death or criminal conviction) can, of course, never be considered "complete." Therefore, such

---

[3] 42 U.S.C. § 1973gg-6(c)(2)(B)(ii). For instance, the NVRA provides that when a registrant moves to another address "within the same registrar's jurisdiction, the registrar shall correct the voting registration list accordingly." Id. § 1973gg-6(f).

[4] Defendants interpret Section 8(a)(3)(B), which instructs States to "provide that the name of a registrant may not be removed from the official list of eligible voters except," inter alia, "as provided by State law, by reason of criminal conviction or mental incapacity," to sanction removal of a registrant from voter rolls on the basis of any State law (not limited to laws relating to criminal conviction or mental incapacity) purporting to eliminate a voter's eligibility. Defs.' Resp. at 18-19. Even if the Court were to accept this grammatically and logically nonsensical interpretation of Section 8(a)(3)(B), such a reading does nothing to change the fact that Defendants' purge is designed to "systematically remove the names of ineligible voters" and is thus prohibited during the quiet period pursuant to Section 8(c)(2)(A).

maintenance is not barred by the proscription of discrete, systematic programs that could, as the statute contemplates, be completed more than 90 days before an election.[5]

It is important that the language of Section 8(c)(2)(B) is <u>not</u> an exception that permits a State to conduct "systematic[]" purges of some categories of registrants during the 90-day period. If Congress had intended to permit the systematic purging of some but not all categories of ineligible voters within the quiet period, it would have simply stated that Section 8(c)(2)(A)—which prohibits such purges—did not apply to specific categories of registrants, but it did not do that. Moreover, to read Section 8(c)(2)(B) as authorizing some systematic purges and not others would run directly counter to the very reason for adopting the 90-day rule—to prohibit large-scale, error-prone voter removals from occurring at a time when mistakes are least likely to be

---

[5] The NVRA's treatment of deceased voters provides an illustration of the different procedures that can be used to remove registered voters, and the way in which the quiet period operates. Section 8(a)(4)(A) requires States to make "a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . the death of the registrant." 42 U.S.C. § 1973gg-6(a)(4)(A). To address this requirement, a State can arrange, in the ordinary course, for periodic death reports to be sent to election officials, so that recently deceased registrants may be promptly removed from official lists of eligible voters. <u>See</u>, e.g., Fla. Stat. § 98.093(2)(a) (requiring the Department of Health to provide the Department of State with a monthly list of deceased persons); 15 Del. Code § 1705(a) (requiring State Office of Vital Statistics to send a monthly list of deceased persons to election officials); <u>Voter Purges</u> at 14. But a State might also, if permitted, choose to initiate a special, broader review in an effort to purge registrants believed to be deceased, including voters who may have erroneously remained on the rolls for months or years after their death. Both of these procedures will remove voters on the "basis" of death, but only the former is permitted during the 90-day quiet period. That is because a State's ongoing process of deleting the names of deceased voters is not the sort of systematic removal program with which Congress was concerned; its modest goal is to keep up to date with recent deaths. But, as Congress recognized, an attempt to purge years' worth of deceased voters from the rolls en masse is susceptible to a high error rate and may erroneously remove many eligible voters due to problems in the "design of [the] program as well as in its implementation." S. Rep. No. 103-6, at 32 (1993).

6

corrected. The propensity for wholesale errors in such programs exists irrespective of the "basis" for purported ineligibility.[6]

It is clear from the statutory provisions that include the quiet period that Congress was concerned not with the particular "basis" (e.g., death, nonresidency, or felony conviction) upon which States might seek to remove voters in the 90 days prior to an election, but rather with the error-prone procedures employed in any systematic attempt to purge voter rolls.[7] The legislative history of the NVRA shows that Congress was responding to the variety of techniques used to create barriers to registration and the potential for abuse and error in systematic purges generally. See H. R. Rep. No. 103-9, at 2-5 (1993) (describing legislative findings).

