**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**


*THE UNITED STATES OF AMERICA,*    )
                                   )
                *Plaintiff,*       ) *Case No:*
                                   ) *4:12-cv-285-RH-CAS*
*vs.*                              )
                                   ) *Tallahassee, Florida*
*STATE OF FLORIDA; KEN DETZNER,*   ) *June 27, 2012*
*Secretary of State, in his*       ) *10 A.M.*
*official capacity,*              )
                                   )
                *Defendants.*      )
_____


**TRANSCRIPT OF HEARING ON PLAINTIFF'S MOTION FOR A**
**TEMPORARY RESTRAINING ORDER**
**BEFORE THE HONORABLE ROBERT L. HINKLE,**
**UNITED STATES DISTRICT JUDGE**


APPEARANCES:


 For the Plaintiff:          U.S. Department of Justice
                             Civil Rights Division
                             By: JOHN A. RUSS, IV
                                 Assistant U.S. Attorney
                                 *john.russ@usdoj.gov*
                             1800 G Street NW
                             Room 7254-NWB
                             Washington, DC   20006


 For the Defendants:         Jones Day
                             By: MICHAEL A. CARVIN
                                 Attorney at Law
                                 *macarvin@jonesday.com*
                             51 Louisiana Avenue, NW
                             Washington, DC   2001-2114



```
 For the Defendants:        Florida Department of State
                            By: DANIEL E. NORDBY
                                General Counsel
                                ASLEY DAVIS
                                Assistant General Counsel
                                daniel.nordby@dos.myflorida.com
                                adavis@dos.myflorida.com
                            R.A. Gray Building
                            500 South Bronough Street
                            Tallahassee, Florida  32399-0250


 For Intervenor Garcia:      McDonald Hopkins, LLC
                             By:  RAQUEL A. RODRIGUEZ
                                  Attorney at Law
                                  rrodiguez@mcdonaldhopkins.com
                             200 South Biscayne Boulevard
                              Suite 2120
                              Miami, Florida   33131
```

<u>P R O C E E D I N G S</u>

1

2          (*Call to Order of the Court.*)

3               THE COURT:  Good morning.  Please be seated.

4               We had a motion to intervene to file sometime back,

5    and I indicated that the intervenor wouldn't get any

6    additional time.  Notice was filed indicating that the state

7    wished to yield some time to the party moving to intervene,

8    and that's fine.  I'll hear from them as an *amicus*.  I'll deal

9    with the intervention motion in due course.

10              Other parties filed materials as late as 10:30, 11:30

11   last night.  Proposed intervenors, of course, don't get to

12   file materials after the deadline for all of the parties to

13   file their materials, but I'll deal with those in due course.

14   This morning I'm going to deal with the timely-filed

15   materials.

16              I can tell you, I've read the entire record probably

17   at least twice, at least the most important parts at least

18   twice.  I have read your materials with some care.

19              It's the government's motion.  I'll hear from the

20   government first.

21              Mr. Russ?

22              MR. RUSS:  May it please the court.  My name is John

23   "Bert" Russ, and I represent the United States in this action.

24              As you know the United States is seeking a temporary

25   restraining order to ensure that the state of Florida complies

1    with Section 8 of the NVRA and to protect the rights of

2    voters.

3         I can go through the various elements for the TRO:

4    That the United States is likely to succeed on the merits;

5    that voters will be irreparably harmed; that the balance of

6    hardships favors granting a TRO; and that a temporary

7    restraining order would be in the public interest.

8         The NVRA represents --

9         THE COURT:  I take it --

10        MR. RUSS:  Sure.

11        THE COURT:  -- with the TRO and what you're asking me

12   to do is enter an order that would be in effect for the next

13   14 days, maybe 14 after that, and then no more.

14        MR. RUSS:  Well, my understanding was, with ex parte

15   motions, the TRO lasts for 14 days, but here we did notify the

16   state -- we called and spoke with Mr. Nordby before filing the

17   TRO to let him know that it was coming.

18        THE COURT:  Fair enough.  That's right.  But why are

19   you calling it a TRO instead of a preliminary injunction?

20        MR. RUSS:  Eventually, we do want a preliminary

21   injunction, but giving that the harm is occurring now, we

22   needed it to stop now and preserve the status quo.  Voters are

23   being threatened with removal from the rolls because of this

24   procedure in Collier County.  They're stating in the letter

25   that they are sending out that you will be removed if you fail

1    to respond within 30 days.  And so, you know, voters like

2    Eileen Selis are getting the letter after the 90-day mark.  We

3    need that to stop to preserve the status quo until such time

4    as we can have a hearing or oral argument on the preliminary

5    injunction motion.

6         THE COURT:  Okay.  I guess I'm not clear why we're

7    doing this in two stages instead of just one.  But, in any

8    event, as a practical matter, it wouldn't make any difference

9    what you call it today, you'd be asking for the same thing.

10        MR. RUSS:  That's correct, Your Honor.

11        THE COURT:  But you're not asking for an order to

12   stay it in effect until the trial; you're just asking for an

13   order to stay it in effect until --

14        MR. RUSS:  Until the hearing on the preliminary

15   injunction motion.  One reason is we wanted to be able to

16   gather some additional evidence.  You know, we'd like from the

17   state the list of 2700 voters, we'd like the list of 180,000

18   that they have discussed, we'd like to know who has been

19   removed for failing to respond to the mailing -- the various

20   reasons that anyone has been removed to this point.  We don't

21   have access to that.  I mean, obviously, we put together the

22   information we do currently have.

23        THE COURT:  All right.

24        MR. RUSS:  The NVRA represents Congress's attempt to

25   balance the need for accurate lists with the need to protect

1    the rights of voters.  Congress understood that, when you have

2    a systematic removal program, sometimes eligible voters can

3    get caught up in that and with the quiet period, 90 days, with

4    a few exceptions, to make sure that voters don't get caught up

5    in that process.

6        What we have here is a state-initiated program.  The

7    state did the data matching, the state compiled a list of

8    names, the state distributed them to the counties and told the

9    counties what it expected the counties to do.  The NVRA makes

10   very clear the state is the appropriate defendant.  Section 8

11   talks about the state shall, and then the various things that

12   the state needs to do.

13       I think the language of the statute is very helpful

14   and very clear here, particularly Section 8(c)(2)(A).  It

15   says, "A state shall complete not later than 90 days prior to

16   the date of the primary or general election for federal office

17   any program the purpose of which is to systematically remove

18   the names of ineligible voters from the official list of

19   eligible voters."

20       What I think is critical there is, we have a federal

21   election coming up on August 14th.  The 90-day mark was

22   May 16th.  We have a systematic removal program in that it's

23   statewide, it involves voters across the state, and we're

24   dealing with ineligible voters.  So to the extent that the

25   state is arguing that this provision shouldn't apply to

1  ineligible voters, it's right there in the statute.  It is

2  supposed to apply to people who are believed to be ineligible.

3            THE COURT:  I'm with you all through that.  Explain

4  to me why, if that's what the statute says and means, then

5  (a)(3), Section 8(a)(3) doesn't say, as the state suggests,

6  the state can never remove a non-citizen.

7            MR. RUSS:  The state's interpretation is incorrect.

8  Jurisdictions can remove ineligible voters from the rolls if

9  they are non-citizens.  Other parts of the NVRA make clear,

10 you have to indicate, when you're registering, that you are a

11 citizen.  The Help America Vote Act also requires that.

12           THE COURT:  Absolutely.  Nobody disagrees, I don't

13 think, with the proposition that a state can limit voting to

14 citizens.  So, if somebody comes in and says, "I'm a

15 non-citizen, I want to register to vote," the right answer is

16 "No, you cannot register to vote."  Everybody agrees with

17 that.

18           MR. RUSS:  That's correct.

19           THE COURT:  I think everybody probably agrees that in

20 February 2013, if the state determines that there is a

21 non-citizen on the list, the person can be taken off the list.

22           MR. RUSS:  That's correct, Your Honor.

23           THE COURT:  No election, there is no question about

24 accuracy, everybody says this person is not a citizen, I can

25 take the person off the list.  The question is, how does that

1    authority square with (a)(3)?  Because(a)(3) says, just as

2    clearly, it seems to me, as the provision you're relying on

3    over in (c), it says the state can't do it, but everybody

4    knows that the state can do it.

5         MR. RUSS:  I mean, that's correct, Your Honor.  I

6    mean, there are a number of grounds in which -- in order to be

7    eligible to register, you have to be a citizen in all 50

8    states; you have to be a certain age; you know, if you commit

9    fraud on your registration, that's grounds for not allowing

10   you to be a voter.

11        I think what's key here is the systematic removal

12   part, that the exceptions that are referred back to in this

13   language deal with systematic removals, and these are the

14   types of systematic removals you can do within the 90-day

15   period.  So someone has died, if the voter requests removal,

16   the criminal conviction or mental capacity, those are the

17   examples of a systematic program that can happen in 90 days.

18   Let's say a voter, seeing all of this publicity, during the 90

19   days comes forward to the supervisor and admits, "I'm not a

20   citizen," they can be removed within the 90-day period.

21   That's not part of a systematic removal program.

22        THE COURT:  Oh, I understand, and I understand there

23   is that language over in (c) about systematic removal.  But

24   the key point and what they put in their papers -- and, of

25   course, you haven't had a chance to write a paper in response,

1    but that's why I need to get you to explain it to me today,

2    because if -- the key language that you're focused on is "any

3    program the purpose of which is to systematically remove the

4    names of ineligible voters."  So the language is "remove the

5    names of ineligible voters."  If that -- if that means a

6    non-citizen in (c)(2), why doesn't that mean a non-citizen in

7    (a)(3)?  And there it says you can only remove from the

8    official -- you cannot remove a registrant from the official

9    list -- very same language -- except for specific reasons,

10   non-citizenship is not one of them.  So, if removing a person

11   from the official list means removing a non-citizen, you're

12   right, they can't have a program that systematically removes

13   within the 90 days, but they also cannot remove the person

14   ever.  That's their argument, and I'm looking for your

15   response.

