IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


THE UNITED STATES OF AMERICA,

    Plaintiff,

v.                              CASE NO. 4:12cv285-RH/CAS

STATE OF FLORIDA and KEN DETZNER,
Secretary of State, in his official capacity,

    Defendants.

_____/


### ORDER DENYING A TEMPORARY RESTRAINING ORDER


This case arises from a program that the Florida Secretary of State began and then voluntarily abandoned to identify and remove noncitizens from the Florida voter-registration rolls. The United States has sued the Secretary and the State of Florida, asserting violations of the National Voter Registration Act. The United States has moved for a temporary restraining order. In substance, the motion may seek a preliminary injunction, but the nomenclature makes no difference. This order confirms the ruling announced at greater length on the record at the conclusion of a hearing on the motion. The order denies the motion primarily because the Secretary has abandoned the program.

Case No. 4:12cv285-RH/CAS

I

The Secretary is Florida's chief elections officer, but each county has its own Supervisor of Elections.  A Supervisor of Elections is a constitutional officer who operates not entirely within the Secretary's control.

The Secretary compiled a list of roughly 180,000 registered voters who he said might be noncitizens.  The Secretary sent a sample of names drawn from the list to the Supervisors with a detailed set of instructions—or at least suggestions—on how to use the list.  The instructions included sending a letter to each person on the list directing the person to send back a form swearing, under penalty of perjury, that the person was or was not a citizen, and, if a citizen, either requesting a hearing or attaching documents showing citizenship.  The proposed letter included a statement that if the person failed to respond within 30 days, the person might be removed from the voter roll.

There were major flaws in the program.  The Secretary compiled the list in a manner certain to include a large number of citizens.  At least insofar as shown by this record, the list included any person who (1) as a noncitizen, obtained a driver's license and accurately disclosed to the Department of Highway Safety and Motor Vehicles that the person was not a citizen, (2) became a naturalized citizen, (3) registered to vote, accurately disclosing to the Supervisor of Elections that the

person was a citizen, and (4) had not yet renewed the driver's license and so had not updated DHSMV's records to reflect the new citizenship status.

Florida driver's licenses are renewed every six years. One thus would expect the average lag between naturalization and driver's-license renewal to be three years. Tens of thousands of Florida residents become naturalized citizens each year. Homeland Security records put the number at nearly 240,000 for the last three years.[1] If just over three-fourths of those were already licensed drivers and, upon becoming citizens, registered to vote, one would expect the Secretary's list to include 180,000 properly registered new citizens. And the Secretary's methodology had other possible flaws as well, including, for example, the possibility that the clerk issuing a driver's license improperly listed a citizen as a noncitizen; the record does not indicate whether a driver has an opportunity to review or correct such an entry. The suggestion that there was a list of 180,000 improperly registered noncitizens was plainly wrong.

---

[1] The numbers are 82,788 for 2009, and 67,484 for 2010, and 87,309 for 2011, for a total of 237,581. James Lee, *Annual Flow Report: U.S. Naturalizations: 2011*, Dep't of Homeland Security 3 (April 2012), http://www.dhs.gov/files/statistics/publications/us-naturalizations-2011.shtm. This appears to be information that can be judicially noticed. Taking notice would be proper only if the parties have an opportunity to be heard. *See* Fed. R. Evid. 201. But it makes no difference whether this information is judicially noticed or even considered at all. It is common knowledge than many thousands of Floridians are naturalized each year. At argument, the Secretary did not deny it, and nobody could reasonably do so. The numbers are set out here just to illustrate the point.

Still, the Supervisors who received the Secretary's sample list identified a small number of noncitizens who were on the list and were registered to vote. The record is less than conclusive but suggests that some actually voted in past elections.

II

In order to obtain a temporary restraining order or preliminary injunction, a plaintiff must establish a substantial likelihood of success on the merits, that it will suffer irreparable injury unless the injunction issues, that the threatened injury outweighs whatever damage the proposed injunction may cause a defendant, and that the injunction will not be adverse to the public interest. *See*, *e.g.*, *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc); *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1354 (11th Cir. 2005).

III

In support of its motion, the United States asserts it is likely to prevail on the merits of two claims, both arising under the National Voter Registration Act. First, the United States says the NVRA prohibits a state from pursuing a program to systematically remove noncitizens from the voting rolls within 90 days before a federal election. And second, the United States says the Secretary's program violates the NVRA's requirement that any such program be uniform and nondiscriminatory.