This concern was well founded. As described below, whether a State purge depends on an automated computer program to generate lists of ineligible voters, or mass mailings requiring currently registered voters to confirm their current address, such sweeping programs inevitably generate inaccuracies and lead to mistakes. Thus, regardless of the particular basis for a purge, as Congress recognized, sufficient time is needed to detect, avoid, and correct such problems so that eligible voters are not wrongly removed from the rolls.

---

[6] Amici are not saying that Florida cannot address the problem of noncitizens who fraudulently vote in federal elections. Florida can and should take appropriate, individualized actions to prosecute election misconduct. But what it clearly cannot do under the NVRA is initiate, at the eleventh hour, a targeted noncitizen removal program that uses questionable data matching and captures hundreds, if not thousands, of citizens who are legitimate voters and which will not be complete within 90 days of a federal election.

[7] The use of the word "program"—and not "activity," cf. 42 U.S.C. § 1973gg-6(b)—further supports the conclusion that Congress did not intend the quiet period to prohibit the discrete and isolated removal of voters that become ineligible during that period, but only large-scale schemes that systematically remove numerous voters.

## II. PAST PURGES IN FLORIDA AND ELSEWHERE CONFIRM THAT THE NVRA RESTRICTIONS ARE CRITICAL FOR PROTECTING AGAINST ERRONEOUS DISENFRANCHISEMENT OF ELIGIBLE VOTERS

Numerous examples over the years of States erroneously targeting eligible voters underscore Congress's prudence in creating a 90-day quiet period. In past systematic purges, Florida and other States have, using faulty criteria and other flawed procedures, wrongly deemed ineligible and even removed from the rolls thousands of properly registered voters.

In 2000, in a large-scale effort to purge persons with criminal convictions from the rolls, Florida identified as ineligible, by conservative estimates, at least 12,000 eligible voters. Thousands of wrongful removals resulted. This debacle was attributed to, in large part, faulty matching criteria: some registered voters were purged from the rolls if 80 percent of the letters of their last names were the same as those of persons with criminal convictions. For instance, the Rev. Willie D. Whiting, Jr. was wrongfully purged because, under the matching criteria, he was considered to be the same person as Willie J. Whiting. See Voter Purges at 3; see also NAACP v. Smith, No. 1:01-cv-00120-ASG, Joint Notice of Settlement and Motion for Dismissal with Prejudice (S.D. Fla. Sept. 4, 2002) (Dkt. No. 605) (settlement of NAACP lawsuit challenging purge, in which Florida agreed to use better matching criteria).

In 2004, Florida attempted to remove 48,000 registered voters from the rolls on the basis of felony convictions. Many of those identified—nearly half of whom were African-American— were in fact eligible to vote, including thousands who had their voting rights subsequently restored under Florida law. The State ordered officials to stop using the list only after civil rights organizations brought national attention to the issue. See Voter Purges at 1.

Problematic voter purges in other states have likewise led to tens of thousands of eligible voters being removed from the rolls. In 2008, Georgia purged 700 people from its voter lists due

8

to supposed criminal convictions. Due to a program that could create matches based on name only—even if other identifying information was different—at least a third of the individuals on the list were in fact eligible. See id. at 22. The same year, Colorado purged up to 31,000 eligible voters from the rolls within 90 days of federal election using faulty matching criteria. The State settled a lawsuit alleging violations of the NVRA, but many voters were forced to use provisional ballots.[8] In 2007, Louisiana officials purged 21,000 registered voters, including those in areas hard-hit by hurricanes, on suspicion that they had moved out of state. To avoid removal, voters were required to demonstrate that they had cancelled their non-Louisiana registration—recourse which was, of course, unavailable to voters who had not registered elsewhere in the first place. See id. at 6. Similarly, in 2006, the Kentucky State Board of Elections compared its voter lists to Tennessee and South Carolina lists, and purged 8,000 voters on the basis of their supposedly having moved to another state—without first having notified the purged voters. Only after a resulting lawsuit was it confirmed that the list included the names of many eligible voters who had not moved, and the State was forced to reverse the purge. See id. at 1, 33.