16        MR. RUSS:  That would be inconsistent with what

17   Congress intended here, given that other provisions of the

18   NVRA make clear that you can -- that the federal registration

19   form requires someone to say that they are a citizen.

20   Congress did not intend for states to be unable to remove

21   citizens at --

22        THE COURT:  Absolutely.  So doesn't that mean that

23   when Congress enacted an exclusive list of the basis on which

24   a registrant can be removed from the official list of eligible

25   voters, Congress was talking about removal of somebody who had

1    properly registered and was not talking about removing a

2    non-citizen?

3              MR. RUSS:  I wouldn't agree with that because

4    8(c)(2)(A) explicitly talks about ineligible voters.  One of

5    the concerns here with this program is that eligible voters --

6    and one of the reasons we have the 90-day period is that

7    eligible voters can get caught up in the systematic efforts to

8    try to remove the ineligible folks, and that's what we're

9    seeing, like Eileen Selis, a Pennsylvania-born U.S. citizen,

10   getting caught up in this dragnet, and that's the problem.

11             When you have a program that captures many times more

12   citizens than non-citizens, that's the harm Congress was

13   trying to address with this 90-day rule.  States are able to

14   construct programs that comply with the NVRA to remove

15   ineligible voters based on citizenship just during the 90-day

16   quiet period because errors can happen in these removal

17   programs.  That's why Congress limited the number of

18   systematic removal programs that can occur during the 90-day

19   period.

20             THE COURT:  I understand.  And the question is, is

21   that a good policy argument to make to the Congress or is that

22   a good interpretation of this statute?

23             MR. RUSS:  Well, I think, you know, Congress made its

24   choices about what policy it wanted when it enacted NVRA.

25   They wanted accurate lists.  It doesn't want non-citizens on

1    the list.  It also wants to protect eligible voters.  And when

2    you have removal programs, errors happen, people get caught up

3    in it.   In this case many times more citizens than purported

4    non-citizens are getting caught up in this removal program.

5              THE COURT:  And that gets to the nondiscrimination

6    requirement.  But let me see if I understand the state of the

7    law.

8              First, on this question of whether (c)(2), when it's

9    talking about removing ineligible voters, on the question of

10   whether that means somebody who was properly registered in the

11   first place and has become ineligible, or whether it means

12   someone who was never a citizen, whether the language extends

13   to a non-citizen, on that question all I have is the language

14   that Congress used.  I don't really have anything in the

15   legislative history that specifically speaks to that.  I don't

16   have any case law that specifically speaks to that.  You've

17   got the Pennsylvania case, and it talks about the 90-day

18   provision.  But this question, cutting it this fine, that was

19   not part of that case.  So I really have nothing but the

20   language and the purpose and my common sense.  That's pretty

21   much what I'm dealing with.

22             MR. RUSS:  I think that's correct, Your Honor.  I

23   mean, the legislative history does reinforce what is stated in

24   the statute about the exceptions that Congress was thinking

25   about when they passed 8(c)(2)(A).

1      To address one point that the state made about broad

2  state law exception that they're trying to --

3      THE COURT:  I understand.  They left the comma out.

4  In the statute they don't have a semicolon.  In the

5  legislative history, they don't even have the comma.

6      MR. RUSS:  Yes; that's correct, Your Honor.

7      The harm here is the systematic removal program.  If

8  something is not systematic, the voter comes forward and

9  confesses, you know, "I saw this publicity, I didn't realize,

10  I shouldn't have registered," that voter can be removed,

11  regardless of the timing.  What this law is getting at is the

12  systematic removal programs, not correcting a mistake where

13  it's clear that there has been a mistake.

14      THE COURT:  So, basically, what your position is, if

15  I understand it, is this:

16      The deadline for a systematic program was May 14th,

17  or whatever it is, 90 days before the primary; the state

18  missed the deadline; and, as a result, non-citizens get to

19  vote.

20      MR. RUSS:  No, Your Honor.  To the extent people have

21  been identified, who have admitted contemporaneously that they

22  are non-citizens, the county supervisors of elections can

23  remove them.  They can treat that as a request for removal.

24      THE COURT:  But some won't be found.  I mean, you

25  want me to stop it, but some won't be found.

1          MR. RUSS:  It's possible that some won't be found.

2     Obviously, hundreds of eligible citizens are getting caught up

3     in it, and we're concerned about voters who get removed for

4     failing to respond to a mail-in.

5          THE COURT:  So that's the real harm.  And the

6     argument is, well, Congress decided to deal with the real harm

7     by saying you can't have a systematic program within 90 days

8     because of the risk of error.  I mean, I understand why you

9     would have a 90-day quiet period.  But the real harm is that

10    we've got a bad list, and we're messing this up.

11         MR. RUSS:  That's why these systematic programs have

12    to be careful, they have to be uniform, they have to be

13    nondiscriminatory.  And part of our concern is that the

14    program that the state undertook -- I mean, it realized that

15    they wouldn't have citizenship data for all of the DMV records

16    until 2017.  That was in one of the training videos, one of

17    their PowerPoint slides.  They knew that this list was not

18    going to generate -- that would generate a lot of errors; and,

19    certainly, the prior secretary of state stated very publicly

20    that he was not comfortable going forward with this list.

21         THE COURT:  So there are people out there who have

22    not provided citizenship information to Highway Safety.

23         MR. RUSS:  That's correct.

24         THE COURT:  I take it -- I looked at my driver's

25    license.  I try not to do my own investigation of the facts,

1   but my driver's license was in my pocket, so I looked at it.

2   It does not say whether I'm a citizen or not.  Does a

3   non-citizen's driver's license say non-citizen?

4        MR. RUSS:  Your Honor, I don't know the answer to

5   that question under Florida state law.

6        THE COURT:  So, if the Highway Safety person just

7   made a mistake, you're signing up for your driver's license,

8   they just hit the wrong button and says non-citizen, there is

9   no way that the driver knows it.

10        MR. RUSS:  That would be correct.  I don't know if

11   the driver's license actually says citizen or not.  It

12   certainly is possible.  I mean, it's inexplicable how Eileen

13   Selis and other native-born citizens would end up on this

14   list.

15        THE COURT:  Now, I understand you didn't give them

16   the SAVE data -- and I say "you," I know it wasn't you, and I

17   guess was not your department, but it's your client.  The

18   government did not give them the SAVE data partly because they

19   said at some point they didn't have A-numbers.

20        MR. RUSS:  That's correct, Your Honor.

21        THE COURT:  Now they say they've got A-numbers.  So

22   now, if you gave them the SAVE data, couldn't they do a -- now

23   they can get pretty accurate information, couldn't they?

24        MR. RUSS:  They would get better information.  I

25   should clarify a few things.

1          The Department of Homeland Security is being

2   represented by the civil division in the lawsuit, and I think

3   we have attached to yesterday's motion that, in response to

4   the intervention, that DHS is willing to work with them,

5   provide they meet the criteria.  Other jurisdictions,

6   including state agencies in Florida, have access to SAVE

7   database, they filed the requirements, they have the A-numbers

8   that are necessary.

9          THE COURT:  And voters get it in Arizona.  So

10  Maricopa County, Arizona, has this information to check

11  citizenship of voters.

12         MR. RUSS:  That's correct.  What they check is newly

13  registered voters where they can ask the voter when they

14  register if they are a naturalized citizen to provide the

15  A-number so they can match it with the database.  If they

16  don't have an A-number or a naturalization number for a

17  particular voter, then the SAVE database won't answer that

18  question.

19         Eileen Selis --

20         THE COURT:  I take it what the state wants to do is

21  come up with an A-number from somewhere else -- I don't

22  know -- some other agency, benefits agency, whatever, has an

23  A-number and is willing to share it with the state, and then

24  they give you the A-number.  What your concern there is that

25  they match the wrong A-number to the voter?

1            MR. RUSS:  Ultimately, if the Department of Homeland

2    Security is satisfied that that is an appropriate way to have

3    access to the database, the Department of Homeland Security

4    will decide that.  And I don't know what DHS will decide once

5    they have complete information from the state about what

6    A-numbers they have and where they got them and how they would

7    work.

8            The SAVE database would not have prevented Eileen

9    Selis from getting caught up in this, because the SAVE

10   database does not have native-born citizens, does not have

11   people who are in the country illegally so that --

12           THE COURT:  I take it the way she got on there is

13   that the driver's license bureau made a mistake, right?

14           MR. RUSS:  I guess we don't know why she's on the

15   list, because she was born in Pennsylvania.  She's not a

16   naturalized citizen.

17           THE COURT:  Well, either they just recorded her

18   citizenship wrong, what I say -- you have 11 million drivers

19   in the state, or however many it is, a certain number of times

20   the clerk keying in the information is going to put

21   non-citizen even though the person is a citizen.  It just

22   makes sense.

23           MR. RUSS:  That's correct.

24           THE COURT:  So that's one place a mistake could be

25   made in this process.  But if that's what happened, then

1  they've got the match, they send it, and SAVE can't indicate

2  that she's a non-citizen; then, if they do it right, or at

3  least if they err on the side of keeping people on the list,

4  they haven't gotten any information to confirm the problem,

5  and they don't do anything with Eileen Selis.

6       The ones that they would do something with, at least

7  if they do it in the -- I won't say "conservative," that gets

8  people excited.  If they do it in the most careful manner,

9  erring on the side of the voter, the ones that they would

10 catch would be ones that they have identified in this match,

11 and then they go and get the A-number and they send it in, and

12 the SAVE system says non-citizen.

13      MR. RUSS:  That's correct.  The SAVE system could

14 identify some non-citizens.

15      THE COURT:  And the SAVE system could eliminate a lot

16 of -- I take it, most of the false positives, just seems most

17 likely, most of the false positives come from people who

18 signed up to drive back in 2009 and went through a

19 naturalization proceeding in 2010, and then it's the right

20 person, but their match gets them, and that's the person

21 they're saying, "We've got information you're not a citizen."

22 And, of course, thousands and thousands and thousands of

23 people are naturalized in this state a year.  And so for all

24 of those newly naturalized citizens, their program catches

25 that person and challenges their right to vote.

1          MR. RUSS:  That's correct, Your Honor.

2          THE COURT:  But if they had SAVE, they would take all

3    of those off the list.