A

The United States bases its 90-day argument on NVRA section 8(c)(2)(A):

> A State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters.

42 U.S.C. § 1973gg-6(c)(2)(A).  Section 8(c)(2)(B) sets out exceptions:

> Subparagraph (A) shall not be construed to preclude—
>
> > (i) the removal of names from official lists of voters on a basis described in paragraph (3)(A) or (B) or (4)(A) of subsection (a) of this section; or
> >
> > (ii) correction of registration records pursuant to this subchapter.

42 U.S.C. § 1973gg-6(c)(2)(B).  It is unclear why the exception in clause (ii) does not apply to the Secretary's program, but neither side says it does.  The exceptions in clause (i) do not apply here; they deal with removal of an individual who requests removal, or has a felony conviction or mental incapacity, or has died.  Thus paragraph (a)(3) deals with removal of names from the voter list:

> (A) at the request of the registrant;
>
> (B) as provided by State law, by reason of criminal conviction or mental incapacity; or
>
> (C) as provided under paragraph (4) . . . .

42 U.S.C. § 1973gg-6(a)(3).  Paragraph (a)(4)(A) in turn deals with removal on one additional ground:

42 U.S.C. § 1973gg-6(a)(4). The Secretary says subparagraph (a)(3)(B) allows removal on any ground "provided by State law," but that plainly is incorrect, first because that reading would render the rest of paragraph (a)(3)—and also section 8(c)(2)(A)—virtually superfluous, and second because in the vertical list with separate entries separately numbered and separated by semicolons, each separately numbered entry must be read as an integrated whole. The reference to removal "as provided by State law, by reason of criminal conviction or mental incapacity" thus means removal based on a criminal conviction or mental incapacity—but only to the extent state law provides for removal on those grounds. The suggestion that two wholly unrelated grounds for removal—"as provided by state law" and "by reason of criminal conviction or mental incapacity"—were set out in subparagraph (B), separated by a comma instead of a semicolon, is wrong.

	The United States says the Secretary's program is a "program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters," that none of the listed exceptions applies to the removal of noncitizens, and that section 8(c)(2)(A) thus prohibits the Secretary from continuing his program into the 90-day quiet period. The quiet period began on May16, 2012, which was 90 days before the scheduled August 14, 2012 primary.

    (A) the death of the registrant . . . .

42 U.S.C. § 1973gg-6(a)(4). The Secretary says subparagraph (a)(3)(B) allows removal on any ground "provided by State law," but that plainly is incorrect, first because that reading would render the rest of paragraph (a)(3)—and also section 8(c)(2)(A)—virtually superfluous, and second because in the vertical list with separate entries separately numbered and separated by semicolons, each separately numbered entry must be read as an integrated whole. The reference to removal "as provided by State law, by reason of criminal conviction or mental incapacity" thus means removal based on a criminal conviction or mental incapacity—but only to the extent state law provides for removal on those grounds. The suggestion that two wholly unrelated grounds for removal—"as provided by state law" and "by reason of criminal conviction or mental incapacity"—were set out in subparagraph (B), separated by a comma instead of a semicolon, is wrong.

    The United States says the Secretary's program is a "program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters," that none of the listed exceptions applies to the removal of noncitizens, and that section 8(c)(2)(A) thus prohibits the Secretary from continuing his program into the 90-day quiet period. The quiet period began on May16, 2012, which was 90 days before the scheduled August 14, 2012 primary.

On first reading, section 8(c)(2)(A) seems to say precisely what the United States claims. But a parallel NVRA provision indicates that this first reading is incorrect. Section 8(a)(3) requires a state to provide that "the name of a registrant may not be removed from the official list of eligible voters" with the specific exceptions quoted in part above—exceptions for the registrant's own request, criminal conviction or mental incapacity, death, or change of residence. 42 U.S.C. § 1973gg-6(a)(3). On first reading, this section—which applies at all times, not just in the 90 days before an election—seems to prohibit a state from ever removing from its voting list a noncitizen, even though the noncitizen should never have been registered in the first place.

But this is not what this section means. Both sides agree that a state can remove an improperly registered noncitizen; the United States challenges only a state's ability to do so as part of a systematic program during the 90-day quiet period. This conclusion is inescapable: section 8(a)(3)'s prohibition on removing a registrant except on specific grounds simply does not apply to an improperly registered noncitizen.