Regardless of whether States are attempting to remove registered voters who are ineligible felons, or ineligible residents of other States, or deceased persons, data-matching techniques used in creating lists of voters to purge are highly susceptible to a significant error rate. See id. at 22-24 (describing potential reasons for data-matching inaccuracy); cf. Upgrading Democracy at 27 (describing inaccuracies in voter registration systems generally and urging

---

[8] See generally Common Cause of Colorado, et al. v. Buescher, Brennan Center for Justice (Jan. 22, 2010), http://www.brennancenter.org/content/resource/common_cause_ of_colorado_v_buescher/; see also Felisa Cardona, A Win for Purged Voters, Denver Post, Oct. 30, 2008, at A-01, available at http://www.denverpost.com/breakingnews/ci_10851260.

states to upgrade their data-matching capabilities). Moreover, these examples demonstrate that without sufficient public vetting of such programs and implementation well in advance of an election, eligible voters will be wrongfully removed from the rolls and left with little or no time to correct the mistakes in time to cast a ballot that counts on Election Day.

The purge at issue here bears the problematic hallmarks of these past purges and those that concerned Congress when it enacted the 90-day quiet period. Defendants have designed and begun to implement a program that, among its other failings, does not take account of recent changes in a voter's status, but attempts instead to systematically identify potentially ineligible voters using a database that is maintained for other purposes and contains outdated and unreliable information.[9] The program does not require confirmation of noncitizen status, but allows removal of registrants if they fail to promptly respond to mailed notices requesting documentary proof of their eligibility. Given the time it takes for errors to be identified and corrected, Congress acted specifically to require any such program to be "complete" at least 90 days prior to a federal election, so as to minimize the chance that erroneously disenfranchised voters would suffer the irreparable harm of improper exclusion from the voting booth.

## CONCLUSION

Congress recognized in enacting the NVRA that although mistakes will inevitably be made in identifying ineligible voters for removal from the rolls, those mistakes are magnified when the procedure employed by the State attempts to systematically purge individuals who may

---

[9] For example, Defendants' database matching process identifies registered voters as potential noncitizens based on no more than a match of first and last names and date of birth. Such three-point matches are notoriously unreliable. See generally Michael P. McDonald & Justin Levitt, Seeing Double Voting, 7 Election L.J. 111 (2008), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=997888; Voter Purges at 22-24.

have become ineligible to vote months or years ago.  Such mistakes, especially if they are on the scale of hundreds or thousands of registered voters, are less susceptible to timely correction if they are made shortly before an election.  No State has an interest in wrongfully removing eligible voters from the rolls, and there is no reason States cannot conduct systematic purges well in advance of elections, so as to avoid such a risk.  For these reasons, the NVRA forbids States, during the statutory 90-day quiet period, to carry out the procedures that systematically produce such errors.  There is no textual or logical basis to make an exception to this rule to allow systematic purges of any kind during the quiet period.

Dated: June 26, 2012

Respectfully submitted,

| DAVIS POLK & WARDWELL LLP | */s/ Diana Kasdan* |
|---|---|
| | Wendy R. Weiser |
| Daniel F. Kolb* | New York Bar No. 4415303 |
| New York Bar No. 1257922 | Diana Kasdan |
| David C. Newman* | New York Bar No. 4028874 |
| New York Bar No. 4590808 | Jonathan Brater* |
| Matthew Cormack* | New York Bar No. 5014899 |
| New York Bar No. 5002159 | Brennan Center for Justice |
| 450 Lexington Avenue | at N.Y.U School of Law |
| New York, New York  10017 | 161 Avenue of the Americas, 12th Floor |
| Tel:    212-450-4695 | New York, New York  10013 |
| Fax:   212-701-5800 | Tel:    646-292-8310 |
| daniel.kolb@davispolk.com | Fax:   212-463-7308 |
| david.newman@davispolk.com | wendy.weiser@nyu.edu |
| matthew.cormack@davispolk.com | kasdand@law.nyu.edu |
| | jonathan.brater@nyu.edu |

*Not admitted in this district

*Attorneys for Amici Curiae Brennan Center for Justice at N.Y.U. School of Law, League of Women Voters of Florida, and League of Women Voters of the United States*