4          MR. RUSS:  It may address some of those concerns.

5          THE COURT:  Why wouldn't it get them all?  There are

6    still errors in the process, I understand.

7          MR. RUSS:  Sure.

8          THE COURT:  But if they did it right, they'd get them

9    all, wouldn't they?

10          MR. RUSS:  I guess the question is, do they have the

11    A-numbers in order to access -- without an A-number, they

12    can't check a person.  So they need to have -- I mean, the

13    division of elections said in October, they didn't have the

14    A-numbers with the voter registration records.  I guess

15    that -- you kind of hinted to one possible problem.  You take

16    another database, another state database, compare it to this

17    one and compare it to a third one, errors are going to creep

18    in along the way.

19          Regardless whether they get the SAVE database

20    tomorrow, that they meet the criteria, DHS says, "Okay, you've

21    shown us you have the A-numbers to access it; you're going to

22    do it for a lawful possible," they can't do a removal program

23    within 90 days of a federal election, because errors can still

24    creep in, people will still get caught up in the process, and

25    Congress, acting pursuant to the elections clause authority in

1     the Constitution, struck a balance.

2           THE COURT:  Let me ask you this:  Even if you're

3     right, even if that's true, we're in the 90-day period for the

4     primary.

5           MR. RUSS:  That's correct.

6           THE COURT:  We're not in the 90-day period for the

7     general.

8           MR. RUSS:  The 90-day period for the general will

9     start on August 8th.

10          THE COURT:  These people that are all very excited on

11    both sides of this issue, they don't care about the primary.

12    Every now and then, but for the most part, this is an issue

13    about the general.

14          MR. RUSS:  You know --

15          THE COURT:  So why couldn't they just go forward with

16    their program and say, "We're not going to remove anybody

17    until August, whatever the date is, after the primary; we're

18    going to do this program and we're identifying people; if you

19    don't respond and say you're a citizen, then the day after the

20    primary, you're coming off the rolls"?

21          MR. RUSS:  The language of the statute, though, is

22    clear about both primary and general elections for federal

23    office.  8(2)(c)(A), Congress didn't limit it to the general

24    elections.  Even though a lot of people just get concerned

25    about the general, Congress wanted to protect voters going to

1  both primaries and into general elections.  Obviously, we

2  can't rewrite the statute to make a different policy choice

3  about whether Congress should have been concerned about

4  primaries or not.  Congress was and put it in the statute.

5          THE COURT:  Oh, I understand.  I don't suggest

6  changing the statute to say that you can do this before the

7  primary.  I'm just saying that -- I mean, if you have an

8  election every three months, you could never do it.  I guess

9  we haven't gotten to that point yet.

10          MR. RUSS:  I am not aware of states that have federal

11  elections that often.  Obviously, this only applies to federal

12  elections.  I don't believe Florida has any federal elections

13  in odd number of years.  That would be a perfect time to do --

14          THE COURT:  Every now and then there is an election

15  that you didn't plan on.  I don't know what we'd do if we have

16  a vacancy in Florida; but I know in Arizona, for example, we

17  were talking about, they just had an election because they had

18  a vacancy.

19          MR. RUSS:  I think that is for another day, the scope

20  of which, would a vacancy election for a congressional seat

21  with the systematic removal program only apply to that

22  congressional district, regardless of what's happening

23  elsewhere?  I don't have an answer for you on that here, and

24  we don't have to decide that here.

25          THE COURT:  But you say, even they can't go through

1   their systematic program and say, "We're only dealing with

2   registration for the general, we're not dealing with the

3   primary."

4          MR. RUSS:  That's correct, because we are within 90

5   days of the federal primary election.

6          If I can talk a bit about some of the harms that

7   the -- the harms to voters caused by this program.

8          This program will result in voters being removed from

9   the list for failing to respond to a mail-in.  Places like

10  Collier County, which have said publicly, and in their letter

11  that they send to voters, are saying, "If you do not respond

12  within 30 days to this certified letter --" and they have

13  evidence that the certified letter actually made it to

14  them "-- you'll be removed from the rolls."

15         THE COURT:  Now, assume that you're right, that

16  that's against the law -- and there are other issues, frankly,

17  with the Collier papers, and the state may want to comment on

18  that.  They tell people, if you're born in Puerto Rico, you

19  may be a United States citizen.  I think you are.

20         MR. RUSS:  You are a U.S. citizen.

21         THE COURT:  Assume that you're right, that the

22  Collier papers overreach, what is this defendant to do about

23  it?  I mean, the secretary of state didn't tell Collier to do

24  these things; in fact, the Collier papers are contrary to the

25  PowerPoint and what the supervisor said -- the secretary said

1    to do.

2          MR. RUSS:  I know the state would like to disclaim

3    responsibility now for what is happening on the ground with

4    the program they initiated.  And that's part of problem, why

5    we can't have it within 90 days, because different counties

6    are doing different things.  I mean, we believe the 90-day

7    rule is sufficient grounds for a TRO.  We've also claimed that

8    it's not uniform.  This gets to the part of the uniformity

9    question.  Volusia County, for example, is telling, as we saw

10   in the letter to Eileen Selis, is telling individuals that you

11   can fax or send a copy of your document, while Collier County

12   is saying you have to come in with the original to the office.

13   So different counties are doing different things.  That's the

14   uniformity question.

15          Anything that's happened within the 90 days, though,

16   the state is responsible for that.  The state is directing

17   counties and still telling counties, "This is complying with

18   federal law, go forward with it, we want you to do it."  The

19   secretary of state has said, "I'm going to try to convince

20   places like Miami-Dade that have stopped their program to

21   restart it."  So the state is certainly responsible for the

22   fact that this is continuing within the 90 days.

23          THE COURT:  All right.  I've got you at 25 minutes.

24   I was going to try to keep each side at 30.  I don't know if

25   you want to save some of your time.

1          MR. RUSS:  I wanted to speak about the motion to

2    intervene, just that we believe that the first set of

3    intervenors, that they've only alleged generalized grievances,

4    that they do not have standing.  Regarding the --

5          THE COURT:  I'm really not going to hear from them on

6    the motion to intervene, so --

7          MR. RUSS:  Then I will reserve some time for

8    response.  Thank you.

9          THE COURT:  All right.  Thank you.

10         Mr. Carvin?

11         MR. CARVIN:  Good morning, Your Honor.  May it please

12   the court.  Michael Carvin for the secretary of state.

13         I must confess, I'm more puzzled now than ever about

14   why the justice department is invoking this court's emergency

15   powers.  The justice department's attorney tells us that he's

16   trying to freeze things going forward, but he can't identify

17   to this court or to us anything that the secretary of state is

18   going to do in the next two weeks or the next two months that

19   they think is problematic.

20         THE COURT:  Can you tell me the secretary of state is

21   not going to do something in the next two weeks or two months?

22         MR. CARVIN:  I can tell you that the entire theory of

23   the justice department's irreparable injury, even accepting

24   that they're correct legally, which of course I disagree with,

25   is moot.  Their theory is that it was improper for us to send

1    out potential ineligibility flyers based on the flawed MDAVE,

2    the Florida DMV program.  The secretary has made it quite

3    clear that he's not going to send any potential ineligibility

4    based on that program, which is precisely why he is seeking

5    the SAVE data.

6           So, in other words, their theory is that the harm was

7    that we would be sending out notices based on an inaccurate

8    database.  If and when we get the SAVE data, we will be

9    sending out ineligibility notices on something that they have

10   to concede is perfectly accurate.

11          THE COURT:  That may put it a bit high.  There are

12   errors that creep into this, but it certainly would be smaller

13   numbers.

14          MR. CARVIN:  I believe with the general caveat,

15   perfectly accurate to the extent of human error, right.  I

16   mean, it's their program; it's updated; they have current

17   information within 72 hours so that the timeline that concerns

18   the secretary and concerns Your Honor about people that become

19   naturalized in the meantime, that's all gone.

20          So the possibility for any kind of systematic error

21   or false positives, presumably -- I have to assume -- the

22   government hasn't told us that there is any basic problems

23   with the SAVE data, so I can't figure out why they have any

24   problem with us using that data.  We are, as you probably

25   know, in federal court right now asking them to give us this

1    improved list so that we can --

2           THE COURT:  I guess one of my questions, and I don't

3    know that it makes any difference, why are you in Washington?

4           MR. CARVIN:  I think it's because that's where

5    jurisdiction is when you're suing the federal government.

6           THE COURT:  Well, that's not true.  The federal

7    government gets sued all over the country.  I think

8    Section 1391 allows that.  I just wondered.

9           MR. CARVIN:  I'm not saying that -- I didn't mean to

10   imply -- first of all, I'm not the attorney, but --

11          THE COURT:  I understand you're not.  Different

12   lawyer, that was the easy one, blame it on the other lawyers.

13          MR. CARVIN:  I will always take that out.

14          I will say that I do practice in D.C., and I would

15   say the routine way you get stuff out of federal agencies is

16   to sue the federal agencies in Washington and have the

17   district courts that are used to telling federal agencies to

18   hand over the data.  I'm not saying it's a hundred percent,

19   but it's the normal course.  So I assume that's what they did

20   here.

21          But my basic point is --

22          THE COURT:  They don't seem to be in a hurry.

23   Apparently, they filed a complaint and nothing else.

24          MR. CARVIN:  Well, I think it's important to

25   understand, they have been asking DHS for 9 months, for 11

1  months now to please give us this data.

2          THE COURT:  Absolutely.  And they got a lot of memos

3  back, "We're thinking about it, and we will be in touch," and

4  then nothing, but --

5          MR. CARVIN:  And -- I'm sorry.

6          THE COURT:  I do want to ask you about this.

7          Just filed as part of the record was a letter that

8  the secretary wrote as part of this exchange saying, "We have

9  asked for a couple -- we've said for a couple of months that

10 we have A-numbers."

11         MR. CARVIN:  Yes.

12         THE COURT:  I've read all of the emails, and I didn't

13 see any reference to having A-numbers.  I saw the government

14 saying, "We need that," and the state saying, "We don't have

15 that," and then I didn't see any reference.  And I think what

16 the government told me when we had our scheduling conference

17 was this was the first they had heard about the state having

18 access to A-numbers.