So section 8(a)(3)'s list of the grounds on which a "registrant" may be "removed" does not apply to removing an improperly registered noncitizen. Section 8(c)(2) provides a quiet period—90 days—during which a state cannot pursue a program to systematically "remove . . . ineligible voters." Surely

"removed" in 8(a)(3) and "remove" in 8(c)(2) mean the same thing. And there is no reason to believe the reference to removing a "registrant" in 8(a)(3) means something different than removing "ineligible voters" in 8(c)(2); by definition, someone who is being "removed" has already registered, so an "ineligible voter" is a "registrant." In short, if, as both sides concede, section 8(a)(3) does not prohibit a state from removing an improperly registered noncitizen, then 8(c)(2) does not prohibit a state from systematically removing improperly registered noncitizens during the quiet period.

This indicates that what Congress had in mind when it drafted these sections was removing a person on grounds that typically arise *after* an initial proper registration. Congress was not addressing the revocation of an improperly granted registration of a noncitizen. A person who was once properly registered can be removed from the voting list under section 8(a)(3) only for specific reasons: the person asks to be taken off the list, becomes ineligible under state law because of a criminal conviction or mental incapacity, dies, or changes residence. During the 90-day quiet period, a state may pursue a program to systematically remove registrants on request or based on a criminal conviction, mental incapacity, or death, but not based on a change of residence. What matters here is this: none of this applies to removing noncitizens who were not properly registered in the first place.

For noncitizens, the state's duty is to maintain an accurate voting list. *See*, *e.g.*, 42 U.S.C. § 1973gg-6(b). A state can and should do that on the front end, blocking a noncitizen from registering in the first place. And if a state finds it has made an error—or a number of errors—and wishes to correct the problem, it should do so well in advance. But the NVRA does not require a state to allow a noncitizen to vote just because the state did not catch the error more than 90 days in advance.

B

The United States bases its second challenge on NVRA section 8(b), which requires a state program that is intended "to protect the integrity of the electoral process"—by providing an "accurate" voter roll—to be "uniform" and "nondiscriminatory." 42 U.S.C. § 1973gg-6(b).

The Secretary's program, while he was pursuing it, probably ran afoul of this provision. The record indicates that the Secretary's program identified many properly registered citizens as potential noncitizens. Given the methodology, that is hardly surprising. The Secretary's proposal was to send letters to the listed individuals requiring a response and ultimately to require them to provide documentation of their citizenship. The Secretary's methodology made it likely that the properly registered citizens who would be required to respond and provide documentation would be primarily newly naturalized citizens. The program was

likely to have a discriminatory impact on these new citizens.  And while the Secretary suggests that having to respond to this kind of inquiry is of little import, that is not so.  A state cannot properly impose burdensome demands in a discriminatory manner.

## III

The Secretary says, though, that he has suspended the program and will not resume it.  He says he is seeking better information, specifically access to a database maintained by the United States Department of Homeland Security that, if used properly, should exclude from the Secretary's list the newly naturalized citizens, and perhaps others included on the Secretary's list in error.  A program that accurately identifies noncitizens who are registered to vote without unnecessarily challenging citizens could meet the requirement of uniformity and nondiscrimination.   And because, as set out above, such a program could be pursued even within 90 days of an election, there is no reason to believe, at this point, that the Secretary will engage in any future violation of the NVRA.

There is no need for an injunction prohibiting the Secretary from continuing with a program he has unequivocally said he will not continue. Support for this conclusion comes from the four-part test governing preliminary injunctive relief, as set out above, including the requirement that any such injunction be necessary to avoid irreparable harm.  And support also comes from the voluntary-cessation

doctrine as applied to public defendants. In this circuit a government entity that has discontinued challenged conduct enjoys a rebuttable presumption that the conduct will not recur. *See*, *e.g.*, *Bankshot Billiards, Inc. v. City of Ocala*, 634 F.3d 1340, 1351-52 (11th Cir. 2011) (collecting earlier cases). If the Secretary or the supervisors of elections go forward with the program the Secretary says he has abandoned, the issue can be revisited.

IV

For these reasons,

IT IS ORDERED:

The motion for a temporary restraining order, ECF No. 7, is DENIED.

SO ORDERED on June 28, 2012.

                                        s/Robert L. Hinkle
                                        United States District Judge