19         MR. CARVIN:  If you turn to Exhibit 4 of the

20 government's own TRO papers, where they attach the email

21 exchange; and, if you turn to page 3 of that, and --

22         THE COURT:  My ECF reference is 7-5, page 8.

23         MR. CARVIN:  Okay.  I have Exhibit 4, page 3.  It's

24 the March 8th email from Maria Matthews.  Are we on the same

25 page?

```
 1          THE COURT:  Got it.

 2          MR. CARVIN:  Okay.  "I don't recall if I had said

 3  that we would be able to get the alien registration numbers or

 4  admissions numbers made available from our Department of

 5  Highway Safety and Motor Vehicles."

 6          The DMV has got the alien registration numbers.  They

 7  did make that inquiry in March.  They are ready to go.  They

 8  filed a lawsuit saying in the lawsuit, "We have satisfied your

 9  informational concerns."  And as far as I know, the government

10  is not saying that, once they got the alien registration

11  numbers, that there's any problem.  So why did they move for a

12  TRO?  Because I assume they thought that, once the government

13  at long last recognizes that they've got the information that

14  they've been telling Florida for a long time they need to give

15  them, that there wouldn't be any problem.

16          THE COURT:  I have to tell you, reading that email, I

17  don't think that says we have the information.  It says, "I

18  don't recall if I said we would be able to get the

19  information."  It doesn't say, "We will be able to get the

20  information," but maybe that's what it meant.

21          MR. CARVIN:  Yeah.  Okay.  Look, I'm not Maria

22  Matthews, you're not Maria Matthews.  My instinct is that what

23  she's saying is, "I don't remember if I told you.  I had

24  previously told you that we didn't know we had the

25  information.  I don't recall if I've updated you that DMV has
```

 1   got it."

 2          But however we interpret what they were saying on

 3   March 8th, the point is today, and at least for a couple of

 4   weeks, I can certainly, when they sued them, they called them

 5   and said, "We've got the numbers.  Can we get the

 6   information?"

 7          THE COURT:  Right.

 8          MR. CARVIN:  But I don't want to distract us into

 9   that other lawsuit.

10          THE COURT:  No, but that's -- it's part of the public

11   interest and the balancing of equities and all of those things

12   that do go into TROs.

13          MR. CARVIN:  But what I can tell you, and I thought

14   we've been explicit in our papers in saying that the secretary

15   is not going to proceed on the MDAVE data, he's going to

16   proceed on the SAVE data.  Neither one of us at this point

17   anticipate any problem getting that SAVE data at least in the

18   relatively near future.

19          But the relevant point is, there's nothing to enjoin

20   in terms of their theory of the case because the secretary is

21   not sending out these eligibility notices that they view as

22   problematic, because they're based on an inaccurate database.

23          THE COURT:  So what you're telling me, let me make

24   sure I've got it nailed down, what you're telling me is, the

25   program that is set out in your PowerPoint and as described

1  earlier, you're not doing it anymore; and whether I enter an

2  injunction and say stop the program or not is not going to

3  make any difference, because you've stopped the program, and

4  you're not doing it anymore.

5          MR. CARVIN:  We need to be very careful here.

6          THE COURT:  Exactly.

7          MR. CARVIN:  We're not doing it today.  We're not

8  doing it on the basis of the MDAVE data.  If we get the SAVE

9  data, I do expect the secretary to, on the basis of that

10  accurate data, proceed to protect the integrity of the Florida

11  voter rules against non-citizens voting, yes.

12          THE COURT:  But that program --

13          MR. CARVIN:  But at this point --

14          THE COURT:  -- would be substantially different than

15  the program that has been done up to this point, because,

16  frankly, we have the 90-day legal issue.  Aside from that, the

17  problem that you have is there are many, many false positives.

18  Now, we can talk about how many on one side and how many on

19  the other, but there are many false positives.  And we don't

20  know how many there would be if you used the SAVE data, but it

21  would just be different.  It would be substantially different

22  than what you've done up to this point.

23          MR. CARVIN:  So how can you enjoin something

24  prospectively based on a retroactive program that is no longer

25  being implemented?  That's one of our basic, you know, the

1    threshold point.  And the only answer I've heard from the

2    government is, well, the counties are doing some stuff.  First

3    of all, they don't have any evidence that the counties are

4    doing anything today, and we're not aware of any of that.  But

5    I believe Your Honor made the point --

6         THE COURT:  Don't I have evidence that Collier County

7    is going forward with what they were doing?  I mean, I've got

8    this -- I've got evidence that they were doing it recently and

9    no evidence that they stopped.  Couldn't I reasonably infer

10   that this is still going on?

11        MR. CARVIN:  I don't know that there is

12   any allegation in this court that Collier County has actually

13   excluded anybody from the rolls, much less excluded any non --

14   a real citizen from the roll or excluded people on the basis

15   of their responses.  We do have --

16        THE COURT:  Isn't it a problem if the state of

17   Florida is sending -- or the supervisor, somebody on behalf of

18   the state is sending a certified letter to some citizens, not

19   others, saying, "We don't think you're a citizen; we're going

20   to take you off the rolls"; and if, in fact, the ones that

21   they are -- the citizens to whom they are sending this letter

22   are overwhelmingly Hispanic; isn't that a problem?

23        MR. CARVIN:  Your Honor, I have three responses.

24        Number one, if it is a problem, it's a problem that

25   exists, and you can't deal with that in a TRO, because TROs

 1  are solely prospective restraining orders.  So it really

 2  doesn't matter for present purposes.

 3        Moreover, if you try to unring that bell, I frankly

 4  don't know how we can do anything to unring the bell, they

 5  read the letter.

 6        As to the merits of this now moot dispute, I will

 7  point out that, no, I don't think receiving a letter that

 8  says, "Look, we've got two pieces of conflicting information

 9  from you.  One of which you told the DMV you weren't a

10  citizen; the other you're trying to register to vote.  Could

11  you clarify this for us?"  And the fact that it is

12  overwhelmingly Hispanic, come on, let's be honest, any

13  completely a hundred percent accurate view, asking people

14  about their citizenships, given the demographics of Florida,

15  is going to be disproportionately Hispanic.

16        THE COURT:  I did notice in the PowerPoint they did

17  manage to find a Canadian to attach as an example.  But, sure,

18  you're right, and that's why I asked the question referring to

19  citizens.  I understand, if you're taking non-citizens off the

20  rolls, that the non-citizens in Florida are going to be

21  overwhelmingly Hispanic.

22        MR. CARVIN:  In any database where there is *prima*

23  *facie* evidence of non-citizenship; i.e., checking that you

24  weren't a citizen two years ago, is going to be overwhelmingly

25  Hispanic.

1           Now, the alternative is that we need to have a

2      perfect answer on who a citizen is or who a non-citizen is

3      before we even send the inquiry.

4           THE COURT:  Right, but you need to be careful about

5      it.  Obviously, you're going to send the inquiry, because

6      that's why you get due process.  You may be wrong, but you

7      probably ought to try to get -- you ought to reduce the number

8      of false positives.  Let me ask this.

9           As part of the system that you went through, DAVE,

10     did anybody look at the chronology?  I mean, you did the

11     matches, and I think I know from the letters in the evidence

12     that I've got how the matches were conducted.  But it seems to

13     me that the biggest number of false positives are likely to

14     result from the fact that somebody got a driver's license in

15     2007 and got naturalized in 2009.  Did anybody look to see the

16     sequence of the voter registration and the driver's license

17     registration?

18          I mean, it seems to me that, if what you know is

19     somebody registered to vote in 2009, and they got a driver's

20     license in 2011, two years later, and said they were not a

21     citizen, that sounds like a problem.  On the other hand, if

22     somebody got a driver's license in 2009, and then registered

23     to vote in 2011 and said they were a citizen, there are going

24     to be tens of thousands of people for whom that is not an

25     error at all; that is perfectly accurate, because, as I say, I

1   don't know what the number is, but there are many, many

2   thousands who are naturalized in this state every year.

3          MR. CARVIN:  What the secretary of state wants,

4   because of that timeline problem, is the most current data.

5          THE COURT:  Absolutely.  But my question was, did

6   anybody check; did you try to control for the chronology?

7          MR. CARVIN:  As I understand it, Your Honor -- and if

8   it's all right I want to give you precisely accurate factual

9   answer -- as I understand it, there was a sample sent out on

10  the idea that they were trying to figure out what you

11  consider, common sense would probably dictate are the closest

12  kinds of correlations.  But may I just consult with co-counsel

13  and make sure I'm not providing you wrong information?

14         THE COURT:  Absolutely.

15     (*Mr. Carvin confers with Mr. Nordby.*)

16         MR. CARVIN:  I can only supplement the answer, Your

17  Honor, by saying they did take basic steps to ensure it was

18  accurate as possible.  They realized there was some inherent

19  problems in terms of time lags in the database, and I guess

20  the effort was to see if this sample would shake those things

21  out, or at least not, you know, create problems.  But they did

22  have *prima facie* evidence.

23         Again, this was going on simultaneously in an effort

24  to get data that was quite current; and, hopefully, that will

25  be resolved; and, therefore, this timeline concern will be

1   dissipated.

2          And since we're talking about what the state is going

3   to be doing prospectively, I respectfully submit that's all

4   that matters at this point.

5          Just to return to your Collier County point, I'm also

6   told that we don't have any information that Collier County is

7   taking any proactive steps.  The government hasn't alleged it.

8   I can't speak for Collier County.  But we have no information

9   in that regard, nor again would an injunction against the

10  secretary of state either unring the bell of what they've

11  already done or stop them from doing something tomorrow.

12         THE COURT:  You can't give me any reason why Collier

13  County would send out a letter telling people that, if they

14  were born in Puerto Rico, they might be a citizen.

15         MR. CARVIN:  If I had to defend Collier County, who

16  is not a client of mine, not everybody born in Puerto Rico is

17  a citizen.  If you're from Spain, and you're born in Puerto

18  Rico, you may be.  I agree with you that the language is quite

19  misleading to suggest that Puerto Ricans are not United States

20  citizens, but --

21         THE COURT:  I think if you were born in Puerto Rico,

22  it's like being born in Alabama, I think when you're born,

23  you're a United States citizen.

24         MR. CARVIN:  Yes, I mean, as I understand it.  But, I

25  mean, I don't want to get into the vagaries of people visiting

1   Puerto Rico and having a baby, because I'm not here to defend

2   Collier County.

3          THE COURT:  That's a whole other issue.  Fair enough.

4          Collier County also requires somebody to -- when they

5   send their form back, they require you to say, if you're going

6   to send in documentation -- if you say you're a citizen, and

7   you're going to send in documentation, it requires you to say,

8   and if I don't get it there within 30 days, I know I'm going

9   to be ineligible to vote.

10         MR. CARVIN:  I think that's right, Your Honor.  It

11  seems like you know more about Collier County, in all candor,

12  than I know about it.

13         THE COURT:  I just read the record.

14         MR. CARVIN:  No, no, I understand.

15         THE COURT:  I was wondering why -- you know,

16  sometimes somebody might think they can get the data within 30

17  days and not be able to get it.  I'm told these days getting a

18  duplicate driver's license and getting a duplicate passport is

19  not as easy as the last time I did those things.  Apparently,

20  it's not easy to go get duplicate documents.

21         MR. CARVIN:  Again, I don't know the vagaries of

22  Collier County, but I think the idea would be you can xerox

23  your passport and send it in.

24         THE COURT:  Some people don't have their passport.

25  Sometimes people lose these things.  You know, I know people,

1    I assume that you know people, that, you know, didn't get on

2    the plane because they couldn't find the passport.

3         MR. CARVIN:  Which is precisely why the secretary

4    wants an accurate *prima facie* evidence and gives these people

5    a full and fair opportunity.  First, all they have to do is

6    swear and affirm that that thing is inaccurate.  There's a

7    hearing.  Nothing is going to happen to them pending this, and

8    then they've have plenty of time to go get the duplicates.

9    Nobody is getting off the roll on the basis of incomplete

10   information.  These are -- a lot of people have admitted that

11   they are not citizens, and those who don't will -- the person

12   you are describing will check the box, no, you're wrong, and

13   I'll get you the information when I can get it.

14        THE COURT:  And Collier County says, if it's not here

15   in 30 days, you are coming off the roll.

16        MR. CARVIN:  I will take your word for that, Your

17   Honor, and I think the papers might indicate that.  Again,

18   standing here today, I have no information that Collier County

19   is pursuing that.

20        Look, Collier County is a covered jurisdiction under

21   Section 5.  If these people have a problem with Collier

22   County, let them sue Collier County.  Why are we being dragged

23   into a fight with Collier County where every criticism of what

24   they are doing is because they are departing from the

25   secretary of state's program?

1          THE COURT:  Well, part of what you did was you told

2     Collier County do these things, knowing Collier County is a

3     covered jurisdiction, and that this hasn't been pre-cleared.

4          MR. CARVIN:  Oh, and nobody -- it's not subject to

5     preclearance.  If it was subject to preclearance, they would

6     have come to this court and alleged it was subject to

7     preclearance.  The fact that they didn't tells you that this

8     is not a change of voting, because all it is is a change of

9     the database for a pre-existing pre-cleared statute.  That

10    process that we're describing hasn't been pre-cleared by the

11    justice department.

12         Should I switch briefly to the merits argument,

13    because I think --

14         THE COURT:  Surely.

15         MR. CARVIN:  I think, frankly, Your Honor, that our

16    conversation about injury may be really irrelevant in terms of

17    the merits, because the government was utterly unable to

18    explain to you why, if non-citizenship is an exception for

19    (a)(3), which they now have conceded it is, how it cannot be

20    an exception for the 90-day removal ban.  The 90-day ban says,

21    except for change of address, all of the exceptions in (a)(3)

22    are exceptions from the 90-day program.  They just stood at

23    this podium and told you it would be insane and contrary to

24    the clear views of the NVRA to not read non-citizenship into

25    (a)(3).

1    Well, if you read non-citizenship into (a)(3), either

2    because it's provided by state law or because of the

3    government's argument, by definition that means, since the

4    90-day provision encompasses all of the exceptions to (a)(3),

5    that needs to go along with that.

6    They want you to come to the extraordinary

7    counterintuitive position that common sense requires you to

8    make it an exception of (a)(3), but doesn't require you to

9    treat it like all of the other exceptions in (a)(3).  In other

10   words, you need to treat non-citizenship better than being

11   convicted of a crime or mental capacity.  You need to treat

12   people who were never eligible to vote at all, who committed

13   fraud to get on the rolls, better than people who were

14   initially placed on the rolls legally, but then the subsequent

15   events -- death, criminal activity, et cetera.  But whatever

16   sort of non-textual reason the government --

17   THE COURT:  There's a good policy reason why Congress

18   might want to do it just that way.  It's not that you're going

19   to treat this better than being convicted of a felony.  It's

20   something that -- being convicted of a felony is something

21   that could happen in the 90 days.  Being a non-citizen is

22   something that would very, very rarely happen within the 90

23   days.  That's the difference.  The idea is, look, you ought to

24   do this, not on the eve of an election; you ought to do it in

25   the quiet of a non-election year.  And that's a good policy,

1    but that doesn't really answer our question.

2            Let me ask you this.  If I agree with your statutory

3    reading, there still is the requirement that this be done

4    non-discriminatorily.

5            MR. CARVIN:  Sure.

6            THE COURT:  So, if the state -- if you send out a

7    list that had 99 false positives for every one non-citizen --

8            MR. CARVIN:  That would make it inaccurate.  It

9    wouldn't make it discriminatory.

10            THE COURT:  If the 99 were all African-American, it

11    would be discriminatory, wouldn't it?  If the 99 were all

12    Hispanic, it would be discriminatory, wouldn't it?

13            MR. CARVIN:  Well, I --

14            THE COURT:  In any event, if you had a program that

15    flawed, I could preliminarily enjoin them, could I not?

16            MR. CARVIN:  No.  There's no provision in the NVRA

17    that says, when you inquire, you need to have perfectly

18    accurate information to make the inquiry.  All it requires is

19    that it be uniform.

20            THE COURT:  So the state says, look, if I decide

21    that, you know, I've had a problem with African-Americans

22    lying on their voter registration application, I'm going to

23    send a letter to every African-American in the state saying

24    that you have to prove that you are registered; I'm not going

25    to send it to whites or Hispanics, you say that's

1   nondiscriminatory?

2          MR. CARVIN:  No.  I'm saying that is blatantly

3   discriminatory --

4          THE COURT:  Absolutely it is.

5          MR. CARVIN:  -- on the basis of race.  But we need to

6   discriminate on the basis of citizenship.  The Congress

7   requires us to treat non-citizens worse than citizens so --

8          THE COURT:  Absolutely.  My question was not, can you

9   send a letter to non-citizens.  Obviously, you can.  But, if

10  you're sending letters overwhelmingly to citizens, then it

11  seems it is my African-American hypothetical, because if, in

12  fact, the overwhelming majority of the people to whom you are

13  sending this is Hispanic, if they are citizens.

14         MR. CARVIN:  That would be very, very suspicious, if

15  the state had engaged in sending Hispanic citizens these

16  things, but we know that's not what happened, even under the

17  government's version of this.

18         THE COURT:  Well, their theory is that is what

19  happened in about 33 percent -- according to the Miami-Dade

20  letter, in a third of these cases, that's what they did; they

21  sent letters to citizens.

22         MR. CARVIN:  No, no.  I'm sorry.  If they

23  intentionally sent letters to citizens, then obviously you

24  would be right, particularly if it had Hispanic disparate

25  impact.  It's not disputed, I don't think, that they had *prima*

1   *facie* evidence of non-citizenship, because they only sent

2   letters to people who indicated that they were not citizens

3   when they registered to drive.  It is true that --

4        THE COURT:  Now, wait.  You say they have *prima facie*

5   evidence.  If somebody went out and said, "I know that in 2007

6   you told the driver's license bureau that you were a

7   non-citizen, and you registered to vote in 2011 and said you

8   were a citizen, four years later, I'm going to arrest you for

9   making a false statement," don't you think that would be an

10  illegal arrest?

11       MR. CARVIN:  What they should do in those

12  circumstances is ask the person, "I've got two pieces of paper

13  in front of me that are in conflict and --"

14       THE COURT:  Without asking, that's not a *prima facie*

15  case.  It's not probable cause.  If they came in here and put

16  that case on in a civil case or a criminal case and said, "We

17  rest, that's all we proved," I would grant the motion for

18  judgment for the defense.  There is no *prima facie* case,

19  right?  Because the timing is different, and they deliberately

20  went forward with data where the timing was perfectly

21  consistent.

22       MR. CARVIN:  Your Honor, let's assume that in 2007

23  they were a criminal, and in 2011 they were registered to

24  vote, and they said to the person, "Are you still a criminal

25  within our things," there might well be a number of false

1   positives, and you would enter summary judgment, if that's all

2   they had.  But what you wouldn't do is tell law enforcement

3   agencies or voter agencies that they can't even ask the

4   question.  That's the dilemma I'm trying to get at here.

5         If they need proof sufficient to satisfy civil

6   litigation before they even send the letter, then you put them

7   in an impossible position, because either they're just going

8   to arbitrarily exclude them, which, of course, nobody wants;

9   or they're going to be completely unable to even do basic

10  followups and say, look, we have an issue here, can you

11  resolve it for us.

12        So, I think, in the criminal law context, there is a

13  big difference between the probable cause you need to arrest

14  somebody and reasonable suspicion, and you need to ask them

15  about something.  We're at the reasonable suspicion stage, and

16  I think that alleviates these concerns about discrimination

17  that you're talking about, because their argument -- this

18  discriminatory argument would apply even to a perfectly

19  accurate database.  And, again, Your Honor, at this point the

20  discussion is largely academic, because the next iteration,

21  the only thing that should concern this court, what's going to

22  happen in the future, won't be based on outdated data and will

23  alleviate any of these concerns.

24        So I don't think that it's fair to call what they did

25  discriminatory, since everyone understands that, if you're

1    asking people about citizenship status, a disproportionate

2    number of people being asked that question are going to be

3    Hispanic in Florida.  And if you do rule that that's

4    discriminatory, that would disable the state from proceeding

5    on any basis, because it will always be disproportionate,

6    unless you --

7             THE COURT:  That's the difference between my question

8    about discriminatory and some of the allegations of

9    discriminatory, some of the newspaper stories that were

10   attached.  Obviously, the fact that the number of people on

11   the list is overwhelmingly minority is not an indication of

12   discrimination, if they by definition count a non-citizen as a

13   minority.  And if it was an accurate list, it's going to be a

14   hundred percent minority, I understand.

15            MR. CARVIN:  And your variation, I believe, is the

16   common sense one, well, if it's accurate.  And my only point

17   is, uniform doesn't connote accuracy.  That's not what

18   Congress was trying to get at.  They were trying to get at,

19   make sure everybody is subject to it, make sure it's

20   nondiscriminatory, and we certainly satisfied that.

21            I'd also point out that the government doesn't argue

22   that it has a disparate impact.  It says -- the newspaper said

23   it might have a disparate impact.  You don't even have an

24   allegation in front of you, and the notion that this somehow

25   violates the Voting Rights Act, without belaboring it, I think

1   the Eleventh Circuit's decision in *Johnson* completely excludes

2   the notion.  If you can ask people about -- if you can exclude

3   people from voting because they were felons, even though

4   everyone admitted in that case that it is a disproportionate

5   impact on minorities, a fortiori, cannot exclude people on the

6   basis that everyone of these is disqualified.

7            THE COURT:  So excluding non-citizens is not

8   discriminatory.

9            MR. CARVIN:  Right.  And that's the dilemma.  If

10   excluding non-citizens is not discriminatory, and we say

11   inaccurate exclusion is, I think the best result for the state

12   is to make sure any decision they make on exclusion is based

13   on accurate data.  And I don't think they can get to that

14   accurate data unless they ask a broader group of people the

15   question, understanding that some of the people are going to

16   say, no, you're mistaken.

17            And in all events, what's confronting us today is

18   whether or not the secretary and state can proceed with the

19   federal database, under federal law that they say we can use

20   for voter registration, and I don't think the government has

21   any objection to that.  But if they do, let them come back in,

22   after we've got the SAVE database, after we're dealing with

23   real world facts rather than hypotheticals, and then Your

24   Honor would be in a position to adjudicate and resolve their

25   emergency relief motions.

1          Thank you.

2          THE COURT:  All right.  You have a couple of minutes

3    left for Ms. Rodriguez.

4          MS. RODRIGUEZ:  May it please the court.  Good

5    morning, Your Honor.

6          Thank you for giving us the opportunity to speak on

7    behalf of bipartisan voters who are very concerned about the

8    integrity of the upcoming federal general election.  I

9    understand from your comments at the beginning of the hearing

10   that you are not interested in hearing our argument regarding

11   our ability to intervene.  Is my understanding correct?

12         THE COURT:  Right.  This is not a hearing on

13   intervention.  You're here as an *amicus* in support of the

14   defendants.

15         MS. RODRIGUEZ:  I appreciate it, Your Honor.

16         Our primary point on behalf of the voters is that

17   they have a serious concern that the votes that they intend to

18   cast in the general election will be cancelled out or diluted

19   by votes that would be cast by non-citizens who remain on the

20   rolls, if the court prevents the state from proceeding with

21   removal of non-citizen voters.

22         I'm not going to address the NVRA issues or the other

23   substantive issues made, because I think counsel have already

24   addressed those with the court.

25         But with respect to the aspects of considering the

*1* balance of hardships and the greater public interest, we would

*2* urge Your Honor to give very serious consideration to the

*3* impact on the votes of legitimate voters that will occur if

*4* non-citizens are permitted to remain on the rolls and to cast

*5* ballots in November.

*6*     The courts in, for example, the *Anderson* case and the

*7* *Roe* case have both stated that the denial of the franchise can

*8* occur not simply because you're preventing someone from

*9* casting a vote, but by the dilution of their vote due to

*10* improper votes, such as ballot stuffing or changing the rules

*11* of the election after the election has occurred; for example,

*12* in the case of *Roe versus Alabama*, where the court had allowed

*13* improperly completed absentee ballots to be counted after the

*14* election in violation of the then existing rules of voting.

*15* And in both of those instances, whether you're talking about

*16* stuffing ballots or you're talking about allowing illegally

*17* cast ballots in the case of *Roe*, in both instances you're

*18* damaging the rights of legitimate voters, who follow the rules

*19* and cast legitimate ballots, in having their vote diluted or

*20* cancelled out.

*21*     There is no remedy for fixing that after the fact.

*22* And that's why it is so important that the state be allowed to

*23* continue to evaluate, even within the 90-day period, the

*24* existence of whether or not there are non-citizens on the

*25* rolls and to remove them, obviously, based on the best

1   available information and giving the persons who are notified

2   due process.  I think we all agree on that.  But in balancing

3   the harms and considering the public interest, we urge the

4   court to give due consideration to the consequences of, on a

5   blanket basis, prohibiting the state from removing non-citizen

6   voters, whether or not the non-citizen steps forward

7   voluntarily.  If they have accurate information that someone

8   is a non-citizen, the state or the supervisors ought to be

9   able to act on it.

10          And on the back end, if there's a mistake committed,

11   there is always the ability to get re-registered with the

12   proper documentation.  There is the ability of someone who is

13   questioned to cast a provisional ballot.  There are a lot of

14   remedies at the front end, but there's no remedy at the back

15   end for pulling out the votes that were cast by ineligible

16   voters.

17          And, therefore, Your Honor, on behalf of the

18   bipartisan group of voters, we would urge the court to deny

19   the government's motion for the temporary restraining order.

20          THE COURT:  All right.  Thank you.

21          MS. RODRIGUEZ:  Thank you.  Your Honor, since you're

22   going to be considering the motion to intervene separately,

23   and the government filed an opposition last night, your order

24   had not provided for us to provide a reply.  I would ask leave

25   of the court to submit a reply to the government's opposition.

1          THE COURT:  Surely.  A week from today?

2          MS. RODRIGUEZ:  That would be fine, Your Honor.

3   Thank you.

4          THE COURT:  All right.

5          MR. RUSS:  Your Honor, I know I just have a few

6   minutes to --

7          THE COURT:  In fact, let me do this, as far as the

8   schedule goes, there was a new motion to intervene -- I don't

9   know -- at 11:30 last night.  Some of these pleadings were

10  filed late last night, some maybe later in the day yesterday,

11  and somebody responded to those.

12         MR. RUSS:  There was an *amicus* brief, which may not

13  require a response, and then there was the Judicial Watch's

14  motion to intervene filed yesterday.

15         THE COURT:  All right.  So there was an *amicus* brief

16  on your side.

17         MR. RUSS:  Yes.

18         THE COURT:  A motion to intervene on the other side.

19         MR. RUSS:  That's correct.

20         THE COURT:  You'll be responding to the motion to

21  intervene.

22         MR. RUSS:  That's correct.

23         THE COURT:  Ms. Rodriguez, why don't you file a reply

24  within a week after that.  There is no reason to get these

25  operating on separate tracks.

1          MS. RODRIGUEZ:  That's fine.

2          THE COURT:  You and that moving party can file a

3   reply seven days after -- seven days without an extension of

4   three, seven days after the motion.

5          You want to respond to the *amicus* brief?

6          MR. CARVIN:  Both, in terms that we don't think the

7   court should accept it and appropriate on the merits, which I

8   assume is the way you would like us to handle it, but -- in

9   other words, I can combine it in one paper rather than do it

10  sequentially, but --

11         THE COURT:  I can tell you the chance I'll say no to

12  an *amicus* brief is slight.  I'm always happy to have all of

13  the help I can get.  Frankly, saying the same thing more than

14  once doesn't help me, but they are likely to be able to do

15  that.  You can reply.  But, look, that's on the merits of this

16  motion.  You don't need to respond to that.  We're going to

17  have a ruling on this motion by noon, so I wouldn't worry

18  about that.

19         MR. CARVIN:  Thank you, sir.

20         MR. RUSS:  Your Honor, to address some of the points

21  that Mr. Carvin made.

22         The state is saying it's doing nothing now, but it

23  has already taken action.  It sent out this list.  It created

24  this, it set this process in motion, and now it wants to

25  disclaim responsibility for the consequences of that.

```
 1            Regarding the question about Section 5
 2  preclearance --
 3            THE COURT:  We'll come back to that, but let me ask
 4  you first.  Maybe not precisely, but almost precisely, this is
 5  a voluntary cessation question.  And the law of the circuit is
 6  that, when it's a government defendant, the voluntary
 7  cessation principles are a whole lot easier for the defense
 8  than they are in all of those Supreme Court cases, going back
 9  to *W.T. Grant* and all that.  The law of the circuit is there
10  is a presumption, when the government says we're not going to
11  do this anymore, they're not going to do it anymore.  So what
12  do you do with that?  Mr. Carvin says pretty clearly, we are
13  not going to do this anymore; we're going to do a different
14  program, but we're not going to do the program that's
15  described in all of these papers.
16            MR. RUSS:  To return to the status quo, we have to
17  address the harm that has occurred.  The letters being sent
18  after the 90th day, the threat of people being removed from
19  the rolls, Collier County saying that they were going to
20  remove people for failure to respond to the mailing.  Voters
21  have been impacted by this illegal purge, and the TRO is to
22  return them back to the rolls when there's no -- where there
23  isn't some contemporaneous statement they admitted they are
24  non-citizen, or their failure to respond that should not be
25  held against them when this purge program should not have been
```

1   occurring in the first place, should have been completed by

2   the 90th day.

3        THE COURT:  All right.  I hear that.  While I'm

4   thinking about it, let me tell you this.  You bring back

5   evidence that there is some citizen that has been taken off of

6   the rolls, and we will get them back very, very promptly.  But

7   that's different from entering an injunction that says put

8   back on the rolls everybody that didn't respond or everybody

9   that you've taken off, without any evidence that that actually

10  caught a citizen.  But if you come in and -- you know, you're

11  going forward, you've got other proceedings, you come in and

12  find out that a citizen has come off the voting rolls as a

13  result of this program, then, frankly, I would hope that they

14  would have the person back on the rolls without you having to

15  ask; but, if they don't, we can fix that.

16       MR. RUSS:  I guess part of the problem is putting the

17  burden on the voters.

18       THE COURT:  I understand.  I'm not suggesting that

19  that's how the statute works.  I'm just telling you that, if

20  you don't get an order out of me today saying put these people

21  back on the rolls, then if you find one that came off in

22  error, that's a whole different thing.  I think it's

23  accurate -- what they say at this point, I think it's

24  accurate, nobody has identified a citizen who has been taken

25  off the rolls yet.

1          MR. RUSS:  That is correct.  What we've identified is

2   that there are many voters who have not responded to this

3   mailing, and the burden should not be on them due to an

4   illegal purge.

5          THE COURT:  I understand.  And there are some

6   citizens who got letters, and there's no reason to understand

7   how in the world they got on the list to begin with, other

8   than, obviously, just an error.

9          MR. RUSS:  That's correct, Your Honor.

10         On the question of the Section 5 preclearance, the

11  NVRA applies statewide.  Section 5 applies to five particular

12  counties.  We made a choice that, if we can get the injunctive

13  relief under the NVRA, then these changes won't be implemented

14  in the five counties.  If ultimately we are unsuccessful in

15  getting an injunction, we will have to make a decision about

16  the Section 5 claim; and, of course, some private groups have

17  not waited, and they have gone ahead in the Middle District

18  and filed a Section 5 enforcement action.

19         Our view is that the state's interpretation about the

20  90-day rule would make it a nullity.  If for any reason, even

21  reasons that aren't listed explicitly, if they can go forward

22  with the removal program, then there is no more 90 days.  It's

23  right out of the statute, for any state law reason, they can

24  remove someone from the rolls.

25         THE COURT:  No.  They can't remove somebody for

1    changing residence.

2            MR. RUSS:  I believe they concede --

3            THE COURT:  Isn't that the one that's in (a)(2) but

4    not in (c), whatever the number is?

5            MR. RUSS:  Yes, I believe that -- they do -- excuse

6    me, Your Honor.

7            To the extent they concede that, then Congress would

8    not have needed to list it.  Congress would simply say that's

9    the one program you can't do.  That's not how Congress wrote

10   the statute.  It said any program.  So our view is that any

11   program means any program.

12           THE COURT:  Accept the legislative principle,

13   anything that can be said in a hundred words can be said in a

14   thousand.  All right.

15           MR. RUSS:  Finally, just one point about -- I know in

16   Ms. Salas's declaration, it states that a hundred people have

17   admitted that they are non-citizens.  We don't accept -- we

18   would want more evidence before we accept that proposition.

19   What does an admission mean?  Is it that somebody years ago at

20   DMV checked non-citizen, and we haven't heard from them since,

21   and so we're going to assume they've admitted; or is it a

22   contemporaneous statement now, yes, in fact, I'm a

23   non-citizen?  That contemporaneous admission, that person can

24   be removed from the rolls.

25           For all of the reasons that we stated, we believe

1    that a TRO is appropriate, and we ask the court to grant the

2    relief.

3          THE COURT:  All right.  Let's take a break.  We will

4    come back at 11:25 by that clock.  That's 15, 16 minutes.

5          (*A recess was taken at 11:10 a.m.*)

6          (*The proceedings resumed at 11:39 a.m.*)

7          THE COURT:  Please be seated.  Thank you for your

8    patience.  I'm sometimes slower than I hoped.

9          I'm going to announce my decision on the motion for a

10   temporary restraining order.  I'm going to say a few more

11   things than would be necessary just to explain the ruling, but

12   the lawsuit will go on after today, and some of this I think

13   is useful from a case management perspective, even if not

14   critical to this ruling, because some of these issues will

15   come around again.  Let me start with some background.

16         The goals of the election system of both the federal

17   government and the state government in implementing it should

18   not be controversial.  One goal should be to make it easy for

19   eligible citizens to register and vote.  Another goal should

20   be not to let non-citizens vote or others who are not

21   eligible.  Again, these goals should not be controversial.

22         Two problems arise in implementing the goals:  one is

23   partisanship and one is accuracy.  Partisanship has no place

24   in conducting an election.  It is equally wrong to let a

25   non-citizen vote on the one hand or to bar or deter an

1  eligible citizen from voting, or even to hassle a citizen

2  based on an inaccurate claim of non-citizenship.  People of

3  good faith on both sides, and certainly people of good faith

4  in the federal government or the state government, ought to

5  agree on these principles and ought to try to stop efforts

6  either to have non-citizens vote or to bar or deter or hassle

7  citizens from voting.

8         Now, accuracy is a different problem.  Determining

9  citizenship is not as easy as the state would have it.  When

10  there are millions of records, errors occur.  Questioning

11  someone's citizenship unnecessarily is not as trivial as the

12  state would have it.  Imagine a person who comes here legally,

13  perhaps brought by parents, abides by our laws, works, studies

14  our constitution, learns of our freedoms, becomes a citizen

15  maybe in this very courtroom, maybe in a courtroom like this

16  somewhere else in the state.  It's a proud day.  And then the

17  new citizen gets a letter that asserts that the person is not

18  a citizen and demands records and sets deadlines and threatens

19  criminal prosecution.  It's not nothing, and it's not trivial.

20         But leaving an ineligible voter on the list is not a

21  solution.  Non-citizens ought not be voting.  And it's not

22  very satisfactory to say that the state missed the 90-day

23  deadline, so non-citizens should be allowed to vote.  People

24  need to know that we're running an honest election.

25         Now, there's going to be a mistake every now and

1   then.  Someone once said, you could sweep every room three

2   times, and there would still be a speck of dust somewhere.

3   But the federal government and the state government ought to

4   be working together to try to minimize the mistakes.

5        Now, one issue on the temporary restraining order is

6   redressability.  Supervisors of election in Florida, at least

7   based on my somewhat limited understanding of the Florida

8   constitutional law, are constitutional officers.  It's not as

9   clear as the government would have it that the supervisors can

10  just be told what to do by the secretary of state.  Certainly,

11  in this lawsuit I can redress any violations of the NVRA by

12  the state or the secretary, or violations in the conduct of a

13  statewide program.  It's much less clear that I can redress

14  specific shortcomings.

15       I had some questions about Collier County, and I

16  don't mean to pick on Collier County, but some of their papers

17  are in this record, and that's why I asked about those.

18       It's not clear that, when the supervisor of Collier

19  County does something different than what the secretary said

20  to do, that there would be any available redress in this

21  lawsuit, at least while the only defendants are the state and

22  the secretary.  Maybe yes, maybe no.  That's not a ruling.

23  I'm just saying it's not clear.

24       Now, part of the TRO analysis is irreparable harm.

25  Denying a vote is plainly irreparable harm.  The state says,

1   oh, well, anybody removed can cast a provisional ballot.

2   That's not a complete answer.  That doesn't work if the poll

3   worker is not properly trained and doesn't do what needs to be

4   done to get the provisional ballot cast.  And it doesn't work

5   if the voter doesn't understand, either because of language or

6   because of lack of sophistication.  It doesn't work if the

7   voter just walks away, either because the voter doesn't have

8   time to stay and cast a provisional ballot or is embarrassed.

9        Now, it's easy for a white executive to stay and cast

10   a provisional ballot, but maybe not for a construction worker

11   or a custodian or a lawn service worker who has to be at work

12   on time.  And maybe not -- it's maybe not a satisfactory

13   answer for a Hispanic who doesn't want to have his neighbors

14   see his citizenship questioned.

15        Also, if there are a lot of instances of this, if

16   there are a lot of people casting provisional ballots, it

17   slows down voting generally, and that can bias an election, or

18   at least the perception.  We all know stories from the 2004

19   election where people in cities had to wait nine hours when

20   people in the suburbs got to vote right way.  Not in Florida,

21   but we've heard the stories.

22        If there are only a view provisional ballots, that's

23   not a big deal in that respect; but, if there are a lot of

24   provisional ballots, it makes a difference.

25        Now, another part of the TRO analysis is the balance

1    of harms and the public interest.  Allowing non-citizens to

2    vote is irreparable harm, just like allowing -- just like

3    precluding eligible voters from voting is irreparable harm.

4          The public interest, an important part of a TRO

5    analysis, is to have an accurate roll, to conduct an honest

6    election.  The public interest is to have it easy for eligible

7    citizens to vote and to keep non-citizens or ineligible people

8    from voting.

9          Now let's turn to the merits.

10         The main part of the government's presentation is the

11   90-day provision.  The NVRA has two provisions that deal with

12   when a registrant can be removed, and the critical word is

13   "removed," and the word is used in both of the provisions.  In

14   Section 8(a)(3) of the Act, there is no 90-day provision.  The

15   provision applies always, and it requires that a state in

16   administering its voter registration for federal elections

17   must provide that the name of a registrant may not be removed

18   from the list of eligible voters except for specific reasons.

19   Non-citizenship is not one of those reasons.  Then over in

20   Section 8(c)(2), the Act has the 90-day provision that the

21   government relies on, and it says that the state cannot have

22   a -- let me back up.

23         What it says is that, "A state shall complete not

24   later than 90 days prior to the date of a primary or general

25   election for federal office any program the purpose of which

1  is to systematically remove the names of ineligible voters

2  from the official list of eligible voters."  Again, that word

3  "remove," and it gives some specific examples.  It actually

4  incorporates by reference part of (a)(3) that I referred to

5  earlier.  It leaves out residency.

6        So you can't have a -- it has exceptions that

7  incorporate the parts of (a)(2) and leaves out residency.  So,

8  plainly, you can't have a systematic program for removing

9  people based on residency in the 90 days before a federal

10  election.  The question is, does the 90-day provision prevent

11  removing non-citizens under a systematic program during the 90

12  days?  And my answer is, it does not.

13        Plainly, (a)(2), which refers to removing people only

14  for specific reasons, does not apply to non-citizens.  And

15  it's the same language, at least close enough that there is no

16  distinction in the language, and so, if (a)(3) -- I think I

17  may have said (a)(2) -- but if (a)(3) does not prevent a state

18  from removing non-citizens, then that same language that

19  Congress used a couple of subparagraphs later does not apply

20  to removing non-citizens during the 90 days.

21        Let me explain using an analogy, and it's not

22  perfect, I understand, it's not intended to be, but it's a

23  helpful way to talk about it.

24        If one applies for insurance, gets an insurance

25  policy, then sometimes the insurance company can cancel the

1    policy.  If the insured gave false information on the

2    application, the insurance company may be able to rescind the

3    policy, make it void *ab initio*.  Cancellation and rescission

4    are two different things.

5            Now, the analogy is imperfect.  That's not what we're

6    talking about here, but the language is useful.

7            I think what these provisions, both (a)(3) and

8    (c)(2), applies to is cancellation, not rescission.  They

9    apply to removing somebody from the roll who was once properly

10   registered.  And so the kinds of things that they specifically

11   talk about are things that happen to one who is properly

12   registered and then becomes ineligible.  One is properly

13   registered to vote and then is convicted of a felony.  One is

14   properly registered to vote and then asked to be taken off of

15   the list.  One is properly registered to vote and dies.  One

16   is properly registered to vote and moves out of the state or

17   out of the jurisdiction.  Those are all things where somebody

18   can properly be on the roll, and then no longer be eligible

19   and be removed.

20           And what the NVRA says is, you can only remove

21   somebody for specific reasons; and, in the 90 days before the

22   election, you can only remove people for a subset of those

23   reasons.  None of those provisions, it seems to me, apply to

24   removing somebody as a non-citizen.

25           Now, you don't get that just from the language; and,

 1   if (a)(3) was not in the statute, I would read (c)(2) exactly

 2   the way the government reads it, and you would win.  But

 3   (a)(3) is in the statute.  Congress used very similar language

 4   in two subsections of the same provision.  It's hard to say

 5   that, when they talk about removing somebody in (a)(3), they

 6   are talking about something different than when they're

 7   talking about removing somebody in (c)(2), and everybody

 8   agrees that (a)(3) does not prevent removing a non-citizen

 9   before the 90 days.

10           That's my best reading of the statute.

11           I disagree with the state's provision that I can turn

12   the comma into a semicolon, and I can say as provided by state

13   law.  I think that would prove too much; and, frankly, it's

14   impossible that somebody could butcher the drafting that

15   badly.  So I do not agree with -- that that's part of the

16   state's provision.

17           Now, that's the thrust of the government's -- that's

18   the first thing on the government's list of reasons to stop

19   this process, but it's not the only thing.  The government

20   also says this is not uniform and it's discriminatory.

21           There certainly seems to be some flaws in the match

22   process with DAVE that created this list.  The evidence is

23   clear that there are false positives and a lot of them.  One

24   flaw may be that, in the process of getting a driver's

25   license, the person's citizenship was put down incorrectly.

1    There's nothing in the record that indicates that the driver

2    gets any confirmation of whether the driver has been recorded

3    as a citizen or not a citizen.  I told you in asking questions

4    that my driver's license doesn't say, but it's an older

5    driver's license, and I'm a citizen.  I don't know if the

6    non-citizen's license says non-citizen.  It may be the

7    non-citizen gets -- maybe gets back some paperwork when you

8    register that says that they've registered you as a

9    non-citizen, and maybe you read that.  But at least on this

10   record, it seems entirely possible that the person getting a

11   driver's license gets no indication at the time of whether the

12   clerk has recorded the person as a citizen or not.  And so an

13   error can be made that lists a person as not a citizen, and

14   the person has no way to correct it, and it's just a mistake.

15   And then that person gets on the list that the supervisor --

16   that the secretary sent out to the counties.

17         A bigger likely flaw is that somebody is a

18   non-citizen when the person gets a driver's license and then

19   becomes a citizen.  We make lots and lots of new citizens in

20   Florida every year.  And so with driver's licenses that are as

21   much as five, six years old or older -- the record has the

22   date, I don't recall exactly -- but a number of years old, it

23   is just a certainty, it's an absolute certainty that the

24   system the secretary used would generate false positives for

25   all of those people who got a driver's license, then became a

1  citizen, and then registered to vote.  A perfectly lawful

2  chronology that happens on a regular basis, and yet the

3  secretary's list puts every one of those people on the list,

4  at least so far as the record shows.  And I asked and

5  Mr. Carvin was very candid in responding.  I don't think he

6  said yes or no, and didn't know for sure yes or no.  But there

7  is nothing in the record that suggests that the secretary

8  looked at the chronology and took off the list people who

9  registered to vote after getting the driver's license that was

10  used as a basis for the match.

11        And if that's what happened, one just knows that

12  there are a lot of people who are false positives, and one

13  also knows that that's not a nondiscriminatory group of

14  people.  The state is absolutely right that one would expect a

15  list, a properly-generated list, that is accurate, no false

16  positives, no false negatives, an absolutely accurate list,

17  would have many more Hispanics than others.  There are more

18  Hispanic non-citizens in Florida than others, and so one would

19  expect that.  And it's not discriminatory for a list of

20  non-citizens to include more non-citizens than others.  That's

21  accurate.  That's not discriminatory.

22        But if citizens who are properly registered are

23  divided into two groups, one that gets this letter and has to

24  jump through these hoops to vote, and another group that does

25  not get this letter and does not have to do anything more to

1   register to vote, and if the group that gets the letter is

2   overwhelmingly minority and the group that doesn't get the

3   letter is not, then that's discriminatory at least in effect.

4   So there's some problems with the system that was put in

5   place.

6           I was careful to say that's a discriminatory impact.

7   I don't suggest that that was the purpose of this.  I don't

8   have any evidence that that was the purpose.  And certainly

9   the state's effort to get the SAVE list is inconsistent with

10   any notion that the purpose was to send this letter to

11   citizens.  The purpose of getting the SAVE list was to send

12   the letter to non-citizens and get accurate information.

13           Now, if you said the state waited until the last

14   minute and asked for the SAVE list, then maybe that analysis

15   would be a little different, but the state has been talking

16   about getting the SAVE list for a long time.  And there is

17   probably enough on both sides to quibble about how it got

18   delayed, but it got delayed, and we are where we are.

19           That brings me to the bottom line on this motion, and

20   there are two parts of it:  one is the four-part TRO analysis,

21   and one is the voluntary cessation doctrine.

22           When a defendant violates the law, gets sued and

23   says, "I won't do it anymore," voluntarily ceases the

24   challenged conduct, then there are two lines of authority:

25   one that applies generally, and one that applies at least in

1   this circuit to the state or other governmental entities.  And
2   in this circuit, for the state or governmental entities, the
3   presumption is that, when the state says, "I'm not going to do
4   this anymore," the state is not going to do it anymore.  And,
5   indeed, everything the state has said seems consistent with
6   that.  The state has said, "We're not going forward."  The
7   secretary has said, the state has said today here in court,
8   "We're not going forward with the existing program that made
9   the matches off of DAVE," that had some of the flaws I talked
10  about.  And so that's a strong defense at least for the
11  defendants under a voluntary cessation doctrine.

12          And also there's the TRO balancing of interest; and,
13  as I said, there is potential irreparable harm on both sides,
14  and the public interest is in having an accurate list.

15          I'm not going to enter a temporary restraining order.

16          I started by telling you I was going to talk longer
17  than I necessarily needed to -- I'm sure longer than you
18  wanted to listen -- but longer than I needed to just to
19  address the TRO.  I could have said the last paragraph and
20  nothing else.  But the lawsuit stays pending, and I guess one
21  message I did want to send along is, I'm still here; and so,
22  if the secretary decides to ramp back up on some other basis,
23  and the government asserts that it's discriminatory, flawed,
24  that it's not proper, I'm here.  We can do this on short
25  order.  Everybody is up to speed on the law at this point.

1      I did want to say one other thing.  The government

2   called this a TRO.  I think as a practical matter, it would

3   have been a preliminary injunction.  The practical effect of

4   that is I do think my order is appealable.  I'll write down a

5   written order.  It's not going to say -- it's not going to be

6   nearly the length that I've talked with you.  I'll cite the

7   voluntary cessation cases and some of the other provisions.

8   But I do think it's an appealable order.  My opinion on what's

9   appealable and not probably gets you nowhere in the Eleventh

10  Circuit, which makes its own decision on those kinds of

11  things, but nobody should say I had called it a TRO and not

12  appealable on that basis.

13      I have not addressed everything in your papers.  I've

14  read it and considered it all.  If there is anything else

15  specifically that you would like me to touch on, I will do it.

16      MR. RUSS:  For the United States, no, Your Honor.

17      MR. CARVIN:  No, thank you, Your Honor.

18      THE COURT:  All right.  Thank you all.  We'll be

19  in --

20      Before we go, is there any other case management we

21  need to do?

22      You should talk with each other, and I should say

23  this.  I do think the quality of the briefing in the case was

24  extraordinary.  You've all done a very good job, and I very

25  much appreciate it.

1          You're very good lawyers.  Talk to each other and

2     figure out what needs to be done.  If there are other issues

3     that need to be resolved, as I say, I'm here, I can be as

4     flexible as I need to be.  Talk to each other about the best

5     way to get it presented, so that we can do it without

6     unnecessary delay, without more background noise than

7     necessary.

8          Thank you all.  We'll be in recess.

9       (*A recess was taken at 12:05 p.m.*)

10                  *   *   *   *   *   *   *   *   *

11

12

13

14    I certify that the foregoing is a correct transcript from the
      record of proceedings in the above-entitled matter.  Any
15    redaction of personal data identifiers pursuant to the
      Judicial Conference Policy on Privacy are noted within the
16    transcript.

17

18

19    *Judy A. Nolton*                    6/27/2012
      Judy A. Nolton, RMR, FCRR              Date
20    Official U.S. Court Reporter

21

22

23

24

25